CLERK'S OFFICE
A TRUE COPY
Sep 21, 2020
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Louis Rey Perez, III, et al. | ) | Case No. **20-M-403 (SCD)** |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| _Defendant(s)_ | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____January 2017_____ in the county of _____present_____ in the
_____Eastern_____ District of _____Wisconsin_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), (b)(1)(A) 846, and 843(b); 18 U.S.C. §§ 924(c), 1956, 1957, and 2 | Distribution of and conspiracy to distribute a controlled substance; unlawful use of communications facilities; Possession of firearms in furtherance of drug trafficking; laundering of monetary instruments, and conspiracy to do so; and aiding and abetting the aforementioned offenses. |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

_____
_Complainant's signature_

Jeffrey Hale, DEA Task Force Officer
_Printed name and title_

Sworn via telephone; transmitted via email
pursuant to Fed. R. Crim. 4.1

Date: **9/21/20**

_____
_Judge's signature_

City and state:     Milwaukee, Wisconsin          Stephen C. Dries, U.S. Magistrate Judge
_Printed name and title_

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANTS

## I. INTRODUCTION

I, Jeffrey Hale, being duly sworn, do depose and state as follows:

1.    I am a state certified law enforcement officer employed as a Special Agent with the Wisconsin Department of Justice, Division of Criminal Investigation (DCI) and have been a sworn officer in the State of Wisconsin for approximately 24 years. I am currently assigned to the North Central High Intensity Drug Trafficking Area (HIDTA) Opioid Task Force. I am also a federally deputized Task Force Officer with the United States Department of Justice, Drug Enforcement Administration (DEA). As such, I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

2.    In connection with my official DCI and DEA duties, I investigate criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 924(c), 1956 and 1957, Title 21, United States Code, Sections 841, 843, 846, 848, 952, and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances. I have participated in the execution of multiple federal search warrants.

1

3.     I have received training in the area of controlled substances investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises.  I have participated in numerous investigations involving violations of state and federal controlled substances laws.  I have participated or assisted in numerous federal and state search warrants for narcotic related offenses that have resulted in the seizure of United States currency, vehicles, real estate, and jewelry from individuals involved in narcotics trafficking.

4.     I have authored and/or aided in investigations that have led to the issuance of numerous search warrants involving violations of both state and federal narcotic laws.  These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers.  Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized therefrom, monetary instruments, and various assets that were purchased with the proceeds of the drug trafficking.

5.     Through training, experience, and discussions with other experienced agents:

a.     I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other areas of the United States;

b.     I am familiar with the appearance and street names of various drugs, including marijuana, heroin, cocaine, and crack cocaine.  I am familiar with

2

the methods used by drug dealers to package and prepare controlled substances for sale. I know the street values of different quantities of the various controlled substances;

c. I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded, and coded. I also know the various code names used to describe controlled substances;

d. I know drug dealers often put telephones in the names of others (nominees) or obtain pre-paid cellular telephones from companies where no subscriber name or address is required to distance themselves from telephones that they use to facilitate drug distribution. Because drug traffickers go through many telephone numbers, they often do not pay final bills when they are done using a telephone number and then are unable to put another line in the name of that subscriber;

e. I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases, or the names of relatives, associates, or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

f. I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency to maintain and finance their ongoing drug business;

g. I know it is common for drug traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, and receipts relating to the purchase of financial instruments, and/or the transfer of funds and other papers relating to the transportation, ordering, sale, and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

h. I know it is common for large-scale drug traffickers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residences, their businesses, and/or other locations over which they maintain dominion and control, for ready access and to conceal these items from law enforcement authorities or rival drug traffickers. These secure locations include, but are not limited to safes, briefcases, purses, locked filing cabinets, and hidden storage areas in natural voids of a residence;

i. I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transferring, concealing, and/or expenditure of drug proceeds, such as currency, financial

3

instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the traffickers within residences (including attached and unattached garages), businesses or other locations over which they maintain dominion and control;

j. I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k. I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses that generate large quantities of currency;

l. I know drug traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, and/or telephone numbers of their associates in the trafficking organization;

m. I know drug traffickers take or cause to be taken photographs of themselves, their associates, their property, and their drugs. These traffickers usually maintain these photographs in their possession; and

n. I know a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. The operation is conducted using surveillance, usually audio and video taping equipment, and pre-recorded buy money. When an informant is used, he/she is searched for contraband, weapons, and money before the operation. The informant is also wired with a concealed body recorder and monitoring device. When the transaction is completed, the informant meets case agents at a pre-determined meet location and gives the purchased drugs and the recording/monitoring equipment to the case agents. The informant is again searched for contraband, weapons, and money. Additionally, all telephone calls made by the informant while under the direction and control of case agents are recorded.

6. In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the person(s)

4

in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

7.     Pursuant to my official duties, I am submitting this affidavit in support of an application for a criminal complaint, arrest warrants, and search warrants for property described in Attachment A, for violations of federal law, including violations of Title 21, United States Code, Sections 841(a)(1), 846, and 843(b), Distribution of, and Possession with Intent to Distribute, Controlled Substances; Attempt and Conspiracy to commit violations of Controlled Substances Offenses, including to Distribute and Possess with Intent to Distribute Controlled Substances; Use of Communications Facilities to Facilitate Controlled Substance Felonies; and, Title 18, United States Code, Sections 924(c), and 1956,   Possession of Firearms in Furtherance of Drug Trafficking; Money Laundering and Conspiracy to Commit Money Laundering; and,  Title 18, U.S.C. Section 2.

8.     Throughout this affidavit, reference will be made to case agents.  Case agents are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your affiant has had regular contact regarding this investigation.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5

9.    The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts.  Because this affidavit is being submitted for the limited purpose of securing search warrants and a criminal complaint, I have not included each and every fact known to me concerning this investigation.  I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations set forth above, occurred and that probable cause exists to believe that the property described in Attachment A, incorporated herein by reference, contain the items that are described in Attachment B.

## II.    INDIVIDUALS FOR WHOM A CRIMINAL COMPLAINT IS SOUGHT

|    | NAME | DATE OF BIRTH |
|----|------|---------------|
| 1  | Louis Rey PEREZ III, a/k/a Ocho, a/k/a Eight Ball | ███ 1997 |
| 2  | Xina YANG | ███ 1997 |
| 3  | Julian SANCHEZ, a/k/a Terps | ███ 1996 |
| 4  | Miguel SARABIA, a/k/a Ali MAS, a/k/a Ali MASSARI | ███ 1975 |
| 5  | Gabriel MATTESON | ███ 1998 |
| 6  | Louis Rey PEREZ, JR., a/k/a Pops | ███ 1974 |
| 7  | Manuel SOTO, a/k/a Roach, a//k/a  Grillo | ███ 1992 |
| 8  | Hauseng YANG | ███ 2002 |
| 9  | Antonio RODRIGUEZ, a/k/a Lil Mexico, a/k/a Grumpy, a/k/a Bump | ███ 1999 |
| 10 | Hector ARENAS | ███ 1993 |
| 11 | Luis F. GOMEZ, JR., a/k/a Scarecrow | ███ 2001 |
| 12 | Ivan J. GALAN, a/k/a Porky | ███ 1993 |

6

| 13 | Jose A. ALVARADO, a/k/a Jokes | ███ | /1996 |
|----|-------------------------------|-----|-------|
| 14 | Esteban REYES | ███ | /1974 |
| 15 | Kevin TAYLOR, a/k/a Eskimo | ███ | /1992 |
| 16 | Ma YANG | ███ | /1988 |
| 17 | Mary YANG | ███ | /1991 |
| 18 | Jasmine L. PEREZ | ███ | /1992 |
| 19 | Michael BUB, a/k/a Buddy | ███ | /1987 |
| 20 | Chong YANG, a/k/a Chongy | ███ | /1992 |
| 21 | Michele M. HART | ███ | /1965 |
| 22 | Mercedes HERBERT GONZALEZ | ███ | /1991 |
| 23 | Azia YANG | ███ | /2002 |
| 24 | Carina RODRIGUEZ | ███ | /2000 |
| 25 | Ger YANG | ███ | /2000 |
| 26 | Shayla A. KNUEPPEL | ███ | /1996 |

## III.    PROPERTIES FOR WHICH SEARCH WARRANTS ARE SOUGHT

10.    For the reasons discussed herein, there is probable cause to believe that located at and in the following properties, more fully described in Attachment A and collectively referred to as "PREMISES," are items that constitute evidence of drug trafficking, including violations of Title 21, United States Code, Sections 841 and 846; possession of firearms in further of drug trafficking, and money laundering, Title 18 United States Code, Sections 924(c), 1956 and 2.

a.    ███ S. 57th Street, West Allis, WI – Primary residence of Louis PEREZ III and Xina YANG. A check with WE Energies revealed that there has been an open account at this address in the name of Louis R. PEREZ, with telephone number (626) 733-███ (Target Telephone 1) since February 24, 2020.

b.    ███ E. Morgan Avenue, Milwaukee, WI – Primary residence of Ma YANG, Azia YANG, Carina RODRIGUEZ, and Michael BUB. A check with WE Energies revealed that there has been an open account at this

7

address in the name of Ma YANG with telephone number (414) 315-███ since June 30, 2020.

c.     ███ S. 6th Street, Milwaukee, WI – Suspected stash location for the DTO. Primary residence of Hector ARENAS. A check with WE Energies revealed that there has been an open account at this address in the name of Hector ARENAS, with telephone number (414) 499-███ since November 16, 2018.

d.     ███ N. 49th Street, Milwaukee, WI – Primary residence of Mary YANG. Location where marijuana vape cartridges are manufactured. A check with WE Energies revealed that there has been an open account at this address in the name of Brandon Jordan (whom case agents know to be the live-in boyfriend of Mary), with telephone numbers (414) 607-███ and (414) 552-███, since July 7, 2018.

e.     ███ S. 30th Street, Milwaukee, WI – Primary residence of Mercedes HERBERT GONZALEZ. A check with WE Energies revealed that there has been an open account at this address in the name of D.S., with telephone number (414) 643-███ since March 20, 2002. City of Milwaukee Property records show that D. S. is the owner of the property.

f.     ███ W. Florist Avenue, Milwaukee, WI – Primary residence of Ger YANG. A check with WE Energies revealed that there has been an open account at this address in the name of Kao YANG, with telephone numbers (916) 214-███ and (414) 758███, since May 20, 2020. Kao YANG is believed to be the mother of Ger YANG.

g.     ███ S. 15th Street, Milwaukee, WI – Primary residence of Kevin TAYLOR. A check with WE Energies revealed that there has been an open account at this address in the name of Martha Pacheco, with telephone numbers (414) 334███, since February 2005. Martha Pacheco is believed to be the mother of TAYLOR.

h.     ███ S. 25th Street, Milwaukee, WI – Primary residence of Chong YANG. A check with WE Energies revealed that there has been an open account at this address in the name of Jonathan VANG with telephone number (414) 708-███ since March of 2018. Jonathan VANG is the live-in boyfriend of Chong YANG.

8

i.	███ S. 21st Street, Milwaukee, WI – Primary residence of Minerva CRUZ, the mother of Manuel SOTO. A check with WE Energies revealed that there has been an open account at this address in the name of Jose Cruz with telephone number (414) 554-███ since September 30, 2016. Jose Cruz is believed to be the husband of Minerva Cruz.

j.	███ W. Pierce Street, Apartment #11, Milwaukee, WI – Primary residence of Jose ALVARADO. A check with WE Energies revealed that there has been an open account at this address in the name of Rosario CHAVEZ, with a telephone number (414) 233-███ since May of 2020. The relationship between Rosario CHAVEZ and ALVARADO is unknown.

k.	███ W. Galena Street, Milwaukee, WI – Primary residence of Hauseng YANG. A check with WE Energies revealed that there has been an open account at this address in the name of Eddie JAMES, with a telephone number (414) 394-███, since December of 2019. Eddie JAMES is the live-in boyfriend of Maihle YANG, who is the sister to Hauseng YANG.

l.	███ S. 26th Street, Milwaukee, WI – Recently purchased property of Louis R. PEREZ III. .According to WE Energies, on September 14, 2020, the utility holder at ███ S. 26th Street lists as "vacant." The prior utility holder is listed as J. S., with an account established in 1978 and disconnected on August 31, 2020.

m.	███ S. 25th Street, Milwaukee, WI – Recent PEREZ III stash unit. A check with WE Energies revealed that since September 8, 2020, the current utility holder is listed as "vacant." The prior utility holder, A.B., held utilities at this address from July 2019 until September 8, 2020.

n.	███ S. 10th Street, Milwaukee, WI, Primary residence of GOMEZ JR. A check with WE Energies revealed that since April 2018 an open account exists in the name of Martha Gonzalez (GOMEZ JR.'s mother). In addition, WE Energies lists ███ as the upper front unit.

o.	███ W. Lapham Street, West Allis, WI, Storage Unit ███ – Storage shed rented by Jasmine PEREZ and believed to be used by the DTO.

9

This storage unit is currently in the name of Jasmine PEREZ as of August 13, 2020.

p.       ██████ W. Lapham Street, West Allis, WI, Storage Unit ████ – Storage shed rented by Louis R. PEREZ III and believed to be used by the DTO. This storage unit is currently in the name of Louis Rey PEREZ as of August 13, 2020.

q.       Safe Deposit Box ██████, located at Wells Fargo Bank, 131 W. Layton Avenue, Milwaukee, WI. Jasmine PEREZ is the sole lessee of the safe deposit box.

r.       Safe Deposit Box ███████ located at U.S. Bank, 939 W. Historic Mitchell Street, Milwaukee, WI. Xina YANG is the sole lessee of the safe deposit box.

s.       Safe Deposit Box ██████, located at JP Morgan Chase Bank, 111 E. Wisconsin Avenue, Milwaukee, WI. Louis PEREZ III and Xina YANG are joint lessees of the safe deposit box.

11.    The following sub-sections set forth various types of information obtained during this investigation regarding the locations and persons described above. Such information includes but is not limited to the following: (1) information obtained from confidential sources; (2) electronic surveillance; (3) recorded conversations; and (4) physical surveillance. In addition, as part of the investigation, the Honorable Lynn Adelman, United States District Court Judge for the Eastern District of Wisconsin, issued Orders authorizing the interception of communications to and from cellular telephones used by Louis R. PEREZ III, Xina YANG, Julian SANCHEZ, and Miguel SARABIA, SANCHEZ's father, as well as a Snapchat account used by Louis R. PEREZ III.

10

12.    This investigation was initiated in September of 2018.  To date, case agents have determined that a group of individuals, including, but not limited to Louis R. PEREZ III, both known and unknown, are involved in a drug trafficking organization (DTO) that distributes marijuana, marijuana vape cartridges, and cocaine in the Eastern District of Wisconsin.  This DTO obtains marijuana and marijuana related products from Julian SANCHEZ and Miguel SARABIA, who operate in the Central and Northern Districts of California. The investigation has further revealed that, upon the sale of controlled substances in the Milwaukee, Wisconsin, area, DTO members mail drug proceeds using the United States Postal Service (USPS) to the California-based suppliers.

13.    Accordingly, those who participated in shipping drug proceeds (i.e. cash) as payment for drugs, in parcels bearing the names and/or addresses of nominees, have conspired to commit money laundering.  Moreover, every disguised shipment represents an overt act of the conspiracy and a specific violation of Title 18, U.S.C., Sections 1956 (a)(1)(B)(i) and (h), knowing the transaction is designed to conceal the nature, source, location, ownership or control of the proceeds, and Conspiracy to Commit Money Laundering. In sum, the currency shipped from Milwaukee, Wisconsin, to California, represents the proceeds from the sales of marijuana in the Eastern District of Wisconsin.  Those proceeds were shipped to the source of marijuana who resides in California, as payment for fronted marijuana, thus ensuring the continued receipt of marijuana to Milwaukee.

11

14.     For purposes of this affidavit, the following abbreviated names will be used throughout because many of the targets are related with identical last names. All other targets will be referred to by their last names.

| | NAME | REFERRED TO AS |
|---|---|---|
| 1 | Louis Rey PEREZ III a/k/a Ocho, a/k/a Eight Ball | PEREZ III |
| 2 | Xina YANG | XINA |
| 3 | Louis Rey PEREZ, JR., a/k/a Pops | PEREZ JR. |
| 4 | Ma YANG | MA |
| 5 | Mary YANG | MARY |
| 6 | Jasmine L. PEREZ | JASMINE |
| 7 | Hauseng YANG | HAUSENG |
| 8 | Ger YANG | GER |
| 9 | Chong YANG | CHONG |
| 10 | Azia YANG | AZIA |
| 11 | Carina RODRIGUEZ | CARINA |

## IV.     PROBABLE CAUSE

### A.     Background and Summary of Investigation

15.     In September 2018, members of North Central High Intensity Drug Trafficking Area (HIDTA) and the Drug Enforcement Administration (DEA) initiated an investigation into individuals distributing large quantities of cocaine and marijuana throughout Milwaukee, Wisconsin, and elsewhere. Law enforcement authorities identified the individual spearheading the DTO in Milwaukee, Wisconsin, as Louis R. PEREZ III (PEREZ III) (a/k/a "Ocho," and a/k/a "Eight Ball"), who has

12

been identified by law enforcement as a Mexican Posse gang member.[1] Upon further investigation, authorities learned that, beginning in at least January of 2017, Julian SANCHEZ (SANCHEZ) and Miguel SARABIA (SARABIA), SANCHEZ's father, who reside in California, are supplying the PEREZ III DTO with bulk marijuana, marijuana edibles[2], marijuana oils/waxes,[3] marijuana vape cartridges,[4] and/or other controlled substances.

16.     SANCHEZ obtains hundreds of pounds of marijuana from growers in northern California.   SANCHEZ, along with his relative, Gabriel MATTESON (MATTESON), package and send the marijuana through FedEx and UPS to numerous addresses in the greater Milwaukee, Wisconsin, area that are associated with the DTO. This has been confirmed by the seizure and search of two packages (one FedEx and one UPS), which contained marijuana and THC oil. Additionally, the investigation has revealed that the PEREZ III DTO manufactures "vape cartridges" containing THC oil, and that SANCHEZ and/or SARABIA also import supplies, to include vape cartridge tubes and boxes, which are then filled and assembled by DTO

---

[1]  Throughout this affidavit case agents have identified certain individuals as Mexican Posse gang members. This affliation has been identified based upon a review of Milwaukee Police Department records, which case agents have used in the past and found to be reliable.

[2]  Edibles are food items containing THC that are intended for human consumption.   Edibles containing THC are Schedule I controlled substances.

[3]  Marijuana wax is a resin concentrate that is extracted from cannabis oil.  Likewise, marijuana wax is a Schedule I controlled substance.

[4] Case agents believe that the PEREZ III DTO is purchasing pen vaporizer parts individually, filling and/or assembling the cartridges with THC oil shipped from California, and placing the cartridges in the "West Coast Cure CUREpen" and "Rove" boxes. "West Coast Cure CUREpen" appears to be a top-rated, high-end brand for THC vape cartridges that have been susceptible to outerfeiting issues.  THC, or tetrahydrocannabinol, is the primary psychoactive component of marijuana, a Schedule I Controlled Substance.

13

members once in Milwaukee. This has been confirmed by the seizure and search of five DHL packages, which contained high-end, top rated CUREpen and Rove vape cartridge boxes. Some of the DHL package labels have listed SARABIA's Telephone number, Target Telephone 7.

17. The PEREZ III DTO members then collect the packages that are sent to various DTO addresses in the City of Milwaukee, and transport these packages to various stash locations. Thereafter DTO members prepare the marijuana and marijuana-related products for distribution. PEREZ III distributes the marijuana and marijuana related products to mid-level distributors of the DTO in Milwaukee, Wisconsin. These mid-level distributors subsequently distribute the marijuana and marijuana related products to numerous customers in the greater Milwaukee, Wisconsin, area at times using the third-party application Snapchat, as well as other third-party telephone applications.

18. Marijuana vape cartridges are then assembled by the thousands on behalf of the PEREZ III DTO by DTO members who are primarily connected to XINA. JASMINE, PEREZ III's sister, as well as XINA, assist the DTO with laundering drug proceeds. Furthermore, JASMINE and ARENAS maintain stash locations for the DTO.

19. The above-referenced court authorized interceptions, combined with physical surveillance, reflect that the PEREZ III DTO has received at least 200 packages, believed to contain marijuana and THC oil, which have been delivered by FedEx and UPS, to at least eight different addresses. Additionally, case agents

14

estimate based on the number of DHL boxes received by PEREZ III DTO that the DTO has received at least 25,000 vape cartridge boxes and empty marijuana vape pens from DHL shipments that were imported from Hong Kong.

20.	Based upon their training, experience, and familiarity with the investigation, case agents believe that the PEREZ III DTO has distributed in excess of 1,000 kilograms of marijuana, a Schedule I controlled substance.

21.	Upon receipt and distribution of the controlled substances, the DTO either mails packages believed to contain bulk currency in the form of drug proceeds to SANCHEZ or has enlisted money couriers to transport the drug proceeds to California. Furthermore, on various occasions in 2020, case agents believe SARABIA traveled to Milwaukee, Wisconsin, to obtain drug proceeds.

22.	Since at least December 11, 2019, PEREZ III and Xina YANG (XINA), PEREZ III's live-in girlfriend who assists PEREZ III with DTO activities, have mailed at least 87 packages, believed to contain bulk U.S. currency, to SANCHEZ in California, using USPS. As of July 2020, the bulk currency packages were mailed to (1) SANCHEZ's grandparent's house, located at ▮▮▮ E. Valley View Avenue, West Covina, California; (2) A USPS postal annex located in Los Gatos, California; and, (3) SANCHEZ's residence in Costa Mesa, California. Later in the investigation, the DTO employed the use of couriers to send the bulk currency back to SANCHEZ.

23.	On April 16, 2020, two parcels that PEREZ III mailed to SANCHEZ were searched pursuant to sneak and peek warrants. Upon the execution of the search warrants, it was determined that each parcel contained $20,000 in U.S.

currency. Although PEREZ III and/or XINA use alias and addresses with no current ties to them to ship the packages, post office video surveillance, court-ordered location data from tracking devices on their vehicles and telephones, and court-authorized intercepted communications have confirmed their association with the packages.

24. Court authorized interceptions have also revealed that SARABIA assists the DTO with laundering drug proceeds through various bank accounts and LLCs, which he operates in conjunction with and at the location of his businesses. More specifically, through intercepted communications and surveillance, case agents have determined that SARABIA collects drug proceeds from PEREZ III, deposits those proceeds into a business account, and subsequently purchases business supplies with the drug proceeds. SARABIA also collects large amounts of U.S. currency in the Milwaukee, Wisconsin, and Chicago, Illinois, areas, and then makes structured cash deposits into various ATMs at different bank branches in Illinois.[5]

25. While the investigation to date has revealed that PEREZ III uses the Target Telephones to conduct DTO business, case agents also believe PEREZ III primarily communicates with some DTO members through third-party phone applications. The investigation has revealed that SANCHEZ and PEREZ III, as well

---

[5] Case agents believe that SARABIA also supplies PEREZ III with an unknown controlled substance other than marijuana related products. The investigation revealed that SARABIA traveled to Milwaukee, Wisconsin, in June, July, and August, 2020, and met with PEREZ III at PEREZ III's residence to collect drug proceeds. Intercepted communications have further revealed that PEREZ III is in debt to SARABIA by at least a six-figure sum of money for previously supplied controlled substances. Considering the operational information gleaned from the investigation, case agents believe that the logical explanation for the debt is that SARABIA supplies PEREZ III with a controlled substance independent of SANCHEZ and PEREZ III's marijuana distribution operation.

16

as other DTO members, use at least six other known third-party applications to communicate drug related business in addition to communicating over the Target Telephones. Case agents have determined through the investigation that these applications include, but are not limited to, Snapchat, Facetime, Wickr, Signal, WhatsApp, and Telegram. Case agents know that many of these applications use end-to-end encryption and are currently unable to be fully intercepted by law enforcement. In addition, the audio features of these applications allow the user of the application to place voice calls over the application in addition to other features of the application such as texting and/or messaging capabilities. Further, the investigation has revealed that PEREZ III uses the WhatsApp platform to communicate with SARABIA. The investigation has also revealed that DTO members, including but not limited to, PEREZ III, XINA, SOTO, HAUSENG, RODRIGUEZ, SANCHEZ, and CHONG use various social media accounts in furtherance of the DTO's activities.

26. Case agents believe that as a result of DTO's use of these various applications, the intercepted communications over the Target Telephones do not fully capture the depth of the DTO's involvement in criminal activity. Further, throughout this investigation several instances occurred where PEREZ III was intercepted over the Target Telephones; however, PEREZ III either immediately shifted the conversation away from criminal activity, or informed the other party that PEREZ III would call back the other party. Yet, no further communications were intercepted over the Target Telephones between PEREZ III and the other individual.

17

## B.    Confidential Source Information

### 1.    Information Obtained From Cooperating Source One (SOI #1)[6]

27.    On October 24, 2019, a federal search warrant was executed at ███ ████████████████████████████ the residence of SOI #1. During the course of the search, agents located the following: $12,000 in U.S. currency, a rifle with an extended magazine, a pistol, thirteen cellular telephones, a money counter, packaging materials including bags, scales, rubber gloves, and a vacuum sealer, and approximately 500 grams of cocaine.[7]

28.    Also on ██████████, 2019, SOI #1 was arrested in █████████████ on a federal arrest warrant issued in the ████████████████ charging SOI #1 with Conspiracy to Possess with Intent to Distribute and to Distribute a Controlled Substance. Upon arrest, SOI #1 provided information regarding PEREZ III.

29.    SOI #1 identified a photograph of PEREZ III and stated that SOI #1 knows PEREZ III by face, but doesn't know his real name. SOI #1 stated that SOI #1 only knows PEREZ III by the nickname of "Grenas." SOI #1 met PEREZ III approximately 1 ½ to two years before SOI #1's arrest. SOI #1 began supplying kilogram quantities of cocaine to PEREZ III shortly after meeting PEREZ III.

---

[6]  Beginning in late October of 2019, a source of information (SOI #1) made statements against SOI #1's penal interest. SOI #1 is cooperating in exchange for consideration on a pending federal narcotics case. Thus far, the information provided by SOI #1 has been corroborated by information known to case agents gathered during the course of this investigation. According to law enforcement databases, SOI #1 has no criminal record. Within the context of the information detailed and relied upon for purposes of this affidavit, law enforcement believes SOI#1 is credible and SOI#1's information reliable.

[7]  At the time of the search, this substance field tested positive for fentanyl; however, laboratory testing revealed that the substance is cocaine.

18

30. SOI #1 stated that PEREZ III split his time between Milwaukee and California, and SOI #1 did not supply drugs to PEREZ III on a regular basis. According to SOI #1, SOI #1 saw PEREZ III infrequently, and their encounters were for the sole purpose of conducting drug transactions. SOI #1 stated that PEREZ III was very close with PEREZ III's family members and did not trust very many people. SOI #1 stated that SOI #1's dealings were with only PEREZ III, and PEREZ III never brought anyone with him when obtaining cocaine from SOI #1. PEREZ III told SOI #1 that he preferred to conduct drug transactions himself so that PEREZ III could control the transaction better. SOI #1 did not know any of PEREZ III's customers.

31. SOI #1 stated that PEREZ III brings approximately 800-1,000 pounds of high-grade marijuana to Milwaukee from California each month for distribution in the Milwaukee area. PEREZ III also sells "vape pens" containing THC in the Milwaukee, area. PEREZ III told SOI #1 that PEREZ III makes more money selling marijuana than cocaine or heroin.

32. SOI #1 identified a photograph of PEREZ JR., PEREZ III's father, and stated that PEREZ JR. transported marijuana and cocaine from California to Milwaukee for PEREZ III. SOI #1 further stated that PEREZ III told SOI #1 that PEREZ JR. was involved in a traffic stop and arrested by the police. PEREZ III was upset and told SOI #1 that PEREZ III believed that someone "snitched" on PEREZ III, resulting in PEREZ JR. being stopped by the police. SOI #1 did not know what PEREZ JR. had in the vehicle, but knew that PEREZ JR. had a pending case as a result of the traffic stop.

19

33.     SOI #1 stated SOI #1 supplied PEREZ III with approximately 10 kilograms of cocaine per week over the last 1 ½ to two years when PEREZ III was in Milwaukee, and one kilogram of heroin around February or March of 2019. According to SOI #1, PEREZ III mainly sold kilogram quantities of cocaine and large amounts of marijuana.  SOI #1 stated that PEREZ III paid approximately $30,000 for a kilogram of cocaine and approximately $46,000 for a kilogram of heroin.  PEREZ III always paid SOI #1 in cash.  PEREZ III told SOI #1 about obtaining kilograms of methamphetamine, but SOI #1 had no direct knowledge of PEREZ III selling methamphetamine.

34.     SOI #1 stated that PEREZ III maintained an additional kilogram level cocaine source of supply in California and Milwaukee. PEREZ III told SOI #1 that even though the kilograms of cocaine cost a little more in Milwaukee than they do in California, it was sometimes easier and less risky for PEREZ III to obtain the cocaine in Milwaukee.  SOI #1 did not know how PEREZ III transported the cocaine to Milwaukee from California since PEREZ JR. was arrested.

35.     According to SOI #1, a few days before SOI #1 was arrested, PEREZ III contacted SOI #1 and requested seven kilograms of cocaine, but SOI #1 did not have any.  SOI #1 stated PEREZ III said that he would go to his "other guy," even though PEREZ III liked the quality of SOI #1's cocaine better. SOI #1 described himself/herself as the "back up supplier."

36.     According to SOI #1, PEREZ III told SOI #1 that PEREZ III had two "stash houses" in Milwaukee, but SOI #1 did not know where those houses were

located.

37.     SOI #1 further indicated PEREZ III told SOI #1 that PEREZ III had a customer who purchased kilogram quantities of heroin from PEREZ III, but that PEREZ III didn't like selling heroin. PEREZ III said that selling heroin was "dangerous." PEREZ III told SOI #1 that PEREZ III's heroin supplier was in Milwaukee.

38.     SOI #1 stated that SOI #1 had a telephone number for PEREZ III in one or more of SOI #1's cellular telephones, and that the number would be stored under the name "Grenas." SOI #1 frequently changed telephone numbers so SOI #1 could not say which one of SOI #1's phone had "Grenas'" phone number. SOI #1 recalled mainly texting and calling with PEREZ III, and stated that PEREZ III also frequently changed his telephone numbers.

39.     Pursuant to a lawful search of SOI #1's various telephones, case agents located a contact name of "Grenas" with the corresponding telephone numbers listed as "Mobile 213-238-███ and "Home 562-273-███" Both of these telephone numbers were intercepted in the ███████ investigation relating to SOI #1 and were used by PEREZ III.[8]

---

[8] At the time of SOI #1's interview, case agents were not in possession of the intercepted calls between SOI #1 and PEREZ III.

## 2. Information Obtained From Cooperating Source Two (SOI #2) [9]

40. On December 18, 2019, case agents met with SOI #2 regarding an ounce-level cocaine supplier in the Milwaukee, Wisconsin, area identified as Antonio RODRIGUEZ. SOI #2 stated RODRIGUEZ uses the street name of "Lil Mexico" and uses cellular telephone number (414) 704-█████ SOI #2 stated that RODRIGUEZ works for a larger supplier unknown to SOI #2. SOI #2 stated SOI #2 had recently seen RODRIGUEZ at a gas station on the south side of Milwaukee driving a gray Nissan Maxima. SOI #2 also observed an unknown Hispanic male, described as a larger build individual with braided long hair, with RODRIGUEZ. Case agents provided SOI #2 with a photograph of PEREZ III, and SOI #2 positively identified PEREZ III as the Hispanic male with RODRIGUEZ. An analysis of pen register data by case agents revealed that (414) 704-████ was in regular contact with one of PEREZ III's cellular telephones throughout January of 2020.

### *February 6, 2020, Arrest of Antonio RODRIUGEZ*

41. On February 6, 2020, at approximately 6:30 a.m., RODRIGUEZ was arrested on an outstanding felony arrest warrant for Possession with Intent to Distribute Cocaine and Carrying a Concealed Weapon, and his home located at ████

---

[9] In December 2019, SOI #2 provided information against SOI #2's penal interest. SOI #2 cooperated in exchange for consideration in a State of Wisconsin case involving Conspiracy to Distribute Cocaine. Thus far, the information provided by SOI #2 has been corroborated by other information gathered during the course of the investigation. According to law enforcement databases, SOI #2 has been arrested for Operating while Revoked, Operating without Owner's Consent, Disorderly Conduct, Possession with Intent to Distribute Cocaine, Manufacture/Delivery of Cocaine, Bail Jumping, Possession of Marijuana, and Operating while under the Influence. Within the context of the information detailed and relied upon for purposes of this affidavit, law enforcement believes SOI #2 is credible and SOI #2's information is reliable.

22

S. 18th Street, Milwaukee, Wisconsin, was searched. Law enforcement located the following items during the search: approximately $4,000 in U.S. currency, two pistols and a rifle, approximately 500 grams of cocaine, three cellular telephones, approximately 20 grams of marijuana, and packaging materials including bags and a vacuum sealer commonly used to package controlled substances. Two of the cellular telephones were identified with corresponding cellular telephone numbers (414) 704- █████ and (414) 232-█████

C.    **Court-Authorized Interceptions**

42.    Beginning on or around March 6, 2019, numerous court authorized interceptions of wire communications and/or electronic communications to and from various cellular telephones were conducted in the Southern District of Ohio. These interceptions continued off and on until October 27, 2019.

43.    During the course of the Ohio investigation, one of the targets of the Ohio investigation was an unidentified male (UM) determined to be a Wisconsin-based target and supplier for the Ohio investigation.

44.    During the Ohio investigation, PEREZ III was intercepted over three Ohio Target Cellphones, which were all used by the unidentified Wisconsin based supplier.

45.    On March 19, 2020, the Honorable Lynn Adelman issued an Order authorizing the interception of wire and electronic communications over telephone number (626) 733-█████ (Target Telephone 1), used by PEREZ III. The interception of Target Telephone 1 occurred from March 20, 2020, through April 18, 2020.

23

46.     On April 10, 2020, the Honorable Lynn Adelman issued an Order authorizing the interception of wire and electronic communications over telephone number (414) 499-███ (Target Telephone 3), used by PEREZ III, and telephone number (626) 629███ (Target Telephone 4), used by XINA. The interception of Target Telephones 3 and 4 occurred from April 10, 2020, through May 9, 2020.

47.     On April 24, 2020, the Honorable Lynn Adelman issued an Order authorizing the continued interception of wire and electronic communications over Target Telephone 1, used by PEREZ III. The interception of Target Telephone 1 occurred from April 24, 2020, through May 23, 2020.

48.     On May 15, 2020, the Honorable Lynn Adelman issued an Order authorizing the continued interception of wire and electronic communications over Target Telephones 1 and 3, used by PEREZ III, the continued interception of wire communications over Target Telephone 4, used by XINA, and the initial interception of wire communications over telephone number (213) 700-███ (Target Telephone 5), used by SANCHEZ. The interceptions of Target Telephones 1, 3, 4, and 5 occurred from May 15, 2020, through June 13, 2020.

49.     On June 24, 2020, the Honorable Lynn Adelman issued an Order authorizing the continued interceptions of wire and electronic communications over Target Telephone 1, used by PEREZ III, the continued interception of wire communications over Target Telephone 4, used by XINA, the continued wire communications and initial electronic communications over Target Telephone 5, used by SANCHEZ, the initial wire and electronic communications over telephone number

24

(562) 380█████ (Target Telephone 6), used by SANCHEZ, and the initial wire communications over telephone number (949) 534-████ (Target Telephone 7), used by Miguel SARABIA. The interceptions of Target Telephones 1, 4, 5, 6, and 7 occurred from June 24, 2020, through July 23, 2020.

50.     On August 4, 2020, the Honorable Lynn Adelman issued an Order authorizing the initial interception of wire and electronic communications over Snapchat account "Midwest_█████ used by PEREZ III. The interceptions of Snapchat account Midwest-█████ occurred from August 5, 2020, through September 2, 2020.

51.     On August 26, 2020, the Honorable Lynn Adelman issued an Order authorizing the continued interception of wire and electronic communications over Target Telephones 5 and 6, used by SANCHEZ, the continued interception of wire communications and initial interception of electronic communications over Target Telephone 7, used by SARABIA, and the initial interception of wire communications over telephone number (562) 306-███ (Target Telephone 8), used by SANCHEZ. The interceptions of Target Telephones 6, 7, and 8 began on August 26, 2020, and are scheduled to end on September 24, 2020. Interceptions did not begin over Target Telephone 5 due to the changed IMEI number.

52.     On August 28, 2020, the Honorable Lynn Adelman issued an Order authorizing the continued interception of wire and electronic communications over Target Telephone 5.  Interceptions began on August 28, 2020, and are scheduled to end on September 26, 2020.

## D. Additional Details Relating to Targets and Search Locations

53.     Identification of callers, phone numbers, and addresses referenced herein have been established over the course of the investigation through the investigative means discussed above, including many conversations of intercepted communications over several months, phone records, information for confidential sources, public records searches, and electronic and personal surveillance.   The intercepted calls[10] detailed below are provided solely as a sample of what case agents believe are numerous inculpatory interceptions with the identified below targets.

### Louis R. PEREZ III

54.     As discussed herein, Louis R. PEREZ III (a/k/a "Ocho," and "Eight Ball"), an Hispanic male born ███████ 1997, is a cocaine and marijuana trafficker who obtains these substances for further distribution to mid-level drug traffickers. PEREZ III resides at ████ S. 57th Street, West Allis, Wisconsin, which has been confirmed by investigation, surveillance, and review of utility records.   During the course of this investigation, case agents determined that PEREZ III has used several cellular telephones, including (626) 733-███ and (213) 529 ████ (Target Telephones 1), (414) 499-████ Target Telephone 3), and Snapchat account "midwest_███████ (Target Account 1).

---

[10]Some of the intercepted communications referenced in this Affidavit were originally conducted in Spanish and Hmong.  These communications were translated into English by certified monitors who are fluent in Spanish and/or Hmong and English.   Furthermore, the significance and meaning attributed to those intercepted communications are based on your Affiant's training, experience, and knowledge thus far derived from this investigation.

26

54. Since at least January of 2017, PEREZ III has been responsible for distributing large quantities of cocaine and marijuana throughout Milwaukee, Wisconsin. Family members and close associates assist the PEREZ III DTO with a myriad of tasks. As payment for marijuana obtained on consignment, or "fronted," the PEREZ III DTO uses the United States Postal Service and courier services to send bulk cash to marijuana supplier Julian SANCHEZ.

## *PEREZ III and XINA's Involvement with Eight Kilogram Seizure of Cocaine from PEREZ JR. in Utah*

55. On September 25, 2018, PEREZ III, Xina YANG (XINA), PEREZ III's live-in girlfriend, and PEREZ JR., PEREZ III's father, were driving from California to Wisconsin. PEREZ JR. was driving a Ford F-150 truck, while PEREZ III, with XINA as a passenger, was driving a Chevrolet Suburban with California plates. At approximately 2:47 a.m., PEREZ JR. was stopped by Utah Highway Patrol because his truck's registration plate did not return to the truck. While stopped, PEREZ III called PEREZ JR., and PEREZ JR. asked PEREZ III to wait for him at the next exit.

56. A canine trained in drug detection alerted on PEREZ JR.'s truck, which PEREZ JR. gave officers consent to search. A subsequent search of PEREZ JR.'s truck revealed a hidden hydraulic compartment in the rear seat area, which contained eight packages of cocaine wrapped in plastic wrap, totaling eight kilograms. PEREZ JR. denied knowing cocaine was located in his truck.

57. PEREZ JR. was arrested for Possession with Intent to Deliver Cocaine, and he subsequently provided conflicting information in a post-arrest *Mirandized* interview. He stated that he had been in California, whereas previously he told

27

arresting officers he had been in Las Vegas. PEREZ JR. further stated that PEREZ III and XINA drove with him in the truck from Milwaukee to California, but PEREZ III and XINA rented a truck in California because they did not want to make the return trip to Milwaukee "inconvenient" for PEREZ JR. PEREZ JR. was released on bail after his interview. On September 25, 2018, PEREZ JR., PEREZ III, and XINA departed Los Angeles, California, on the same American Airlines flight, which arrived at Chicago O'Hare airport in the early morning hours on September 26, 2018.[11]

58.    Hotel records reflect that on September 21, 2018, XINA rented two rooms at a Best Western in Indio, California, through September 25, 2018. XINA provided PEREZ JR.'s address, and it appeared as though PEREZ III signed the rental agreements for both rooms. The room charges were paid for with cash and a credit card. XINA also booked all of the return flights on September 25, 2018, using her Wells Fargo Bank debit card, after she received a $2,000 deposit into her Wells Fargo bank account at a branch location in St. George, Utah.

59.    Additionally, on September 21, 2018, PEREZ III and PEREZ JR. activated two pre-paid phones, with which they used to communicate until PEREZ JR. was stopped with the eight kilograms of cocaine. PEREZ JR.'s prepaid phone was located in his truck, next to his "personal" phone. A review of the download of PEREZ JR.'s prepaid phone identified the only listed contact as "L." When PEREZ JR. was

---

[11]   In the above-referenced case issued out of the District of Utah, PEREZ JR. pleaded guilty to Possession of Cocaine with Intent to Distribute pursuant to Title 21, U.S.C., Section 841(a)(1). On February 19, 2020, United States District Judge David Nuffer, District of Utah (Southern Region) sentenced PEREZ JR., in part, to 60 months' incarceration.

arrested, he stated that PEREZ III purchased the prepaid phone on September 21, 2018, using an unknown subscriber, and that he used it only for the GPS feature. Notably, the day after this traffic stop, PEREZ III cancelled a phone number that he had activated on July 26, 2017, and established a new number.

60.     Based upon their training, experience, and familiarity with this investigation, case agents believe that PEREZ III and XINA likewise possessed the eight kilograms of cocaine seized on September 25, 2018, in Utah, and concealed their possession of it through PEREZ JR. Case agents further believe that this seizure corroborates information that the PEREZ III DTO transported kilogram quantities of cocaine from California to Wisconsin.

### *PEREZ III DTO Receives Controlled Substances Via Shipping Companies and through the Mail*

61.     Intercepted communications over Target Telephones 1 and 4, as well as contemporaneous surveillance of DTO members, have revealed that PEREZ III coordinates the shipment of packages containing suspected controlled substances to various DTO associate residences in Milwaukee, Wisconsin.

62.     These addresses include but are not limited to ███ W. Crawford Avenue, Milwaukee, Wisconsin (prior residence of ALVARADO and KNUEPPEL); ███ S. 30th Street, Milwaukee, Wisconsin (residence of HERBERT GONZALEZ); ███ W. Burnham Street, Milwaukee, Wisconsin (prior residence of MA and BUB); ███ S. 17th Street, Milwaukee, Wisconsin (prior residence of HART); and ███ E. Morgan Avenue, Milwaukee, Wisconsin (prior residence of PEREZ JR. and current residence of MA, BUB, and other YANG family members).  Furthermore, interceptions over

29

Target Telephones 1 and 4 reflect that the DTO associates know of and are assisting PEREZ III in receiving packages at their residences. Interceptions over Target Telephones 1 and 4, pen register information, and surveillance have also established that XINA facilitates delivery of some of the packages to MA and MARY, XINA's relatives. Finally, based on physical surveillance, most of the packages received by the DTO appear to have been or are currently transported primarily to PEREZ JR.'s prior residence and MA and BUB's current residence (███ E. Morgan Avenue); and, residences believed to be serving as a DTO stash locations, (███W. Pierce Street, Apartment #201), Hector ARENAS's residence (███ S. 6th Street), and MARY's residence (███ N. 49th Street).

 63. Case agents are aware that with respect to the FedEx packages, (1) PEREZ III routinely tracks many of these packages on his cell phone and expressed concern for some of the packages' whereabouts when they fail to arrive in the expected timeframe, which was reflected in intercepted communications over Target Telephone 1 with Fed Ex; (2) interceptions on Target Telephones 1 and 4 established that PEREZ III coordinates the delivery and retrieval of the packages among the DTO members; (3) based on surveillance, the DTO uses multiple members, vehicles, and counter surveillance techniques to retrieve packages from the various addresses in Milwaukee, Wisconsin; (4) at least some of the packages were in the name of aliases; and (5) upon receipt of at least one of the packages, PEREZ III, using Target Telephone 1, called SANCHEZ to confirm receipt. Based upon their training, experience, and familiarity with this investigation, Case agents believe that the

FedEx packages contained a large quantity of controlled substances because of the above-described manner where PEREZ III distanced himself from these packages.

64. On April 29, 2020, two DTO-related packages were intercepted. Case agents seized one package from FedEx, which package was searched pursuant to a warrant. This search revealed approximately 9.64 pounds of marijuana and approximately 237 grams of THC oil, which was packaged in one-gram quantity plastic containers. Later that same day, UPS, in accordance with UPS policy, opened another box that smelled of marijuana. The package contained approximately 2,029 grams of THC oil, which was also packaged in one-gram quantity plastic containers. UPS then contacted law enforcement regarding the contents of the package. Case agents thereafter seized this UPS package.

65. Throughout April 29 and 30, 2020, both PEREZ III and XINA contacted FedEx and UPS numerous times, inquiring about the whereabouts of the packages that had been intercepted. On May 1, 2020, after learning about the interceptions of the two packages containing controlled substances, PEREZ III changed both of their phone numbers, and SANCHEZ changed his phone number.

66. In early April 2020, DHL opened five packages that arrived to its facility from Hong Kong and that were destined for at least three separate addresses, including PEREZ JR.'s prior residence and HART's prior residence. Because the packages were sent internationally from Hong Kong, Customs and Border Patrol (CBP) opened the packages, revealing hundreds of "West Coast Cure CUREpen – 1000 mg THC," "Rove Tangy Sativa," and "Rove Dream Hybrid," vape cartridge boxes,

31

which included plastic inserts designed to hold vape cartridges that contain THC oil. Based upon case agents training, experience, and familiarity with the investigation, case agents believe the cartridges are commonly used to consume THC oil through "vaping." Two of the packages were addressed to "Luis Perez, ███ E. Morgan Avenue, Milwaukee, WI 53207 USA." The label on both of these packages listed the following contact phone number for the recipient: (949) 534-███ (Target Telephone 7), which is a number associated with Miguel SARABIA, SANCHEZ's father. All packages were ultimately delivered to the respective residences.

67.     Based upon the investigation, including the incoming shipment of THC oil as well as the CUREpen and Rove vape cartridge boxes, and the intercepted communications wherein the DTO members discussed the acquisition and assembly of the vaporizing pen parts, case agents believe that the DTO manufactures and distributes "vape cartridges" containing THC oil in the Milwaukee area. Specifically, case agents believe that the DTO purchases the pen vaporizer parts individually, filling and/or assembling the cartridges with THC oil shipped from California and putting the cartridges in the "West Coast Cure CUREpen" and "Rove" boxes.

68.     Additionally, case agents obtained a search warrant for PEREZ III's iCloud account. After reviewing the information received as a result of the search warrant, case agents found an email, dated October 19, 2019, from PEREZ III and XINA's previous landlord. The landlord expressed a concern regarding drug activity at ███ Rose Lane, Vallejo, California, a residence PEREZ III and XINA's were renting at the time. Attached to this email was a photograph depicting a "Shark 710" oil filling

32

machine. Case agents' online research revealed that the "Shark 710" machine is marketed to the Cannabis and CBD oil market and is priced between $13,000 and $15,000. The machine is fully automated and is capable of filling 100 cartridges in an average of 30 seconds. Furthermore, based upon surveillance and interceptions over the Target Telephones, case agents believe that MARY, GER, MA, AZIA, CHONG, CARINA, and others are assisting the DTO with the manufacture of the vape cartridges at MARY's residence at ███ N. 49th Street, Milwaukee.

### *PEREZ III also uses Stash Locations to Conceal Contraband*



**███ W. Pierce Street, Apartment ███ Milwaukee, Wisconsin**

69. On April 10, 2020, case agents installed a remote camera at the DTO's suspected stash apartment, the Knitting Factory Lofts, located at ███ W. Pierce Street, Apartment ███ Milwaukee, Wisconsin (the Pierce Street stash apartment).

70. In the early morning hours of April 12, 2020, case agents obtained six large black garbage bags from the dumpster in the parking lot associated with the Pierce Street stash apartment, four of which were determined to be associated with Apartment ███ An analysis of the remote camera footage by case agents revealed that numerous black garbage bags were removed from the apartment. Case agents recovered a total of 498 "Shield N Seal" brand vacuum sealed bags some of which continued to maintain the odor of fresh marijuana. Based upon their training and experience, case agents know that the bags recovered from the garbage are commonly used to transport marijuana, and each individual bag, when full, holds approximately

33

one pound of marijuana.  Further, case agents observed that the inside of each bag was wet and appeared to have been rinsed out to remove any marijuana residue.

71.    Based upon their training, experience, and familiarity with this investigation, case agents believe that the PEREZ III DTO used ███ W. Pierce Street, Apartment #201, Milwaukee, Wisconsin as a stash location. Furthermore, case agents' review of remote surveillance and positional cell phone data revealed that PEREZ III and XINA frequented the Pierce Street stash apartment. Remote surveillance and interceptions over Target Telephones 1, 3, and 4 further reflect that other DTO members have access to and/or have been observed on multiple occasions at the Pierce Street stash apartment, to include SOTO, RODRIGUEZ, GOMEZ JR., JASMINE, PEREZ III, XINA, REYES, GALAN, HAUSENG, PEREZ JR. (prior to reporting to prison) and several other unidentified individuals. On various occasions, the DTO members, including SOTO, RODRIGUEZ, GOMEZ JR., PEREZ III, and REYES, along with other unidentified individuals, have been observed carrying both into and out of the stash apartment large boxes and bags, which case agents believe are associated with the DTO's marijuana trafficking.

## ███ S. 6th Street, Milwaukee, Wisconsin

72.    Case agents believe that, in addition to the Pierce Street stash apartment, PEREZ III also uses Hector ARENAS's house, ███ S. 6th Street, as an additional "stash" location for storing the DTO's controlled substances. Case agents have observed PEREZ III bring boxes to ARENAS's house. Case agents have also observed PEREZ III walk in and out of ARENAS's house with duffel bags before

34

engaging in what case agents believe to be drug transactions. Case agents have observed other DTO members at this residence. These members include SOTO, RODRIGUEZ, GOMEZ JR., PEREZ III, XINA, MARY, GER, and REYES. During numerous hours of surveillance conducted at the residence, case agents have observed many instances of drug trafficking activity, including but not limited to, packages and bags going in and out of the residence. Additionally, in a court-authorized intercepted communication over Target Telephone 1 between PEREZ III and ARENAS, as detailed below, ARENAS informed PEREZ III that police may be in route to his house. PEREZ III then directed ARENAS to hide the guns and any other contraband in the basement, lock the doors to the house, go outside, and refuse officers entry to his house.

73. On May 30, 2020, at 11:58 p.m., ARENAS, using (414) 366-███ called PEREZ III, using Target Telephone 1. During this call, ARENAS advised PEREZ III that ARENAS and his girlfriend had been involved in an argument and ARENAS's girlfriend called the police. ARENAS stated, "…she was calling the cops, [U/I] that I am a drug dealer and all types of shit bro." Later in the conversation ARENAS stated, "She was beating my ass bro so if they come here bro and they c--, Imma wait outside. I'm not gonna let them come in or knock on my door." Based upon their training, experience, and familiarity with the investigation, case agents believe that ARENAS informed PEREZ III that ARENAS had been involved in a physical altercation with his girlfriend, and he was worried that she told the police ARENAS was a drug dealer. Further, ARENAS informed PEREZ III that ARENAS was not

35

going to let the police enter the residence and would wait outside for the police to arrest him.

74.    In response PEREZ III stated, "No, lock everything in your house dawg, lock the doors. Then put everything-put the guns, put all the guns downstairs. Grab your keys man and hide 'em bro. Hide them somewhere outside dawg."  ARENAS asked, "Hide what outside?"  PEREZ III replied, "Like lock your doors. Lock all your doors to your house and go outside, bro, and then just grab your keys and put 'em in the bucket outside bro."  Based upon their training, experience, and familiarity with the investigation, case agents believe that PEREZ III told ARENAS to lock up the stash house and hide all of the stored guns. PEREZ III also directed ARENAS to hide the keys so that the police couldn't access the house.  ARENAS replied, "Alright. [U/I] guns right now dawg."  PEREZ III replied, "Yeah, just put the all guns in the basement, bro."  Case agents believe that at the direction of PEREZ III, ARENAS hid all of the guns stored at the residence in the basement at ████ S. 6th Street.

### ████ S. 26th Street, Milwaukee, Wisconsin

75.    In September 2020, case agents reviewed a recorded video jail call placed by SOTO to PEREZ III on September 3, 2020, at 4:02 p.m., while SOTO was in custody.  The video call depicted both SOTO and PEREZ III.  During the call, case agents observed PEREZ III driving with an unknown passenger holding the telephone while PEREZ III talked to SOTO.  While PEREZ III drove the vehicle, case agents observed the phone facing out the front window.  SOTO commented, "That's by Mineral and 26."  On the video, case agents were able to observe that PEREZ III

traveled south on South 26th Street from Mineral. Case agents were further able to observe PEREZ III's route to █████ S. 26th Street. Eventually PEREZ III parked behind a residence on the west side of South 26th Street. Case agents observed that there was no garage behind the residence. PEREZ III exited the vehicle and walked to the front of the residence. PEREZ III stated, "There's gonna be plenty of spots bro. Plenty, like four or five spots you can choose from." Case agents know that PEREZ III is actively purchasing various properties in the Milwaukee area. SOTO declared, "I want that one." PEREZ III laughed and stated, "It's yours, primo." PEREZ III walked to the front door and opened it. Case agents heard the sound of jingling keys in the background, but the video did not depict PEREZ III actually unlocking the door.

76.    In the video, case agents observed that PEREZ III appeared to be showing the house to SOTO. Case agents observed RODRIGUEZ and an unknown acquaintance of PEREZ III's sitting inside of the residence on a couch. PEREZ III stated to SOTO that the house was "his," and that he had recently purchased it from "an old lady."[12] During SOTO's video tour of the property, case agents observed some furniture inside the residence. Based upon their training, experience, and familiarity with the investigation, case agents believe that PEREZ III and his associates are currently using the residence.

---

[12] Because of COVID-19, case agents know that the Milwaukee Register of Deeds has been unable to update property records contemporaneously with closings. Thus, the sale of this property has not yet been updated.

77.     Case agents examined the GPS data corresponding to the device affixed to PEREZ III's known vehicle, the Chevrolet Impala.  Case agents observed that the Impala was parked at or near the residence on August 28, 2020, at 9:04 a.m., 10:50 a.m., and 5:30 p.m.  On August 29, 2020, the Impala was again parked at or near the residence at 2:46 p.m. and again at 3:00 p.m.  Further, On August 31, 2020, PEREZ III's Impala was parked at or near the residence at 12:06 p.m. and again at 5:04 p.m.  In addition, on September 1, 2020, the Impala was again parked at or near the residence at 2:32 p.m.  The majority of the stops listed above were for a short duration (i.e., ranging from two minutes to 37 minutes).  Case agents thus believe that this residence is also currently used as a stash house for the PEREZ III DTO.

78.     Case agents also examined the data related to the GPS device affixed to RODRIGUEZ' Nissan Maxima.  Case agents observed that the Nissan was parked at or near the residence on September 11, 2020, at 10:40 p.m. and stayed for approximately one minute, and again on September 13, 2020, at 12:44 a.m., where it stayed for approximately ten minutes.

79.     Case agents know that the members of the PEREZ III DTO use multiple vehicles.  Therefore, the GPS data noted above only serves as an example of the PEREZ III DTO's use of this residence.

80.     Case agents checked with WE Energies and the check revealed that J.S. held the utilities at this property from 1978 through August 31, 2020.  As of September 14, 2020, the current utility holder for ███ S. 26th Street is listed as "vacant."

38

**█████ S. 25th Street, Milwaukee, Wisconsin**

81.     On July 2, 2020, at 4:44 p.m., XINA, using Target Telephone 4, called Chong VANG (CHONG), XINA's relative, using (414) 639-████ XINA asked, "Can you tell your landlord that he wants the upstairs?" CHONG stated, "I can do that. Why?" XINA replied, "Cause he still wants the upstairs." CHONG agreed, "Okay, I can do that." Case agents believe that PEREZ III wanted to rent the upper unit of CHONG's residence at ████ S. 25th Street to use as an additional stash location for the PEREZ III DTO. Based upon their familiarity with the investigation, case agents know that PEREZ III uses numerous stash residences to facilitate the drug trafficking activities of the DTO.

82.     On September 8, 2020, case agents conducted surveillance of PEREZ III, Antonio RODRIGUEZ, and Hector ARENAS. At approximately 5:18 p.m., PEREZ III, operating a white Hyundai, and RODRIGUEZ, operating his Nissan Maxima, arrived at ████ S. 6th Street, the residence of ARENAS, and entered the residence. At approximately 5:48 p.m., case agents observed PEREZ III, RODRIGUEZ, and ARENAS exit the west side entry door of ████ S. 6th Street. Each of the aforementioned men carried a large box with orange writing. During the course of the investigation, case agents have observed FedEx and/or UPS deliver similar boxes to the DTO.

83.     Case agents observed RODRIGUEZ, PEREZ III, and ARENAS load up the boxes into ARENAS's Explorer. At approximately 5:52 p.m., ARENAS, RODRIGUEZ, and PEREZ III re-entered ████ S. 6th Street. Case agents again

39

observed ARENAS exit the residence carrying a box, which he placed into the Explorer. Following ARENAS, PEREZ III, and RODRIGUEZ exited the residence. PEREZ III, RODRIGUEZ, and ARENAS entered their respective vehicles and all three vehicles left the area, following each other.

84. After extensive counter surveillance by PEREZ III, RODRIGUEZ, and ARENAS, where it appeared that ARENAS identified one of the undercover law enforcement vehicles, case agents observed all three briefly circle the area surrounding ███ S. 25th Street. The vehicles, operated by RODRIGUEZ, PEREZ III, and ARENAS parked at the rear of ███ S. 25th Street. The Explorer (ARENAS) backed into a parking spot at the rear of the residence. Simultaneously, case agents had been monitoring the data associated with the GPS devices affixed to ARENA's Explorer and RODRIGUEZ's Nissan. A review of GPS data corresponding to each vehicle confirmed the above-referenced physical surveillance. Because of the location of the parked vehicles, and fearing detection, case agents were unable to determine whether any of the boxes were unloaded.

85. In addition, case agents examined the data corresponding to the GPS device affixed to PEREZ III's Impala, as well as additional information related to the GPS devices for ARENAS's Explorer and RODRIGUEZ's Nissan. A review of the data associated with the GPS device affixed to PEREZ III's Impala revealed that on September 11, 12, 14, and 15, 2020, PEREZ III's Impala was parked at ███ S. 25th Street at various times during those days, with stops ranging from fifteen minutes to seven hours. The data corresponding to the GPS device affixed to ARENAS's

Explorer revealed that the Explorer was parked at ███ S. 25th Street on September 9, 13, and 15, at various times those days, with stops ranging from eight minutes to thirty minutes. The data corresponding to the GPS device affixed to RODRIGUEZ's Nissan revealed that the Nissan was parked at ███ S. 25th Street on September 9, 10, and 11, at various times during those days, with stops ranging from eight minutes to twenty-two minutes. Based upon case agents' familiarity with the investigation, to include but not limited to physical and electronic surveillance, case agents believe the activity at this location is recent. Before September 8, 2020, members of the PEREZ III DTO did not frequent ███ S. 25th Street on a regular basis. Therefore, based upon their training, experience, and familiarity with the investigation, case agents believe that PEREZ III is now using the upper unit, ███ S. 25th Street, as an additional stash location for the DTO.

86.     On September 15, 2020, in the afternoon, while conducting surveillance a case agent observed ARENAS exit the door corresponding to the upper residence, ███ S. 25th Street, Milwaukee, Wisconsin.

87.     Further, on September 15, 2020, case agents obtained account holder information from WE Energies for ███ S 25th Street, Milwaukee, Wisconsin. This check revealed that since September 8, 2020, the current utility holder for ███ S. 25th Street is listed as "vacant." The prior utility holder, A.B., held utilities at this address from July 2019 until September 8, 2020.

### PEREZ III DTO distributes Marijuana and Related Products through Snapchat

88.     On May 12, 2020, the Honorable William E. Duffin, United States Magistrate Judge, authorized a search warrant for XINA's Snapchat account "ladie█████" discussed below, and PEREZ III's Snapchat account, "midwest_█████" Target Account 1. After the information authorized by the warrant was returned to case agents, an analysis of the information contained in PEREZ III's account revealed numerous conversations regarding the sales of marijuana, two photographs of kilogram quantities of cocaine, and numerous chats indicative of marijuana and cocaine distribution.

89.     Additionally, the court-authorized interceptions over the Target Telephones reflected numerous calls between PEREZ III and others discussing "Midwest Connect" or "Midwest Connected," leading case agents to believe that PEREZ III has named the marijuana distribution business "Midwest Connected" and/or "Midwest Connect." Case agents further know that the DTO packages controlled substances in bags bearing a "Midwest Connected" custom label. For example, throughout April and May 2020, PEREZ III, using Target Telephone 1, was intercepted communicating with a phone number believed to be used by a vendor, Adam █████ regarding the size, design, and cost of bags bearing the label "Midwest Connected," which bags PEREZ III uses to package controlled substances.

90.     On April 15, 2020, at 11:51 a.m., PEREZ III, using Target Telephone 1, called █████, using telephone number (408) 621-████ During this call, PEREZ III identified himself as "Ocho" from "Midwest Connected." Additionally, on May 2,

2020, PEREZ III sent two text messages to ████████that stated, "Do u have tracking for the bags?" and "Is that Fe[d] ex?" Based upon the investigation to date, case agents believe that PEREZ III was awaiting a shipment of "Midwest Connected" bags to package controlled substances and attempted to gain clarification from ████████ regarding whether ████████ used FedEx to ship the bags.

91.     Furthermore, on May 2, 2019, United States Postal Inspection Service (USPIS) located a suspicious Priority Mail Express package shipped from Vallejo, California, to MA's residence, XINA's sister, at ████ W. Burnham Street, Milwaukee, Wisconsin. USPIS opened the package and located approximately 2,341 grams of marijuana (approximately 5.15 pounds). The marijuana was packaged in five separate bags, all of which bore the label "Midwest Connected." Case agents know that the MA is currently receiving packages of suspected controlled substances, and case agents further believe, based on intercepted calls over Target Telephone 4, that MA assists the DTO by, in addition to receiving packages containing suspected controlled substances, assembling marijuana vape cartridges and preparing and packaging drug proceeds that are thereafter mailed to SANCHEZ in California.

92.     Additionally, over Snapchat PEREZ III frequently requests customers to "verify," (i.e., PEREZ III directs customers to send videos of themselves smoking "product," requests customers to tell PEREZ III how the customer "got this snap," and requests customers to "verify" by sending snaps with "product and cash."). For example, on April 14, 2020, PEREZ III, using Target Account 1, sent Snapchat account "bang_████ chat text messages which stated, "u need to verify," "Make sure

43

u not police," and "I need a video of u smoking an product." On April 15, 2020, Snapchat account "bang_███████replied, "You want me to record now?" On April 16, 2020, PEREZ III responded, "Whenever u blow."

93.    PEREZ III's Snapchat Story dated May 11, 2020, stated, "From now on every Sunday and Tuesday Shop will be closed but u can still get right with my brothers @h██████3 @m██████66 @m█████p."



94.    Based upon information obtained through court authorized search warrants, as well as knowledge of this investigation, case agents know that: (1) HAUSENG is the user of Snapchat account "h████3" because the account uses HAUSENG's first name; the telephone number listed on the subscriber information for the account is (414) 722-████ which is a telephone number that has been confirmed to be used by HAUSENG through intercepted communications on Target Telephones 1 and 4; and, a search warrant return for the account depicted HAUSENG; (2) SOTO is the user of Snapchat account "manuels████ because the account uses SOTO's first name and the initial of his last name; and a search warrant return on SOTO's Instagram account reflected photographs of SOTO as well as a screen shot of a Snapchat icon dated October 13, 2019, depicting the user name

44

"m███████6;" and (3) RODRIGUEZ is the user of Snapchat account "m███
███p" because a search warrant return for the account depicted RODRIGUEZ.
Further, RODRIGUEZ routinely uses the nickname "Bump" and/or "Bump/Bump."
Case agents further believe, based upon interceptions and surveillance, that
HAUSENG, SOTO (prior to his arrests), and RODRIGUEZ are active participants in
the PEREZ DTO, and serve as DTO distributors. Accordingly, case agents believe
that this Snapchat Story reflects that HAUSENG, SOTO, and RODRIGUEZ are
assisting PEREZ III with distribution in Milwaukee, and that PEREZ III directs his
customers to DTO distributors to purchase controlled substances.

95.     PEREZ III's Snapchat Memory dated April 1, 2020, stated, "I'm all sold
out so hit me up my brothers if u wana get good Midwest Connected shit #otw shit
@h████3 @m███████6."



96.     Case agents believe that through this Snapchat memory, PEREZ III
directed his customers to contact HAUSENG and SOTO through their Snapchat
accounts to obtain controlled substances.

97.     Target Account 1 contained hundreds of photographs and/or videos
depicting processed marijuana, different marijuana strains, marijuana edibles, vape

45

cartridges, marijuana wax, large marijuana grows, greenhouses, photographs of PEREZ III, large amounts of U.S. currency, photographs of receipts from shipping companies showing shipments to Milwaukee, lists of what was available and prices for "packs" (pounds) of marijuana broken down by strain and amount available for sale, photographs of "Midwest Connected" packaging bags, packaged one-pound quantities of marijuana inside of vacuum sealed bags, and packaged THC "wax" in one-gram containers similar to what was intercepted by law enforcement on April 29, 2020. A few examples are below.







98. Several of the photographs depict marijuana "wax" both in containers as well as large amounts of "loose" marijuana wax on what appear to be wax paper. Further, visible in the photographs are cardboard boxes similar to the cardboard boxes that case agents retrieved from the April 12, 2020, trash search at ██ W. Pierce Street, Milwaukee, Wisconsin, as well as the boxes that have been observed on physical surveillance and boxes observed via remote camera being delivered to ██ E. Morgan Avenue in Milwaukee. Additionally, the boxes depicted in some of the photographs appeared to be lined with self-sticking tile, similar to the packages seized by law enforcement on April 29, 2020, from FedEx and UPS.

### *PEREZ III Sends Drug Proceeds to SANCHEZ via U.S. Mail*

99. To date, case agents have determined that DTO members, including, but not limited to PEREZ III, XINA, and SANCHEZ use the U.S. mail to send and/or receive drug proceeds collected in the Eastern District of Wisconsin and shipped to various locations in California.

100. United States postal records, post office video surveillance, and court ordered location data from tracking devices on vehicles used by PEREZ III and XINA reflect that PEREZ III and XINA mailed at least 87 packages, believed to contain bulk U.S. currency, to Julian SANCHEZ in California since December 11, 2019, from the U.S. Post Office located at ██ S. Howell Avenue, Milwaukee, Wisconsin.

101. Based upon United States postal records, out of the 87 suspected drug proceeds parcels, all but one were addressed to "Julian SANCHEZ." Some of the destination addresses have been associated with Julian SANCHEZ in law

47

enforcement database, and some of the destination addresses have been determined to be third party shipping companies that have mailbox rentals. In one instance, SANCHEZ opened a private mailbox using his California driver's license and his U.S. passport.

102. PEREZ III and XINA use aliases and addresses with no current ties to them to ship the packages. For example, sender names on the packages have included "Joe Gonzalez" and "Melany Gonzalez." Examples of the sending addresses have included a former address for PEREZ III as well as a Walgreens pharmacy store located on S. Howell Avenue in Milwaukee, Wisconsin. However, beginning in June of 2020 through early July of 2020, at least 19 packages were sent to SANCHEZ at various locations in California. The sender name on these 19 packages was listed as "Xina Yang" or "Violeta Gonzalez" (the name of PEREZ III's mother), and used the sender address of ████ S. 57th Street, West Allis, Wisconsin, the primary residence of PEREZ III and XINA.

103. Despite their often time use of alias and incorrect sending addresses, case agents have confirmed that PEREZ and XINA mailed the above-referenced packages because (1) court ordered location data for their vehicles reflect that their vehicles were stopped in the area of the Howell Avenue post office on dates that correspond to the dates on which some of the packages were mailed; (2) video surveillance has captured PEREZ III and XINA mailing parcels on certain dates, which parcels have been identified as the ones mailed to Julian SANCHEZ; and (3)

48

video surveillance has also captured PEREZ III and XINA's vehicles at the post office on dates the correspond to the mailing dates of some of the above-described packages.

104.   Based upon their training, experience, and familiarity with the investigation, case agents believe that from the intercepted telephone calls and the investigation to date, each of the U.S. Postal packages contain $20,000 in drug proceeds.   As set forth above, case agents have documented 87 packages sent by PEREZ III and/or XINA to SANCHEZ from approximately December 10, 2019, through July 28, 2020. Based upon this analysis, the PEREZ III DTO has mailed approximately $1.7 million in drug proceeds to SANCHEZ in a six-month period.

### *PEREZ III Conceals his Ownership of* ▓▓▓ *S. 57th Street and Secreted a Safe in the Basement*

105.   Evidence gathered during the investigation of the PEREZ III DTO, including, but not limited to monitored conversations and surveillance, has revealed that the residence located at ▓▓▓ S. 57th Street, West Allis, Wisconsin, is used by PEREZ III and XINA as a principle residence.   Based upon their training, experience and familiarity with the investigation, case agents believe that the evidence establishes that PEREZ III and XINA, who have access to and control over the residence, are the true owners of the property.   As set forth below, PEREZ III, XINA, and JASMINE, PEREZ III's sister, concealed PEREZ III's true ownership of the property.

106.   Case agents' review of Milwaukee County Register of Deeds revealed that on or about February 14, 2020, the real property identified as Parcel number 438-▓▓▓▓, and located at ▓▓▓ S. 57th Street, West Allis, Wisconsin, was

49

purchased for $185,000 by "Jasmine L. Perez" and "Voileta L. Gonzalez," PEREZ III's and JASMINE's mother. In fact, one month after the purchase, on March 31, 2020, PEREZ III called JASMINE and reminded her to make the mortgage payment. (Hey, for the mortgage, um, you gonna make the payment?).

107. As further evidence of PEREZ III's actual ownership of the property, beginning in late April and continuing through June of 2020, case agents intercepted several telephone calls regarding PEREZ III's purchase of a large safe, which PEREZ III purported to weigh approximately 700 pounds. The calls indicated that PEREZ III not only purchased the safe for the residence, but directed contractors to dig a hole in the basement for the safe, which was then cemented into the floor during the basement remodeling at the residence. In addition, the calls noted that the safe was so large it required a private delivery service.

108. On April 30, 2020, at 10:50 a.m., PEREZ III, using Target Telephone 1, called (414) 659-█████ a telephone used by a contractor working on PEREZ III's residence at █████ S. 57th Street. During this call, PEREZ III and the contractor discussed pouring concrete into the basement floor. PEREZ III stated, "I also was gonna say, can you maybe by [U/I] come before they pour it, before [U/I] to dig up that hole?" The contractor asked, "For?" PEREZ III stated, "For the hole that we talked about in the floor." The contractor asked, "Oh, for the safe?" PEREZ III replied, "It hasn't got here yet. But I got the dimensions to it." The contractor confirmed with PEREZ III that the basement floor was currently only gravel. The contractor also confirmed with PEREZ III that he could "get that dug in." PEREZ III requested the

50

contractor come as quickly as possible because the concrete workers were going to be pouring the basement concrete. Case agents believe that during this call, PEREZ III confirmed with the contractor that the basement hole in the appropriate dimensions would be in place before the concrete was poured.

109. On May 7, 2020, at 2:43 p.m., (414) 659-███ a telephone used by a contractor working on PEREZ III's residence, called PEREZ III, using Target Telephone 1. During this call, PEREZ III and the contractor discussed the layout of the basement remodel. Later in the conversation the contractor stated, "The uh, we'll have the rec (recreational) room for that whole rest of the area where the safe is, we'll still have storage there. And then I can put down a..." PEREZ III replied, "Okay." The contractor continued, "A false floor that opens up with a hinge." PEREZ III confirmed, "Okay." Case agents believe that the safe would not only be dug into the basement floor, but that the safe would likely be concealed by a false floor with a hinge to allow access to the safe.

110. Based upon the numerous intercepted telephone calls regarding the safe, case agents believe that this safe will contain firearms and evidence pertaining to the drug and money laundering trafficking activities of the PEREZ III DTO, and will be located in the basement of ███ S. 57th Street.

### *PEREZ III and XINA Conceal Drug Proceeds through Bank Accounts*

111. On November 30, 2016, XINA opened bank account x243 at Wells Fargo Bank in Milwaukee, Wisconsin. On the signature card, XINA listed her employer as Pro Nails. A review of the deposits into this account identified 33 cash deposits

51

totaling approximately $71,000 occurring from January 2017, to November 2018. The deposits occurred in Milwaukee, Wisconsin; Santa Rosa, California; Davenport, Florida; Santa Monica, California; and St. George, Utah. A review of the account also revealed several large cash deposits, which preceded expenditures or cash withdrawals. For example:

   a. On July 14, 2017, a total of $4,400 in cash was deposited at a branch location in West Allis, Wisconsin. On July 17, 2017, two cash withdrawals for $2,500 each were conducted at two separate branch locations in San Francisco, California. The withdrawals occurred 38 minutes apart.

   b. On August 11, 2017, a total of $8,524 in cash was deposited at a branch location in Milwaukee, Wisconsin. Over the next five days, a review of the account revealed over $3,200 in purchases for travel related expenses. In addition, on August 14, 2017, a cash withdrawal for $5,500 was conducted in Milwaukee, Wisconsin.

   c. On April 16, 2018, a $5,000 withdrawal from XINA'S Wells Fargo account occurred at a Wells Fargo branch located in Santa Rosa, California. The same day case agents' review of the account revealed a $5,000 deposit into XINA's Wells Fargo account at a Wells Fargo branch located in Milwaukee, Wisconsin.

   d. On March 12, 2018, a $300 withdrawal from XINA's Wells Fargo account at the Wells Fargo branch at 200 B Street, Santa Rosa, California occurred. On the same day, an additional $5,000 withdrawal from the same account at the same branch location occurred. Additionally on that date, case agents' review of the records revealed another $5,000 withdrawal at the Wells Fargo branch located at 2751 4th Street, Santa Rosa, California. A further review by case agents revealed that also on the same day, $5,487 was deposited into XINA's Wells Fargo account at the Wells Fargo branch located at 131 W. Layton Avenue, Milwaukee, Wisconsin. Case agents also observed an additional deposit that day in the amount of $7,020 into XINA's Wells Fargo account at the Wells Fargo branch located at 6130 W. National Avenue, Milwaukee, Wisconsin. Based upon their training, experience, and familiarity with the investigation, case agents believe that these cash transactions through XINA's account represent the concealment of DTO drug proceeds.

52

112.   On April 20, 2018, PEREZ III opened a Wells Fargo account ending in x363 at the Wells Fargo branch located in Healdsburg, California. Between April 20 and April 23, 2018, a total of $13,275 was deposited in this account in Milwaukee, Wisconsin. Between April 23 and April 24, 2018, all $13,275 had been withdrawn in Santa Rosa, California. XINA's Wells Fargo account reflects similar activity during this time period.

113.   In August 2018, XINA completed a credit card application for US Bank. In the application, XINA listed her occupation as a Nail Technician with an annual income of $36,000.

114.   On March 7, 2019, XINA opened a checking account (x919) at US Bank in Vallejo, California.  This account was subsequently closed on January 17, 2020. For this account, XINA listed her employer as "Xina Nails" on the signature card for the accounts.  A review of cash deposited into account x3919 identified 42 cash deposits totaling over $65,000 that occurred between March 8, 2019, and January 14, 2020.  The cash deposits occurred at US Bank branches in Milwaukee, Wisconsin; Vallejo, California; Redding, California; and Santa Rosa, California.  In addition, a review by case agents revealed that several large cash deposits occurred into account x919 which preceded expenditures or cash withdrawals.  For example:

   a.  On June 25, 2019, ATM cash deposits of $4,730 occurred in Vallejo, California.  On June 27, 2019, a $3,000 purchase was conducted at Green Buddha in Los Angeles, California.

   b.  On August 16, 2019, ATM cash deposits of $1,500 occurred in Milwaukee, Wisconsin.  On August 19, 2019, account records reflected a purchase of $1,216.60 at United Airlines.

53

115. On October 3, 2019, XINA and PEREZ III opened a joint bank account at US Bank (x6785) in Indio, California. On October 21, 2019, $3,000 in cash was deposited into the account. The funds were immediately transferred to US Bank account x3919. On December 12, 2019, a currency transaction report was filed on PEREZ III and XINA for a cash deposit of $24,000 into US Bank account x6785.

116. On January 30, 2020, XINA and PEREZ III opened five bank accounts between them at JP Morgan Chase Bank in Milwaukee, Wisconsin.

    a. XINA and PEREZ III opened jointly a business bank account (x590) in the name of Ling Ling Nails, LLC. The address on the signature card for the business was ▮▮▮ W. Pierce Street, ▮▮▮▮▮▮ Milwaukee, Wisconsin (the stash apartment leased by JASMINE). According to online corporate records from Wisconsin Department of Financial Institutions, "Ling Ling Nails, LLC" was registered with the State of Wisconsin on January 8, 2020. The registered agent for Ling Ling Nails is XINA. From January 30, 2020, to March 27, 2020, the account listed only two cash deposits totaling $2,900. The cash deposits funded payments made to Walmart, Uber, and Airbnb.

    b. PEREZ III opened two personal bank accounts (x790 and x756) in his name. PEREZ III listed his personal address as ▮▮▮ W. Pierce Street, ▮▮▮▮▮ Milwaukee, Wisconsin on the signature card for both accounts. From January 30, 2020, to April 8, 2020, PEREZ III made five cash deposits totaling $2,199 into these personal accounts.

    c. XINA opened two personal bank accounts (x826 and x016) in her name. XINA listed her personal address as ▮▮▮ West Pierce Street, ▮▮▮▮▮ Milwaukee, Wisconsin on the signature card for both accounts. From January 30, 2020, to April 8, 2020, XINA made three cash deposits totaling $2,210 into these personal accounts. These deposits funded the payment of personal expenses in the account such as utilities, credit cards, and other miscellaneous expenses.

117. In summary, case agents' review of the above-mentioned bank accounts for PEREZ III and XINA reveal that, combined, over $175,000 in cash was deposited

into the accounts from January 2017 to April 2020. This review further revealed that the currency deposited into these accounts preceded significant expenditures or cash withdrawals.

118. Case agents' review of records also revealed that the deposit and withdrawal activity often corresponded with flight activity of various PEREZ III DTO members. For example:

    a. On January 6, 2017, $860 cash was deposited into JASMINE's TCF Bank Account. Also on January 6, 2017, PEREZ III and Esteban REYES flew from Mitchell International Airport in Milwaukee, Wisconsin, to Sacramento International Airport in Sacramento, California, on American Airlines. The flights, totaling $1,413.11, were paid for with a TCF Bank card belonging to JASMINE. PEREZ III returned to Milwaukee two days after departing Milwaukee, Wisconsin. The short turnaround time is consistent with travel in furtherance of DTO activity.

    b. On July 14, 2017, PEREZ III, XINA, and another DTO associate flew from O'Hare International Airport to San Francisco International Airport. PEREZ III paid for all of the flights with his US Bank debit card. That same day, $4,400 cash was deposited into XINA's Wells Fargo account. This deposit was made at the Wells Fargo branch in Milwaukee, Wisconsin. On July 16, 2017, PEREZ III and XINA flew from San Francisco International Airport to O'Hare International Airport. The flights were paid for in cash, and $7,500 was withdrawn from XINA's account the following day.

    c. On August 11, 2017, $8,524 cash was deposited into XINA's Wells Fargo account at the Wells Fargo branch located at 7600 W. Hampton Avenue, Milwaukee, Wisconsin. On August 12, 2017, PEREZ III flew from O'Hare International Airport to San Francisco International Airport on American Airlines. The flight was paid for from XINA's Wells Fargo Bank account.

    d. Based upon their training, experience, and familiarity with the investigation, case agents believe that some transactions were structured to avoid detection. As evidence of this, on July 17, 2017, the day after PEREZ III and XINA flew from San Francisco International

55

Airport to O'Hare International Airport, three separate withdrawals, each for $2,500, from XINA's Wells Fargo account occurred at three separate California Wells Fargo branch locations.

119.    Despite frequent travel to California and numerous cash deposits in their bank accounts, to date, case agents have been unable to identify any legitimately earned income on behalf of either PEREZ III or XINA.

120.    On October 31, 2018, PEREZ III and SANCHEZ flew from O'Hare International Airport to Los Angeles International Airport. PEREZ III paid for both flights from his US Bank account.

121.    On November 11, 2018, PEREZ III and SANCHEZ flew American Airlines from Los Angeles International Airport to O'Hare International Airport. Each flight cost $586.04 each, and XINA's Wells Fargo account paid for the airfare.

**Julian SANCHEZ and Miguel SARABIA supply PEREZ III with marijuana and marijuana products. Gabriel MATTESON works in concert with SANCHEZ to package the marijuana obtained from Northern California.**

**Julian SANCHEZ**

122.    As discussed herein, Julian SANCHEZ (a/k/a "Terps"), an Hispanic male born ███████████, 1996, resides at ███ Avenue of the Arts, Apt. ███Costa Mesa, California. This has been confirmed though investigation and surveillance. The investigation to date has revealed that SANCHEZ supplies the PEREZ III DTO with bulk marijuana, marijuana edibles, marijuana oils/waxes, marijuana vape cartridges, and/or other controlled substances, which is then sold in Milwaukee, Wisconsin under the brand name "Midwest Connect" or "Midwest Connected." During the course of this investigation, case agents determined that SANCHEZ has used several cellular

56

telephones, including (707) 888-███ and (213) 700███ (Target Telephone 5), (562) 380-███ (Target Telephone 6), (562) 306-███ (Target Telephone 8), as well as Snapchat account "officialdjhaze" and Instagram account "lowkeyyterpss" to further the activities of the DTO. Between March 22, 2020, and July 22, 2020, approximately 103 intercepted calls and/or text messages between SANCHEZ and PEREZ III were deemed criminal and pertinent in nature. In addition, between August 6, 2020, and August 28, 2020, approximately 57 intercepted "Snaps" and "chats" between SANCHEZ and PEREZ III using Target Account 1 were deemed criminal and pertinent in nature.

123. For example, on April 7, 2020, at 2:37 p.m., PEREZ III, using Target Telephone 1, made an outgoing call to Julian SANCHEZ at (707) 888███ During this call, PEREZ III and SANCHEZ discussed PEREZ III using PEREZ III or JASMINE's financial information to assist SANCHEZ in the rental of a residence. SANCHEZ talked about downloading the application on their cellular telephones. At one point SANCHEZ stated, "That's all good. What I'm gonna do is, mmm, I'm 'bout to drop these boxes and I'm gonna go [U/I] and shit." PEREZ III replied, "Alright." Later in the conversation, SANCHEZ stated, "Hey, send me the address too 'cause Imma bout to drop these off." PEREZ III responded, "Alright, I got you bro."

124. Based upon their training, experience, and familiarity with the investigation, case agents believe that SANCHEZ was looking for a new residence to rent and that SANCHEZ does not have the credit needed to obtain the rental property. SANCHEZ asked PEREZ III to assist SANCHEZ with the financial

57

information so that SANCHEZ could obtain the property. Further, during this call, SANCHEZ and PEREZ III discussed the shipment of a package to PEREZ III, and SANCHEZ told PEREZ III to send the address where the package should be shipped.

125. On April 17, 2020, at 12:02 p.m., PEREZ III, using Target Telephone 1, received an incoming call from SANCHEZ using Target Telephone 5. During this call, SANCHEZ is heard answering another telephone talking to someone else. Towards the end of the conversation SANCHEZ stated, "I gotta ship all this shit out so I can make money and pay my fucking monthly bills, too." PEREZ III stated, "Hey, call me back, yeah?" SANCHEZ replied, "Yeah, I'll call you."

126. Based upon their training, experience, and familiarity with this investigation, case agents believe that SANCHEZ told PEREZ III that SANCHEZ had to mail packages containing controlled substances to PEREZ III to keep the drug proceeds flowing and to pay his bills. ("I gotta ship all this shit out so I can make money and pay my fucking monthly bills too."). Case agents further believe that PEREZ III did not want to talk about the packages at that time, and thus interrupted SANCHEZ and asked SANCHEZ to call PEREZ III back. ("Hey, call me back, yeah?"). SANCHEZ agreed. ("Yeah, I'll call you.").

127. On April 18, 2020, at 5:55 p.m., PEREZ III, using Target Telephone 1, called SANCHEZ, using Target Telephone 5. SANCHEZ asked, "Hey, what was it two twenty (220)? Or what?" PEREZ III replied, "Yeah I think so, two twenty (220)." SANCHEZ stated, "Alright."

128. Based upon their training, experience, and familiarity with this investigation, case agents believe that this call is in reference to the two USPS parcels PEREZ III sent to SANCHEZ on April 15, 2020. A search of those USPS parcels revealed that each one contained $20,000 in U.S. currency. Therefore, case agents believe that SANCHEZ asked PEREZ III how many packages were sent and how much was in each package. ("Hey, what was it two twenty (220)? Or what?"). Case agents further believe that PEREZ III confirmed the contents of the two packages he sent to SANCHEZ. ("Yeah I think so, two twenty (220).").

129. On May 16, 2020, at 9:43 p.m., SANCHEZ received an incoming call on Target Telephone 5, from Miguel SARABIA, his father, using (949) 534-███ Target Telephone 7. This call lasted approximately 37 minutes. During this call, SANCHEZ and SARABIA discussed numerous topics, including SANCHEZ's Airbnb account. Case agents know, from intercepted calls over Target Telephones 1 and 5, that at the time of this call, SANCHEZ had rented an Airbnb in northern California and was awaiting large quantities of marijuana. During the conversation SARABIA stated, "I still don't know if it was tracking still for his-his shipment." SANCHEZ replied, "Oh that's good." SARABIA stated, "The-the carts. The other ones I'm not gonna send it to him yet though. 'Til they [U/I]." SANCHEZ replied, "Man. He'll pay you or I have a [U/I] I don't [U/I] either one." SARABIA stated, "Our shit's almost ready." SANCHEZ asked, "Oh yeah?" SARABIA responded, "Besides the other one's I'm missing but…" SANCHEZ replied, "It's coming together man." SARABIA answered, "Yup." Case agents believe that during this call, SARABIA and SANCHEZ discussed

59

the shipments of controlled substance packaging regarding the empty vape cartridges and vape boxes shipped to Milwaukee, Wisconsin, from Hong Kong. Case agents further believe SANCHEZ referred to PEREZ III and the money PEREZ III owes SARABIA when SANCHEZ stated, "Man. He'll pay you…"

130.    Later in the conversation SANCHEZ continued, "Yeah, I think that shit is super fucked up nigga. I was like bro, what's up? He started talking to his homies and shit. I think he said this Monday or next Monday everything at 100%. It'll ready two-hundred so I'm driving two-hundred, dropping the bitches and that's it. I'm going the fuck home and then talk to JC hopefully fix that and get-get the ball rolling on this. On the inside 'cause it dry as fuck up here, man. It be dry for like a month or two and then come back up here for a four box order—from there four to two we go down to L.A. do two, three boxes and then that's when it's going to ramp up again." SANCHEZ replied, "When's he gonna kick off his carts? Is he already making 'em?" SANCHEZ replied, "Oh. He's already doin it. I know because they were dry on carts and now there's carts plus posting up. All [U/I] carts here there so." SARABIA asked, "What carts he posting up?" SANCHEZ replied, Mmm. Right now, V-V-S's. Yeah, nothing just [U/I] V-V-S's and uh, the West Coast Cures." Based upon their training, experience, and familiarity with the investigation, case agents believe this conversation pertained to SANCHEZ's plans to obtain 200 pounds of marijuana for PEREZ III and ship it to Milwaukee. ("I'm driving two-hundred, dropping the bitches and that's it"). Case agents know that a "box" is a common term used to describe one hundred pounds of marijuana. Further, case agents believe that SARABIA inquired

60

when PEREZ III was manufacturing the cartridges containing THC oil, ("When's he gonna kick off his carts? Is he already making 'em?"), and SANCHEZ told SARABIA that PEREZ III was already making them, ("Oh. He's already doin' it").

131. The conversation continued, and SARABIA stated, "I lost my ass [U/I] one of his carts." SANCHEZ replied, "Uncle [CHUCKLES] uncle is funny." SARABIA stated, "Yeah, "I'll go half with you," I said. "Half." I said "you-you rather go half then buy some stupid expensive." SANCHEZ asked, "He still got 'em for eight bucks?" SARABIA asked, "He-he-Goofy (SARABIA's brother; SANCHEZ's uncle) get 'em for eight bucks?" SANCHEZ replied, "Yeah, I said he coulda go 'em for eight bucks through that one plug. I'm not fucking with that white dude no more, but I can still get the plugs from that." SARABIA asked, "Well... How much you get from her?" SANCHEZ replied, "Hmm? That fucker was acting weird I had to drop her but I still just get the... um..." SARABIA stated, "Honestly... Goofy's [U/I]." SANCHEZ stated, "[U/I] go get that cart. No. But he wants them for free I already know." SARABIA responded, "They cost me five bucks." Case agents believe that during this conversation, SARABIA and SANCHEZ discussed the prices they sell marijuana filled vape cartridges. ("He still got 'em for 8 bucks?" "They cost me 5 bucks"). Based upon their training, experience, and familiarity with the investigation, case agents believe that in this conversation SANCHEZ and SARABIA discussed Goofy's sale of vape cartridges on behalf of SANCHEZ and SARABIA. Based on the investigation to date, including intercepted communications, cage agents believe that the vape

61

cartridges that Goofy sells contain TCH oil, consistent with the vape cartridges being sold by the PEREZ III DTO.

132. Furthermore, case agents know that this DTO also involves close friends and family members.

133. On June 24, 2020, at 7:36 p.m., SANCHEZ, using Target Telephone 5, received a call from an unidentified male, using (831) 750-████ (UM7120). SANCHEZ stated, "What up? I had to tell you. Cancel that trip 'cause I'm fucking stuck up here." UM7120 asked, "What do you mean?" SANCHEZ replied, "Fucking, I told my guy I would stay up here and dry up all the OGs. So, they're holding me to me to my fucking word. So, I think." Case agents are aware that OG is a slang term for marijuana and that SANCHEZ needed to stay in northern California to obtain the marijuana that SANCHEZ promised to purchase for PEREZ III ("my guy."). UM7120 asked, "How many more you gotta get?" SANCHEZ replied, "Uh, fuck. I'm almost done clearing them out. I got like three more weeks. That's only two, three more boxes. He held me to my word. Man, you fucking dick. He's like bro, you know. So, you told me bro you were [U/I] until the O's were done. I was like damn." UM7120 laughed and SANCHEZ continued, "This nigga. And bro I'm just trynna make your pockets fatter, bro. Blah, blah. blah, blah. Man, shut up nigga I wanna go home. . . . [U/I] wanna keep going [U/I] ragging bull bro. I told him right after these OG's bro don't talk to me about no 'come take a run' 'cause it's already July. I don't wanna hear nothing." As stated above, case agents know that the term "box" is a common term used in reference to a 100 pound quantity of marijuana. Further, case agents believe

that SANCHEZ talked about PEREZ III requiring SANCHEZ stay in northern California to obtain the additional 200-300 pounds of marijuana ("That's only two, three more boxes"), but that SANCHEZ wanted to go back home to Los Angeles.

134. On July 10, 2020, at 7:38 p.m., SANCHEZ, using Target Telephone 5, called (909) 761-███ used by JARED, a relative of SANCHEZ's. SANCHEZ inquired about JARED's immediate activities. JARED replied, "Inside grandma's house right now." SANCHEZ stated, "I see you. I'm on the block nigga searching for a sixty (60) K right now, nigga. Imma bout beat the fuck out of the post office man. I'm waiting for him right now." JARED replied, "Oh, yeah? Bro, you don't come till seven (7) o'clock." SANCHEZ stated, "Nah, bro. They said they delivered my boxes, that's what I'm saying bro." JARED replied, "Yeah, I'm trynna tell grandma, recover the [U/I] with me right now." SANCHEZ stated, "No, I know. I seen the recording. That guy never came." Case agents know that in early July 2020, PEREZ III mailed three packages believed to contain $20,000 in U.S. currency in each package (total of $60,000) from Milwaukee to SANCHEZ via the USPS to SANCHEZ's grandmother's residence, located at ███ E. Valley View Avenue, West Covina, California. Case agents believe that SANCHEZ tracked the packages through the USPS website and discovered that the packages containing the currency showed that the packages were delivered, but that SANCHEZ never received the boxes at that address.

135. SANCHEZ continued, "Bro, this nigga right here, bro. He scanned my shit and said that he deliver my shit, bro. And when I called the P.O. office, the post office, they are telling me that this foo delivered it at the wrong house, bro." JARED

63

replied, "Yeah. He did that. We got the neighbor's mail foo." Case agents believe that SANCHEZ and JARED discussed the delivery of the mail to the Valley View address and that the mail delivery person had scanned the packages as delivered, but that the Post Office told SANCHEZ that the packages had been delivered to the wrong address.

136. SANCHEZ stated, "Nigga, Imma bout to beat the fuck out this foo. Bro, trust, when I see this nigga he's gonna be on [U/I] bro." JARED replied, "Yeah. Yeah, I'm supposed to wait – I'm waiting for my check too, man." SANCHEZ stated, "I'm right here, nigga. I'm outside. I see your car and everything, nigga." JARED replied, "Oh yeah? I gotta go [U/I]" SANCHEZ stated, "Let's go. Come outside. JARED replied, "Alright." Case agents believe that SANCHEZ was in the area of the Valley View address, and that SANCHEZ wanted JARED to come outside and assist SANCHEZ with locating the missing packages containing cash.

137. On July 5, 2020, at 10:09 p.m., SANCHEZ, using Target Telephone 6, received a call from JESUS, SANCHEZ's uncle (a/k/a "Goofy"), using (562) 284-███. During the call, SANCHEZ and JESUS discussed how the prices of marijuana had increased and that the market is good. SANCHEZ and JESUS discussed how Gabriel MATTESON, JESUS's son, needed guidance in the drug trafficking business. SANCHEZ stated that MATTESON has "drive" but he's not "ready," meaning ready to be fully involved in drug trafficking activities. SANCHEZ stated that MATTESON and SANCHEZ had developed a closer relationship as a result of their joint involvement in the marijuana business. SANCHEZ owed MATTESON $2,000 and

SANCHEZ was paying MATTESON whatever was owed to him. JESUS told SANCHEZ that JESUS would keep his word if SANCHEZ were ever "getting locked up." JESUS stated he would be there, and "bail him out." SANCHEZ indicated that he "appreciates it," and stated that he knows his dad (Miguel SARABIA) wouldn't have his back. SANCHEZ stated that MATTESON has been the one telling SANCHEZ about his dad. SANCHEZ continued to explain how hurt he was and couldn't believe SARABIA didn't think SANCHEZ would find out that his dad was a "rat," especially now that SANCHEZ and MATTESON are so close. SANCHEZ commented that SANCHEZ "doesn't respect rats." JESUS stated that SARABIA is still his dad; he's still family. SANCHEZ can be upset, but "family is family." Case agents believe that during this conversation, SANCHEZ had recently learned that his father, SARABIA, had cooperated with law enforcement in the past and SANCHEZ was upset.

138.    SANCHEZ stated, "Uncle, what hurts the most -- uncle, what hurts the most, Imma be real with you, uncle, what hurts me the most is I brought him into my line and he's helping out my line. He ain't not gonna give me money in my line, uncle. I know what's up with this nigga. He's already sending liters and edibles to my line and not tell me 'bout it? But hey uncle, I don't give a fuck. That five thousand dollars ($5,000), that's just little money to me. I touch real money, uncle. I don't give a fuck about that shit, real talk. That nigga can wash that shit and wipe his ass. I don't give a fuck, straight up." Case agents believe that SANCHEZ referred to SANCHEZ bringing SARABIA into the PEREZ III DTO ("my line") and that SARABIA sends

"liters" of marijuana wax and marijuana edibles to PEREZ III without either informing SANCHEZ or cutting him in on the profits. ("Sending liters and edibles to my line and not tell me bout it?"). In addition, case agents believe that SARABIA launders drug proceeds for the PEREZ III DTO. ("That nigga can wash that shit.").

139. Further, during the same call, SANCHEZ and JESUS discussed how "Ocho" (PEREZ III) is "so loyal." SANCHEZ found out through PEREZ III that SARABIA was selling PEREZ III "liters," which case agents believe to be marijuana oils. SANCHEZ explained that SANCHEZ cannot understand how his dad didn't even tell him, especially now that he's back in Los Angeles. SANCHEZ explained that SANCHEZ's grandmother has a saying for SARABIA (her son), "Whenever he sees an opportunity he takes it." SANCHEZ stated that he believes PEREZ III will not side with SARABIA over him. Case agents believe, based on this conversation, as well as other intercepted communications, that SANCHEZ and SARABIA are at times supplying PEREZ III with marijuana-related products independently of each other, and that SARABIA is going behind SANCHEZ's back to supply PEREZ III with other controlled substances.

140. SANCHEZ and JESUS continued to talk about family matters, including their distrust of SARABIA. SANCHEZ stated how SANCHEZ cannot associate with SARABIA because SANCHEZ has "too much to lose." SANCHEZ believes that SARABIA will "sink him" if SARABIA keeps dealing with PEREZ III. SANCHEZ commented that the hard part for SANCHEZ would be to tell "Ocho" (PEREZ III) "I don't want you fucking with my pops." SANCHEZ commented that it

66

wouldn't look good for SANCHEZ to discuss "family problems" with PEREZ III. SANCHEZ stated, "You need to understand, uncle, Imma switch my car out 'cause this nigga gave me a car and I don't know what the fuck this nigga be doing. Like, a tracker." Based upon their training, experience, and familiarity with the investigation, case agents believe that SARABIA gave SANCHEZ his vehicle and that SANCHEZ was now worried that, because SARABIA had cooperated with law enforcement, SANCHEZ possibly had a GPS tracking device attached to the vehicle.

### *Search of SANCHEZ's Instagram Account*

141. In addition to the calls listed above, on May 4, 2020, a federal search warrant was executed on Instagram account "lowkeyy███████ used by SANCHEZ.

142. SANCHEZ's Instagram account contained numerous photographs and videos depicting marijuana and THC oil, indicative of marijuana and THC oil trafficking, numerous photographs and videos of SANCHEZ holding large amounts of U.S. currency, photographs of a money counter displaying the amount on the counter as $80,000, as well as photographs of USPS boxes case agents recognized as being shipped from PEREZ III (the shipping label reflected the package was shipped from "Melany Gonzalez" and addressed to Julian SANCHEZ). Also included within SANCHEZ's Instagram account was a photograph of a cellular telephone depicting a screen shot of a FedEx tracking site dated April 29, 2020, which indicated that a package was seized by police in Milwaukee, Wisconsin. The caption on the screen shot stated, "Give you a lil idea why I ain't been on my phones why I ben acting funny or anything I got a lot on my plate right now." Case agents believe that this screen

67

shot referred to the packages seized by case agents on April 29, 2020, and that SANCHEZ and/or PEREZ III were nervous that the police had intercepted the package containing controlled substances.

143. Further, there were several hundred videos contained in SANCHEZ's account. At least 19 videos depicted large amounts of cocaine, which case agents believe is indicative of cocaine sales. In addition, there were at least 24 videos depicting guns, including guns containing extended magazines for the pistols. Due to the manner in which Instagram provided the data, case agents were unable to determine the exact date the videos were posted. However, based upon the provided login information, SANCHEZ was actively using this account as of the warrant return date, May 20, 2020.

144. SANCHEZ's Instagram account also contained a message dated October 21, 2019, where SANCHEZ sent an Instagram message to an unknown user that stated, "Yo what's up my pops told me to hit you up call me 562380███████ however, no further conversation was documented in the Instagram messages. Case agents believe that SARABIA ("pops") directed SANCHEZ to contact the unknown Instagram account user to discuss controlled substances over Target Telephone 6 because case agents believe that SARABIA assists SANCHEZ with finding customers to distribute controlled substances for the DTO.

145. A string of messages between SANCHEZ and another unknown Instagram user revealed multiple messages regarding the prices of marijuana-related products and drug proceeds. For example, on December 29, 2019, SANCHEZ sent a

68

message that stated, "Feel me gt more coming too no cap light 160k weekly." Case agents believe that SANCHEZ referred to PEREZ III's regular shipment of bulk U.S. currency to SANCHEZ to purchase marijuana and marijuana-related products ("gt (got) more coming" and "light 160k weekly."). On January 13, 2020, SANCHEZ sent an Instagram message to this unknown user that stated, "707888█████ trap line 562380█████ Case agents believe that SANCHEZ provided the unknown user with both of SANCHEZ's telephone numbers ("70788████" a predecessor phone number for Target Telephone 5, and "562380████" Target Telephone 6). Case agents further believe that SANCHEZ identified Target Telephone 6 as SANCHEZ "drug phone" ("trap line 562380█████

146. On March 12, 2020, SANCHEZ sent an Instagram message to an unknown user that stated, "Ima give you my throw away too let's not lose contact lol 562380█████ Case agents know that this number is Target Telephone 6. An analysis of the conversations between SANCHEZ and the unknown user of the account revealed numerous conversations about obtaining hundreds of pounds of marijuana, prices for the marijuana, and growing marijuana in northern California.

### *SANCHEZ's Milwaukee Bank Account Information*

147. On October 26, 2018, SANCHEZ opened US Bank account (x122). An analysis of the account showed that the account maintained $56,680 in cash deposits occurring from October 30, 2018, to February 1, 2019. All of the cash deposits, except for an initial $100 cash deposit when the account was opened, were conducted in or around Milwaukee, Wisconsin. The deposits also appeared to be structured in a

69

manner to avoid the filing of a Currency Transaction Report (CTR), which is required to be completed by a financial institution anytime U.S. currency totals more than $10,000 in a single deposit. On October 30, 2018, at 11:47 a.m., SANCHEZ deposited $9,900.00 cash at a US Bank branch on Mitchell Street in Milwaukee, Wisconsin. At 12:16 p.m. the same day, a second cash deposit of $5,010.00 occurred into the same account but the cash was deposited at a US Bank branch on Greenfield Avenue in Milwaukee, Wisconsin. This also occurred on February 1, 2019, when SANCHEZ conducted three cash deposits of $9,900.00, $9,920.00 and $9,950.00 at different times and branches in Milwaukee, Wisconsin.

148. Based upon case agents' review of the account, the deposited cash was typically withdrawn in cash from the account within five to six days of the deposit. In total, $56,515 cash was withdrawn from the account. Case agents know that the account is now closed.

### SARABIA also Sends PEREZ III Marijuana Oils, Marijuana Edibles, and Empty Vape Cartridges

### Miguel SARABIA

149. As discussed herein, Miguel SARABIA (a/k/a Ali MAS), an Hispanic male born ▓▓▓▓▓▓ 1975, resides at ▓▓▓▓ Baylor Drive, Norwalk, California. This has been confirmed though investigation and surveillance. The investigation to date has revealed that SARABIA supplies the PEREZ III DTO with bulk marijuana, marijuana edibles, marijuana oils/waxes, marijuana vape cartridges, and/or other controlled substances, which is then sold in Milwaukee, Wisconsin, under the brand name "Midwest Connect" or "Midwest Connected." SARABIA and PEREZ III are

70

believed to only communicate through the third-party application WhatsApp, as case agents have not intercepted any communication between SARABIA and PEREZ III over any of the Target Telephones. During the course of this investigation, case agents determined that SARABIA has used several cellular telephones, including (949) 534-███ (Target Telephone 7), as well as other unknown telephone numbers. In addition, SARABIA uses the third-party phone application WhatsApp to further the activities of the DTO. Between May 15, 2020, and September 3, 2020, there were approximately 1,461 communications registered between PEREZ and/or SARABIA on the pen and trap for the WhatsApp accounts used by PEREZ III and/or SARABIA.

150. On May 19, 2020, at 4:17 p.m., SARABIA, using Target Telephone 7, called SANCHEZ, using Target Telephone 5. During the conversation, SANCHEZ stated, "Hey, we're about to get shit cracking in Milwaukee. When you wanna jump this shit? 'Cause... Hey, you know what this nigga just told me?" SARABIA replied, "Yeah." SANCHEZ stated, "He – hey, those indoors were sold in six days. Those 100 pounds were sold in six days of indoors." SARABIA asked, "Yeah?" SANCHEZ replied, "In six fucking days." SARABIA stated, "Yeah, I believe it." Based upon their training, experience, and familiarity with the investigation, case agents believe that SANCHEZ referred to PEREZ III's sale of 100 pounds of indoor-quality marijuana in six days in Milwaukee ("Those 100 pounds were sold in six days of indoors."). SANCHEZ stated, "He said the only problem is the muscle, like all that but we get all that shit over there we'll fucking—this shit would be crackin'. Imma do three boxes over here. I'm opening another box. So Imma do three boxes and Imma come

home pay you out." SARABIA stated, "Hell yeah." As indicated above, case agents are aware that a "box" is used to describe one hundred pounds of marijuana. Case agents believe that SANCHEZ and SARABIA are working with PEREZ III to sell at least 300 pounds of marijuana in Milwaukee. ("So Imma do three boxes and Imma come home pay you out"). SANCHEZ continued, "And then Imma be a week over here and then Imma go back. Imma be a week over there in L.A. and then me and Gabriel (MATTESON) are coming back up, run it up." SARABIA replied, "All good." Case agents believe that SANCHEZ informed SARABIA that SANCHEZ would be in northern California for at least another week, then return to Los Angeles, California, area for a week, and then back to northern California, with Gabriel (MATTESON) to obtain another large quantity of marijuana. ("Imma be a week over here and then Imma go back. Imma be a week over there in L.A. and then me and Gabriel are coming back up, run it up.").

151. Later in the conversation SANCHEZ stated, "Nah, "Ocho's" (PEREZ III) all like thinking you're mad— [chuckles] We'll, I don't know if you don't know if your dad…" SARABIA replied, "No I ain't mad at him." SANCHEZ replied, "Your dad don't hit me up." SARABIA asked, "Why would I be mad—I mean I usually only text him when I gotta update him whenever I got going to him but I don't got shit going to him, you know, right now." SANCHEZ replied, "Hey, he said he sent you the [U/I] list too?" SARABIA asked, "Did I send it to him?" SANCHEZ replied, "No 'cause when I called him on it he said—he acted like—he was like no his bill is 106 racks or something." SARABIA stated, "I don't know I gotta see that text. I don't fucking

know. I thought I copied and pasted the whole text and their Halex bill's on there too." SANCHEZ replied, "Oh, no." SARABIA continued, "But I thought I had sent it to you." SANCHEZ replied, "Nah, but it's cool you should just said fine—you woulda paid the bill." SARABIA stated, "I thought I [U/I] text. I haven't checked. Honestly, after that he texted. I didn't even look at it. I just— I don't know what he said." SANCHEZ replied, "Nah, nah he was just like I think your dad's mad at me. He made a comment like "oh, your dad" like "know your dad wants his cheese." SARABIA stated, "Yeah." SANCHEZ continued, "But yeah [U/I] all that "my dad ain't trippin' bro." I was like, "but I mean who don't want their money." Based upon their training, experience, and familiarity with the investigation, case agents believe that PEREZ III owes SARABIA $106,000 ("106 racks") for controlled substances and controlled substance-related packaging, and that PEREZ III thought that SARABIA was mad at PEREZ III over the debt. Case agents further believe SARABIA and PEREZ III have direct contact with each other, as case agents have observed through pen register data that SARABIA and PEREZ III communicate with each other on the encrypted application WhatsApp.

152. On May 21, 2020, at 12:25 a.m., SARABIA, using Target Telephone 7, called SANCHEZ, using Target Telephone 5. This conversation lasted approximately 43 minutes. During the conversation, SARABIA stated, "Oh yeah? That's cool. [U/I] you gotta ship it today. One of them got [U/I] today." SANCHEZ asked, "Oh yeah?' SARABIA replied, "Another one yeah. I've seen it while they put the update on it. You got – you got the other shit coming in." SANCHEZ stated, "Yeah I know.

Everything's supposed to be coming in. But he called me the other day just to tell me how much he appreciates me an' shit. So I know." Case agents believe that during this conversation SANCHEZ referred to PEREZ III when he stated, "But he called me the other day just to tell me how much he appreciates me an' shit." Case agents believe PEREZ III directs SANCHEZ to obtain marijuana for the DTO since PEREZ III moved back to Milwaukee from California in November of 2019.

153. SARABIA stated, "Yeah, you got like thirty thousand (30,000) blue ones, like seventeen thousand (17,000) Gorillas. Some shit." SANCHEZ asked, "Oh, is it the-[U/I] come in already? Damn." SARABIA replied, "Yeah, I guess. I mean, the other day I stopped the cart, you only got the boxes." SANCHEZ replied, "Yeah, no yeah." SARABIA stated, "He ain't get all the carts yet." SANCHEZ replied, "No yeah, no yeah. Oh it's [U/I]." SARABIA stated, "You gonna have to wait. I know you must be sittin' on boxes [U/I]." SANCHEZ replied, "No, he just put the- he'll put out the cheese." SARABIA replied, "Yeah. It's all good." Based upon their training, experience, and familiarity with the investigation, case agents believe this discussion pertained to the DHL packages PEREZ III has been receiving packages that contain the empty vape cartridge boxes and the empty vape cartridges. Case agents further believe SARABIA coordinates these shipments from Hong Kong for PEREZ III and SANCHEZ.

154. Later in the conversation SANCHEZ stated, "He said he gonna pay you like—He said he was gonna do these two (2) boxes, three (3) boxes and then he's gonna pay you. But-whenever you wanna pull the trigger, I don't give a fuck. I have a

74

hundred racks right here." SARABIA replied, "No I mean, well. Imma let him be—shit." SANCHEZ stated, "I don't care. You want a strong arm—a strong arm, I got it." SARABIA replied, "I have a strong arm." SANCHEZ stated, "I'll be like [Stutters]…" SARABIA stated, "I ain't be trippin" in a little [U/I]." Based upon their training, experience, and familiarity with the investigation, case agents believe that the two discussed PEREZ III paying the debt to SARABIA. PEREZ III and SANCHEZ were going to sell 200-300 pounds of marijuana and then PEREZ III would repay SARABIA. ("He said he was gonna do these two (2) boxes, three (3) boxes and then he's gonna pay you."). Further, case agents believe that SANCHEZ had $100,000 in cash, ("I have a hundred racks right here"), and offered to pay SARABIA the debt that PEREZ III owed to SARABIA; however, SARABIA wasn't concerned about the debt. ("I ain't be trippin.").

155. SANCHEZ continued, "I'm sorry nigga, I'm going home [U/I] that nigga is like, "Hey bro, it's like you said more money [U/I] your own." SARABIA replied, "I'm gon' [U/I] I don't wanna feel like I have to fucking strategy trynna [U/I]." SANCHEZ replied, "Yeah. I feel ya. Yeah." SARABIA asked, "You know?" SANCHEZ replied, "Oh, he be like "oh your dad is a plug. He does real [U/I], he be saying." Based upon their training, experience, and familiarity with the investigation, case agents believe that PEREZ III told SANCHEZ that SARABIA was a good source of supply ("oh your dad is a plug. He does real [U/I], he be saying."). SARABIA replied, "Nah, I got him. [U/I] shit. Everybody fucks with me when they trynna get down. Not because of money 'cause I'm a man of principle." Case agents believe SARABIA

75

related to SANCHEZ that people prefer dealing with SARABIA, not because of the prices of the controlled substances he offers, but because SARABIA was reliable. ("Not because of money 'cause I'm a man of principle.").

156. SARABIA later returned to the subject of PEREZ III, "Yeah, and Milwaukee, Milwaukee, I'm getting sick of waiting on Milwaukee. I bet he's just waiting there." SANCHEZ replied, "If it is, it is [U/I]. If not, we'll figured something." Case agents believe that SARABIA thought PEREZ III was holding a large amount of U.S. currency in Milwaukee and SARABIA was getting frustrated. ("I'm getting sick of waiting on Milwaukee. I bet he's just waiting there."). SARABIA stated, 'I been to that lady, you know Rosa [U/I]." SANCHEZ replied, "All I know is either way if we could…" SARABIA interrupted, "I told her, 'you need to talk to your guy 'cause you know what I'm gonna end up fucking up this money, spending' that's what I told her." Case agents believe SARABIA has additional contacts in the Milwaukee area. Case agents further believe that SARABIA and SANCHEZ are attempting to further their controlled substance distribution network. Case agents believe "Rosa" is at least one unknown associate in the Milwaukee area. SANCHEZ replied, "Yeah, I was gon' say if that don't work out we gotta get something inside 'cause that shit is gonna be a goldmine for us. 'Cause I got - - Everyone right now needs it 'cause…" SARABIA affirmed, "Yeah." SANCHEZ stated, "That's all that's in demand right now." Based upon their training, experience, and familiarity with the investigation, case agents believe that this conversation referred to a cocaine shortage in Milwaukee ("'cause that shit is gonna be a goldmine for us. 'Cause I got - - Everyone right now needs it

'cause…"). SARABIA continued, "I told her the only reason I'm gonna do this shit [U/I] I know what I'm doing." SANCHEZ stated, "Yeah, that's all that's in demand right now. That shit is so high in demand." Case agents believe that SARABIA and SANCHEZ discussed selling kilograms of cocaine and that cocaine was in high demand. ("That shit is so high in demand.").

157. On May 30, 2020, at 6:09 p.m., SARABIA, using Target Telephone 7, called SANCHEZ, using Target Telephone 5. During the conversation SANCHEZ stated, "Yeah. Still doing. Still going. He's still sending another 100K. [U/I] another fuck." SARABIA's response was unintelligible. SANCHEZ stated, "I was running it up real quick. [U/I] kicked ass." SARABIA replied, "Yeah." SANCHEZ stated, "Fucking. I wanna do that…" Based upon their training, experience, and familiarity with the investigation, case agents believe that SANCHEZ expected $100,000 in the mail from PEREZ III to purchase more marijuana. ("He's still sending another 100 K."). Along these same lines SARABIA stated, "I texted "Ocho" last time he said he got his packages. All the other ones, I mean the new shit. I mean its still. All his other stuff is from Hong Kong. The other shit. It's already been shipped but I guess, uh, it's in Hong Kong right now so I don't know when they are gonna they're gonna [U/I] from that." Case agents believe SARABIA facilitates the international packages that PEREZ III receives from Hong Kong, China containing the empty vape cartridges and empty vape packages. Case agents further believe SARABIA confirmed with PEREZ III that PEREZ III received some of these packages recently. A check by case agents with U.S. Customs and Border Patrol, revealed that PEREZ

III received packages containing empty vape cartridges from Hong Kong within the time frame of this intercepted call.

158. On June 30, 2020, at 8:35 p.m., an unidentified male (UM51█ using (480) 375█ called SARABIA at Target Telephone 7. During the call, SARABIA stated, "Okay, this is what I'm going to need from you Pizarron. It's a little complicated. 'Cause I'm getting ready to head back to Wiscon-- so Imma-- and then—." Case agents believe that the reference to "Wiscon" was meant to be Wisconsin. UM51█ replied, "Okay." SARABIA stated, "I got your paper. Imma put your paper. So Imma need from you to get me access to your debit card, the BMA the one for the business but I need the card. What I need to do is I need to put it on Applepay 'cause Imma deposit the money from the ATM then, but it takes like two days. I'll put like [AUDIO BREAKS] . . . So what Imma do, Imma put the money in your account." UM51█ replied, "How much you put it though?" SARABIA stated, "I'ma fucking-- the whole thing, what I'm gonna do. Probably get you about 20-30 g's right away boom off the back to get you moving. Somewhere around there, you know? Just to get." Case agents believe that SARABIA was going to place U.S. currency owed for previous drug transactions onto the Apple pay card for UM51█ UM51█ replied, "So what I gotta do? I gotta send you my card?" SARABIA answered, "The card. I need you to give me. Imma-- I don't need it right now. When I'm there, I'm gonna ask you then. Imma enter my apple thing and then what I do. I go to the ATM, I put my phone on the little thing, bluuuuuh, it makes a noise and then I enter your pin and I just deposit the fucking paper. And it says deposit 25 bills at a time, you know? So

78

Imma try to put it [U/I] time." Based upon their training, experience, and familiarity with the investigation, case agents believe this is in reference to the fact that the ATM only permitted 25 bills per ATM deposit transaction placed onto UM51█ Applepay card, which case agents know to be a contactless payment technology for Apple devices which allows you to pay using your Apple device instead of a debit or credit card. Because of the ATM deposit limit, case agents know from the investigation and surveillance that SARABIA conducts numerous ATM deposits at a time to deposit the drug proceeds. UM51█ replied, "Yeah."

159. SARABIA continued, "I have some paper sitting over there. I'm already, I already bought the building, now I'm buying from the City of Madison County. I'm buying the land next door, they own it. So I'm buying the land and then I, I'm already in. You know I started the process already for the Distro. You know what Distro is, right?" UM51█ replied, "Mm, no." SARABIA stated, "Distribution center." Case agents believe that SARABIA purchased commercial property in Madison, Wisconsin, and has plans to open a marijuana distribution business in Wisconsin once marijuana becomes legal in the state.

160. UM51█ asked, "A distribution for what? Like a dispensary?" SARABIA answered, "No, it's called Distro. Not dispensary. It's called Distro. A type eleven." UM51█ replied, "I never heard of that shit." SARABIA responded, "I know because they're not too many. The Distro is the guy that can broker a thousand pounds, 300 pounds, whatever, oils, consumables, a Distro is a licensed distributor that can distribute to the dispensaries, that can grow, distribute to dispensaries and do all

79

that and deal with everyone, licensed. It's called Distro, it's one of the hardest one to get." UM51█ replied, "Damn, nice." Case agents believe that SARABIA is attempting to become one of the first licensed wholesale marijuana distributors in the State of Wisconsin. SARABIA continued, "So I got Tony Evers, Melissa, uh, Regina Sargent which is the two Congress people in Madison County that are working on giving me the first license. In Madison County." Case agents know that Tony Evers is the Governor of the State of Wisconsin, and that Melissa Sargent is a representative in the Wisconsin State Assembly. UM51█ replied, "Damn." SARABIA stated, "I'll be the first one; the first ones to get the license there. You know, hopefully, God willing. And my building, we resumed it already. So I resumed my business already to what they wanted me to do for Agriculture, but it's called Mercantile. It's called Mercantile. It's the zoning. So I'm already Mercantile and part of Cultivation. Mercantile means trade and business Agriculture. So I can operate 24/7. So I'm buying the land next door which is [AUDIO BREAKS] 35,000 [AUDIO BREAKS] they just redo my blueprint for one side of the building only. The one that's gonna operate as a-- okay so half the building is going to be a Dist (distribution) and the other half is gonna operation." Case agents believe that SARABIA has purchased an unknown building in Dane County, Wisconsin, and that SARABIA plans on manufacturing marijuana for distribution to future dispensaries in the State of Wisconsin.

161.   Later in the conversation, UM51█ stated, "Do they have a Chase over there in Wisconsin?" SARABIA replied, "Uh, I gotta check. I know they have BMA's

that I do know, you know? No not Wisconsin, in Chi." UM51█ asked, "Oh, in Chi?" SARABIA replied, "Mm-hmm. Well the money still in Chi. It's not in Wiscon." UM51█ stated, "Oh, alright." SARABIA continued, "Yeah, I got the money in Chi, in Wisconsin when I move it up but I have the money sitting over there. I moved it over there because when [AUIO BREAKS] BMA so I said, "Imma move the money over here" and it's about a two hour drive. I don't wanna -- I was not 'bout to drive with a million, uh, 1.6, I can sure that shit was stressing." Based upon their training, experience, and familiarity with the investigation, case agents believe that SARABIA had secreted 1.6 million dollars in U.S. currency somewhere at a stash location in Illinois. UM51█ exclaimed, "What the fuck!" SARABIA replied, "I was stressing the fuck out. I went and took it. I took it because my friend told me he was going to send it to me over here. A Chinese/Asian guy, you know? So I arrived and went to go get the Chinese/Asian to that place. You know how I do it. When I [U/I] receipt in Nola." Case agents believe that the unknown Chinese or Asian person paid SARABIA a large portion of the U.S. currency and SARABIA was worried about transporting such a large quantity of U.S. currency that represented illegal proceeds. Therefore, SARABIA left the money at a safe location in Illinois.

162. On July 5, 2020, at 8:33 p.m., SARABIA, using Target Telephone 7, received a call from unidentified male (UM00█, using the phone number (562) 247-█ During the conversation, SARABIA stated, "Oh, I'm over here in Chi-town; you know me. We moving a lot. A lot. Too much, sir." UM00█ replied, "You crazy." SARABIA said, "I'm heading to Wisky [Wisconsin] right now in a little bit. Jump on

Highway 94 and head to Wisconsin. I'll be up there, uh I got to bring some paper out you know?" Case agents believe SARABIA told UM00█ that he was in Chicago, Illinois ("Chi-town"), and after that SARABIA would be going to Wisconsin. Based upon positional data for SABRABIA's phone, Target Telephone 7, case agents know that SARABIA was actually in California at the time of this call.

163.    During this conversation, SARABIA and UM00█ discussed selling marijuana edibles, and UM0█ told SARABIA that he had a "lot of boys" in "Wisconsin, Milwaukee, Chicago." UM00█ continued, "Well the other one, the thing is, it's not really that it's good, it's no one can fuck with us. Not even half." UM00█ asked, "Know what I mean? Put it this way, everything we put-we're gonna put like four (4), five (5) dollars on top of everything." SARABIA replied, "Yeah like-like the eddies." The eddies is big money, you know? . . . I'll tell you one thing. If I ain't doubling, I ain't touching it. How 'bout that?" It's the only way Imma risk my paper." Case agents believe UM00█ and SARABIA discussed the hefty profit they are able to make on marijuana edible products. ("The eddies is big money, you know?"). Furthermore, case agents believe SARABIA told UM00█ that SARABIA would double the price of marijuana edibles to make a better profit ("If I ain't doubling, I ain't touching it"), and that SARABIA didn't want to risk his money for anything less ("It's the only way Imma risk my paper.").

164.    As the conversation continued SARABIA said, "I'm a player though. I'm a player. I don't give a fuck. I lost [unintelligible amount of money] G's. Don't give a fuck, that shit don't stop me." UM00█ replied, "Yeah, I'll get it there." Based upon

their training, experience, and familiarity with the investigation, case agents believe SARABIA told UM00█ that SARABIA was motivated to sell and make money by selling controlled substances. UM00█ told SARABIA that he will get the controlled substances to SARABIA in Wisconsin ("Yeah, I'll get it there"). SARABIA continued, "I fucked up, I fucking [U/I] and that's what, even my boy told me, 'You should never ever vacuum; I'm like you, 'You told me dick.' He goes, 'Yeah, but I didn't think you were gonna go like that. I thought you was gonna use those little boxes.' I fucking vacuumed that, I fucking sent it was six or seven boxes, fifty (50) pounds each. It was uh, six vacuums, vacuum seals – little things in each one." Case agents further believe SARABIA explained to UM0000 that SARABIA had six or seven boxes with 50 pounds of marijuana in each confiscated by law enforcement. SARABIA explained to UM00█ that his "boy" (SANCHEZ) told SARABIA that SARABIA shouldn't vacuum seal marijuana with other controlled substances. Case agents believe SARABIA vacuum sealed additional quantities of controlled substances along with the marijuana ("little things in each one"). SARABIA and UM00█ then discussed how "they" (law enforcement) know what packaged marijuana distributed through parcel shipments appears to look like based on how the boxes are packaged, and the density.

165.    On July 12, 2020, at 4:14 p.m., SARABIA, using Target Telephone 7, called an unidentified female (UF1345), "China," user of (626) 780-███ During the call UF13█ asked SARABIA, "Have you talked to Goofy?" Case agents believe UF13█ is an employee and involved with SARABIA at the Boost Mobile store owned

83

by SARABIA in Lakewood, California. Later in the call, SARABIA told UF13█ that SARABIA received a phone call from his son, SANCHEZ, last night. SARABIA said that during the conversation with SANCHEZ, SANCHEZ told SARABIA that SANCHEZ went to his mom's house. SARABIA told UF13█ "I guess the package said it was delivered but it wasn't there, so Julian (SANCHEZ) went to the neighbors." UF13█ asked, "The mailman went to the neighbors?" SARABIA clarified and said, "I guess they must have sent him money, right? I said delivered, but they never got it at his mom's so they went knocking on doors." Case agents know through intercepted calls on other Target Telephones that PEREZ III mailed a total of seven packages containing U.S. currency to SANCHEZ at two different addresses in California, but that three of the packages were not delivered despite being marked as delivered by the United States Postal Service.

### SARABIA met with PEREZ III in Wisconsin to Obtain Drug Proceeds and Laundered the Cash

166.    Based upon the court ordered Title III wiretap location data associated with Target Telephone 7, case agents confirmed SARABIA traveled to Wisconsin on July 14, 2020, and that he was operating a silver 2016 Toyota Camry bearing Illinois registration AE2 8474, which case agents located on July 15, 2020. Case agents conducted physical surveillance of SARABIA and determined SARABIA and his known girlfriend, Monica CORONA, were staying in an apartment located at ██ W. Wisconsin Avenue in the City of Milwaukee, Wisconsin.

167.    On July 16, 2020, at approximately 11:43 p.m., the court ordered location data associated with SARABIA's Target Telephone 7 reflected that SARABIA

was in the area of PEREZ III's residence. Case agents responded to the area, and at 12:15 a.m. on July 17, 2020, located SARABIA's silver 2016 Toyota Camry bearing Illinois registration AE2 8474 parked on the west side of S. 57th Street several houses north of ███ S. 57th Street, PEREZ III's residence. At approximately 2:28 a.m., case agents observed the silver Toyota Camry leave its parked location with the lights off. Case agents were unable to observe who entered the vehicle due to the time of day.

168. At approximately 2:38 a.m., case agents observed the silver Toyota Camry bearing Illinois registration AE2-8474 enter the parking lot behind ███ W. Wisconsin Avenue and park. Case agents observed the trunk open on the Toyota Camry and observed SARABIA exit the front driver's door and CORONA exit the front passenger door. Case agents observed SARABIA walk to the trunk of the car and retrieve a large darker colored backpack from the trunk that appeared to be weighted down. Both SARABIA and CORONA walked to the entrance of ███ W. Wisconsin Avenue and entered the building. Based upon their training, experience, and familiarity with this investigation, case agents believe that SARABIA met with PEREZ III to obtain drug proceeds.

169. On July 17, 2020, at 6:14 p.m., SARABIA, using Target Telephone 7, called an unidentified male (UM51██, using (480) 375-███ During the conversation SARABIA stated that he was at "Vernon Hills." SARABIA stated, "But I went in there, and I was waiting, I was like, "Why isn't [U/I] right there? 'Cause the ATM, I was in the line, and nobody [U/I]. It said right there, "No Cash." So I said, squish, I'm out... two minutes ago." UM51█ replied, "Shit, so that one's not even

85

taking cash?" SARABIA stated, "No, that one doesn't have cash. I mean so, I'm gonna – there's another one but it's – it's like towards the city. [U/I] I got like 90 G's on me. Some twenties (20), [U/I] like fuck. I've been depositing. Don't think I just deposit for you. I've been fucking racking, bro." Case agents believe SARABIA collected and deposited drug proceeds for UM51█ to assist UM51█ with laundering his money. Case agents believe that SARABIA also launders money for other unknown criminal associates as well as himself. UM51█ asked, "For someone else, or what?" SARABIA stated, "Yeah, some stuff have came up. I've been racking it up. But all the hundreds, the-the- all the big bills I sent them all. Because those bigger ones they're expecting the [U/I] to grab." Case agents believe that SARABIA mailed the larger denominations of U.S. currency to unknown associates and was depositing the smaller denominations through various ATM locations.

170. Later on in the conversation SARABIA stated, "It's all good. It's your best friend. He texted me." UM51█ replied, "I never knew that." SARABIA responded, "C'mon man, you don't need nothing from anybody. I'll send it, don't worry." UM51█ asked, "Huh?" SARABIA stated, "I gotta tell him, give me three or four accounts." Case agents believe that SARABIA referred to different bank accounts when SARABIA referenced "accounts." SARABIA continued, "Different ones, and I'll put it over there, and that's it. And you don't got to worry about shit." UM51█ replied, "Well, yeah, if you do it that with the card." SARABIA replied, "You don't need the card in order to -- with his account bro. I got all of the papers for all that." UM51█ stated, "I know. I know the way you were talking about it. I knew you

86

were talking about those." SARABIA stated, "No, [U/I] I got like 15 fucking accounts bro. I went to the wrong [U/I] number, oh fuck. [U/I] go back to the message, fucking . . . Right now I'm heading to the other one." Case agents believe that SARABIA had access to 15 different bank accounts that SARABIA used to deposit drug proceeds and further believe the accounts are not with the same bank. UM51█ asked, "How much you trynna do?" SARABIA answered, "Well fuck, I'm trynna bring your thirty (30), nigga." Based upon their training, experience, and familiarity with the investigation, case agents believe SARABIA attempted to deposit thirty thousand dollars for UM51█ UM51█ responded, "Alright." SARABIA stated, "That's what I'm trynna do." UM51█ exclaimed, "You halfway! You halfway!" SARABIA replied, "No well, I put fourteen (14). When I tried to put, it didn't let me put more. It spit it out. . . . It spit it out so I'm like, it's gassed out. Put it back in and nothing." Case agents believe SARABIA deposited fourteen thousand dollars into one ATM; however, the machine would not allow SARABIA to deposit anymore.

171. On July 17, 2020, at 1:11 p.m., case agents conducted physical surveillance of SARABIA and CORONA. Case agents observed SARABIA and CORONA leave Milwaukee, Wisconsin, together in the Toyota Camry described above. Case agents observed SARABIA walk to the vehicle carrying a weighted down backpack, which appeared to be the same backpack SARABIA carried when he returned from PEREZ III's residence earlier that morning. Case agents followed SARABIA and CORONA from Milwaukee, Wisconsin, to Illinois, and conducted surveillance throughout the afternoon. Case agents observed SARABIA and

CORONA eventually stop at a CITI Bank located at 700 N. Milwaukee Avenue, Vernon Hills, Illinois. Case agents observed SARABIA arrive at the CITI Bank at approximately 4:58 p.m., and pull into the drive through and stop at the ATM machine. Case agents observed SARABIA manipulating the machine and appeared to be placing something into the ATM, after which he received several receipts. Case agents believe SARABIA conducted several transactions while he was at the ATM. Case agents observed that SARABIA left the ATM at approximately 5:12 p.m. Based upon the timing in conjunction with the surveillance, case agents believe the conversation between SARABIA and UM51█ detailed above, corresponded to these transactions.

172. While in the Midwest, on July 17, 2020, at 2:54 p.m., SARABIA, using Target Telephone 7, called JESUS, his brother and father of Gabriel MATTESON, using (562) 284█ This conversation occurred in both Spanish and English. SARABIA stated that he spoke to "Ocho" (PEREZ III), and JESUS asked what transpired. SARABIA stated that "Ocho" believed that SARABIA was running to "get paper," which case agents believe to mean money. JESUS acted surprised, and SARABIA stated that "Ocho" asked SARABIA to talk to "the guy" to see if SARABIA can recover that money for "him," which case agents believe to be PEREZ III. SARABIA stated that if SARABIA could recover the money for PEREZ III, that PEREZ III would give SARABIA "10 racks -- from the 60 G's." Case agents believe that this conversation was in reference to the $60,000 that was lost in the three packages from the Postal Service destined to be delivered to SANCHEZ at █ E.

Valley View in California (as described in calls intercepted over SANCHEZ's Target Telephones). JESUS asked SARABIA why PEREZ III thought it was "RONNIE" [a SANCHEZ/SARABIA relative] who stole the package, and SARABIA stated that "Ocho" believed that it was someone who was close to him/her, and not anyone from the post office because the packages show as being delivered in the postal service tracking system.

173. SARABIA told JESUS that it was "funny" because [U/I] called SARABIA saying that SANCHEZ was knocking on neighbors' door and scaring his parents. JESUS stated that if JESUS talked to RONNIE and if "they did take it," JESUS would "probably try to get him out of the way." JESUS stated that he would "get out of the way," but that's something to discuss face to face rather than on the phone, and SARABIA agreed. SARABIA told JESUS to "get on it" before SARABIA returns to California. SARABIA stated that "Ocho" is scared, and that "Ocho" claimed that he was "doing paperwork," and was unsure about some of the money because "they" (unclear who he is referring to) "don't get down like that." SARABIA stated that he told "Ocho" "whatever you want to give him, that's on you." Case agents believe that PEREZ III discussed the missing money packages with SARABIA and that if SARABIA would be able to have one of SARABIA's associates recover the packages, PEREZ III would financially compensate that person an amount of U.S. currency that PEREZ III would determine ("whatever you want to give him, that's on you.").

174. A review of U.S. Postal records by case agents revealed that on July 9, 2020, PEREZ III shipped three postal packages to SANCHEZ in California to the

address ███ E. Valley View Avenue, West Covina, California. Based upon previously seized packages, the corresponding weight of the packages, and the investigation to date, case agents believe that each parcel contained $20,000 in U.S. currency. Based upon intercepted communications, case agents further believe that these packages were stolen by an unknown individual in California, and therefore failed to reach SANCHEZ.

175. On July 18, 2020, at 1:22 p.m., SARABIA, using Target Telephone 7, called JESUS, using (562) 284-███ JESUS asked, "And that man, has he reported himself?" Case agents believe this 'man' to be PEREZ III. SARABIA answered, "Tuesday, Tuesday, but... he asked me about [U/I]." JESUS told SARABIA that SANCHEZ called JESUS yesterday and SANCHEZ told JESUS that SANCHEZ was gonna go to his "grandpa's house and ask him for the surveillance videos to see if someone grabbed it." JESUS told SARABIA that "the other dude" (PEREZ III) "brain washes" SANCHEZ. SANCHEZ told JESUS that SANCHEZ's buddy "Ocho" was "getting a crew" ready to go to California to attempt to locate the missing money packages. JESUS told SARABIA that SANCHEZ thought that "Ocho" was going to bring a bunch of "guys" from where "Ocho" is from (meaning Milwaukee). SARABIA told JESUS that "the crew is us." Case agents believe that SARABIA and JESUS referred to themselves as "the crew," meaning that they are in charge of the California DTO.

176. On July 20, 2020, at 1:33 p.m., SARABIA, using Target telephone 7, called JESUS, using (562) 284-███ During this call, SARABIA and JESUS

90

continued to talk about the missing money packages and that SANCHEZ and "Ocho" (PEREZ III) were accusing one of SANCHEZ's family members of stealing from the DTO. SARABIA told JESUS that he had purchased a phone in Milwaukee and SARABIA was attempting to activate it. JESUS told SARABIA to talk to "Ocho" about the missing money and to have SANCHEZ "go get on that shit" when SANCHEZ returned from northern California. JESUS told SARABIA that the video from the house was "the most important thing" to determine if the packages were delivered. JESUS told SARABIA that if SANCHEZ was "up north" then SANCHEZ and PEREZ III were not putting in the time or effort to locate the packages. SARABIA told JESUS that SARABIA would "hit him up right now." Case agents believe that SARABIA told JESUS that he would call PEREZ III momentarily.

177. On July 21, 2020, at 5:12 p.m., SARABIA, using Target Telephone 7, called an unidentified male (UM84█), using (909) 974-█ During this call, SARABIA and UM84█ discussed the missing money packages and SANCEZ's belief that someone stole the packages. SARABIA stated that SARABIA hadn't talked to SANCHEZ yet, but SARABIA's "friend at the post office" told SARABIA that the packages were delivered. UM84█ told SARABIA that UM84█ will have his "dad" look at the cameras on the residence. SARABIA stated that SANCHEZ is "in a situation with the dude over there," which case agents believe to be PEREZ III. UM84█ told SARABIA that SANCHEZ "will be forever paying off his debt" and that SANCHEZ will be "a mule forever" to pay off the debts. SARABIA described SANCHEZ as not "being on top of his game," and that if SANCHEZ were, SANCHEZ

would be looking for the missing money instead of "smoking weed." UM84█ told SARABIA that SANCHEZ should have asked SARABIA for "some help."

178. On July 21, 2020, at 5:25 p.m., SARABIA, using Target Telephone 7, called JESUS, using (562) 284-███. During this call, JESUS stated, "And that clown, did he report himself?" SARABIA responded, "Well, I will see, tomorrow. I will see him tomorrow night so he can give me what's left. Thirty is what is left. Thirty-two. I will see him tomorrow. So hopefully he is ready, so we are good with that." JESUS commented, "Yeah, get that out the way." SARABIA stated, "Yeah, once I get that, I'm good." Based upon their training, experience, and familiarity with the investigation, case agents believe that JESUS and SABRIA discussed the remaining money owed to SARABIA from PEREZ III and that the amount was $32,000. Further, case agents believe that SARABIA was going to see PEREZ III "tomorrow" to collect the outstanding balance.

179. On July 22, 2020, at 12:27 p.m., SARABIA, using Target Telephone 7, called JESUS, using (562) 284█████ During this call, JESUS stated "And that man, did he report himself?" Case agents believe that this is in reference to PEREZ III. SARABIA answered, "I'm going see him at eight (8:00)." JESUS stated, "Alright. Well let's see what happens." SARABIA replied, "Yeah, I'm gonna see him today and then I'll be on my way, tomorrow." JESUS responded, "Yeah, well let's see if he comes through." Case agents believe this to be in reference to PEREZ III paying SARABIA the outstanding balance owed to SARABIA. SARABIA stated, "Yeah, I texted him earlier. Like, "hey, you know, hopefully we can do it earlier and not too late." 'Cause

last time, Dick, he had me [U/I] like 3:00, I left at 3:00 in the morning." Case agents

believe that this is in reference to the payment that PEREZ III made to SARABIA on

July 17, 2020, referenced above. JESUS responded, "No, fuck all that." SARABIA

replied, "I told him-I told him –that's messed up. I told him yesterday, you know,

could you make it earlier. You gotta give me time to do what I gotta do, you know?"

Case agents believe that SARABIA talked about needing the money earlier because

he had to deposit it. JESUS stated, "Yeah. Did he answer?" SARABIA replied, "Yeah,

he told me at 7:00. I told him if we can do 8:00. I told him "that's fine." Case agents

believe that PEREZ III and SARABIA had made arrangements to meet later that

evening to make the payment.

180.   In response to the above-referenced call, case agents conducted

surveillance in the area of ▮▮ W. Wisconsin Avenue.  At approximately 8:20 p.m.,

case agents observed SARABIA and CORONA exit ▮▮ W. Wisconsin Avenue and

enter the silver Toyota Camry bearing Illinois registration AE2-8474.  Case agents

had established surveillance at PEREZ III's residence at ▮▮ S. 57th Street, and at

8:36 p.m., case agents observed SARABIA exit the Camry carrying a backpack.  At

8:49 p.m., PEREZ III arrived in a Chevrolet Impala and greeted SARABIA.  Case

agents observed both SARABIA and PEREZ III on the porch at ▮▮ S. 57th Street

where they then disappeared from case agents' view.  At 9:37 p.m., case agents

observed SARABIA exit the residence at ▮▮ S. 57th Street and walk to the trunk of

the vehicle where SARABIA was observed placing the same backpack into the trunk

of the Camry.  Case agents followed SARABIA and CORONA back to ▮▮ W.

Wisconsin Avenue where they parked in the parking lot. SARABIA exited the passenger seat and removed the same backpack from the trunk of the Camry. Both SARABIA and CORONA then walked to the entrance of ▮ W. Wisconsin Avenue and entered the building. Based upon their training, experience, and knowledge of this investigation, case agents believe that SARABIA obtained drug proceeds from PEREZ III, which he transported in the backpack.

181. On July 23, 2020, at 1:01 p.m., SARABIA, using Target Telephone 7, called JESUS, using (562) 284-▮ This conversation occurred partly in Spanish and partly in English. During this call, SARABIA told JESUS that "I seen him yesterday" and that SARABIA got his "bread." Case agents believe that SARABIA met with PEREZ III to pick his owed drug proceeds. JESUS told SARABIA that JESUS had talked to "him" (meaning SANCHEZ), and that "he" "needed to get that money 'cause right now you're in no condition, know what I mean?" JESUS stated that "the other guy" (referencing PEREZ III) took "30," which was half of the loss. Case agents believe that this was in reference to the missing packages from the postal service. Later in the call, JESUS stated that SANCHEZ was supposed to travel to Milwaukee to meet with PEREZ III, but that SANCHEZ did not want to go "for a dry run" and further, if SANCHEZ did travel to Milwaukee, that PEREZ III would want SANCHEZ to take a large amount of U.S. currency back with him, which SANCHEZ did not want to do. Based upon intercepted communications, case agents know that XINA is pregnant with PEREZ III's child and a gender reveal party was planned to which SANCHEZ was invited. Based upon intercepted telephone calls as well as

94

location data for SANCHEZ's phone, SANCHEZ did not travel to Milwaukee as originally planned.

182.   On August 18, 2020, at 10:37 a.m., case agents were monitoring the location data information for SARABIA's cellular telephone and observed that SARABIA was located at the Los Angeles International Airport.  At 4:51 p.m., the location data showed that SARABIA was in the area of the O'Hare International Airport in Chicago, Illinois. At 7:39 p.m., the location data showed that SARABIA was in the downtown Milwaukee, Wisconsin area.  At 9:03 p.m., the location data showed that SARABIA was in the vicinity of ███ S. 57th Street, West Allis, Wisconsin. (PEREZ III's residence).  Case agents attempted to conduct physical surveillance, but by the time agents arrived SARABIA was no longer in the area. Case agents reviewed the WhatsApp pen data and observed that PEREZ III and SARABIA were in contact via WhatsApp several times from approximately 5:25 p.m. until approximately 8:56 p.m.

183.   Case agents reviewed the surveillance camera at the rear of ███ S. 57th Street (PEREZ III's residence) and observed that at approximately 8:54 p.m., a small SUV vehicle arrived and parked in the alley near PEREZ III's residence.  A single subject exited the driver's door and went to the rear of the vehicle and removed a bag. Due to darkness, case agents could not positively identify the person.  After retrieving the bag, the subject walked toward the alley gate at ███ S. 57th Street.  At approximately 9:15 p.m., the subject walked out of the area of ███ S. 57th Street, entered the small SUV, and drove out of the camera view.  Based on the investigation

95

to date, as well as the location data for SARABIA's phone, case agents believed that this subject was SARABIA.

184.   Case agents reviewed the location data for SARABIA's phone, which revealed that SARABIA returned to the area of downtown Milwaukee briefly, then traveled south on I-94 to Vernon Hills, Illinois, and arrived at 10:53 p.m.  SARABIA then traveled back to downtown Milwaukee, where he arrived at approximately 1:58 a.m. on August 19, 2020.  Case agents believe that SARABIA obtained drug proceeds from PEREZ III and subsequently travelled with the proceeds to Vernon Hills, Illinois, where the proceeds were deposited via ATM into unknown bank accounts.

### *SARABIA Conceals Drug Proceeds*

185.   According to the California Department of Motor Vehicles, public databases, as well as information from law enforcement officers in California, SARABIA also uses the alias name of Ali MAS.

186.   The investigation has revealed that SARABIA owns a Boost Mobile store, a Direct TV store/Dish TV, and other unidentified businesses.  Additionally, the investigation has revealed that SARABIA has at least fifteen different bank accounts and numerous LLCs, some of which are linked to either his long-time girlfriend, CORONA, and/or his alias, Ali MAS.

187.   Based upon USPS records, intercepted calls, physical surveillance, and bank records, case agents believe that SARABIA is using his various bank accounts and LLCs to launder DTO proceeds. Specifically, case agents believe that SARABIA, in addition to knowing about the concealed U.S. currency shipped from Milwaukee, Wisconsin, to various addresses in California, deposits large amounts of cash, which he then uses for business purchases.

96

a. For example, On March 4, 2020, post office video surveillance depicted PEREZ III mailing three USPS Priority parcel shipments from Milwaukee, Wisconsin, to West Covina, California. The packages weighed 4.1l pounds, 4.4 pounds, and 4.5 pounds and were all addressed to SANCHEZ. PEREZ III used an alias name (Joe Gonzalez) and a Walgreens address on the return label. PEREZ III sent two of the packages to SANCHEZ's grandparents' residence and one of the packages to a postal annex store located at 964 East Badillo ████ Covina, California. Records reflect that all three of the parcels were delivered on March 6, 2020, and none of the packages required a signature upon delivery. Based upon their training, experience, and knowledge of this investigation, case agents believe that each parcel contained approximately $20,000, for a total of $60,000.

b. On March 9, 2020, a cash deposit of $39,000 occurred in SARABIA's Citibank business account ending in x401, which he opened in the name of Ali Mas/ATF Qwiky Trust. On the same day, a wire transfer was initiated for $38,850 to a business in China that supplies mobile phone accessories.

c. As another example, on April 15, 2020, post office video surveillance depicted PEREZ III mailing two USPS Priority parcel shipments, both weighing 3 pounds and 14 ounces, from Milwaukee, Wisconsin, to West Covina, California. Both packages were addressed to SANCHEZ. PEREZ III used the same alias name and false address on the return label as for the packages sent on March 4, 2020, as described above. PEREZ III sent one of the packages to SANCHEZ's grandparents' residence and one of the packages to the postal annex store located at 964 East Badillo ████ Covina, California. On April 16, 2020, United States Postal Inspectors conducted a search warrant on the two USPS parcels above. Upon inspection of each package, Postal Inspectors found U.S. Currency concealed inside magazines. Each package contained $20,000 in U.S. currency totaling $40,000. Both packages were delivered on April 18, 2020, and neither of the packages required a signature upon delivery.

d. On April 22, 2020, a cash deposit of $31,500 occurred in SARABIA's business x401 account. On the same day, a wire transfer was initiated for $30,000 to the same business in China that supplies mobile phone accessories.

97

## Gabriel MATTESON

188. Gabriel MATTESON is an Hispanic Male born on ███████ 1998. MATTESON resides at ████ Heflin Drive, La Mirada, California. This has been confirmed though investigation and surveillance. The investigation to date has revealed that MATTESON assists SANCHEZ with the packaging and shipping of marijuana obtained in northern California, which is then shipped to Milwaukee, Wisconsin, for the DTO to distribute under the brand name "Midwest Connect" or "Midwest Connected." Between May 21, 2020, and September 6, 2020, approximately 77 intercepted calls and/or text messages between SANCHEZ and MATTESON were deemed criminal and pertinent in nature.

189. For example, on May 22, 2020, at 6:52 p.m., case agents intercepted an incoming call to SANCHEZ on Target Telephone 5 from JARED, a relative, using (909) 761-███. After other unrelated conversation JARED asked, "Hey, Gabriel, big chillin' now or what?" SANCHEZ replied, "Yeah this foo's been big chilling now for like two weeks, three weeks, a month. I don't know. [ASIDE: Hey Gabriel, you better (INTERRUPTION) soon, nigga. I've been fucking this shit up]." JARED said, "[U/I]. You gon' make Gabriel a millionaire or what?" SANCHEZ replied, "Mmm, Gabriel said he was the chosen one." During the conversation, a third male voice was heard. Based upon circumstances and voice identification, that male voice is believed to be Gabriel MATTESON. Case agents believe JARED and SANCHEZ were discussing MATTESON, and case agents further believe MATTESON was with SANCHEZ, because SANCHEZ yelled to MATTESON during the conversation. ("Hey Gabriel,

98

you better (INTERRUPTION) soon, nigga. I've been fucking this shit up."). Further, case agents reviewed the location information for Target Telephone 5 around the time of the call (6:48 p.m.), and a review of that data for Target Telephone 5 revealed that it was in the area around Santa Cruz, California (northern California).

190.   On May 24, 2020, at 2:55 p.m., SANCHEZ, using Target Telephone 5, called MATTESON at phone number (562) 536-███ SANCHEZ said, "I was say, go take Bonnie for a walk, like to go pee in the back, but go through the front door and then text me like when you are outside like the doors closed and then I'm going to fill one pack. I wanna see if you hear any vibration. But like go over like…" MATTESON replied, "Alright…" SANCHEZ continued, "You gonna take her, like pee, where the [U/I] shit, where she always goes, by the rose bushes and shit." MATTESON replied, "Alright." SANCHEZ said, "Text me when you are outside and the door is closed so I can do it when you are like right by –" MATTESON confirmed, "Alright." Case agents reviewed the positional data for Target Telephone 5 which revealed that immediately prior to the call (2:48 p.m.) and immediately after the call (3:03 p.m.) Target Telephone 5 was in the area of Santa Cruz/Aptos, California. Based upon their training, experience, and familiarity with the investigation, case agents believe SANCHEZ asked MATTESON to go outside of the rental home they were utilizing in order to listen as SANCHEZ vacuum sealed the marijuana to see if the noise of the sealer could be heard outside the residence.  Furthermore, case agents believe, that during this timeframe MATTESON and SANCHEZ were packaging and sealing marijuana to be shipped to the PEREZ III DTO in Milwaukee, Wisconsin.

191.    On June 26, 2020, at 6:53 p.m., SANCHEZ, using Target Telephone 6, received a call from MATTESON, user of (562) 536-███ During the conversation, SANCHEZ stated, "Hey, I got a long drive, ayr. I went already, I got everything-- I got the bags for us I got more bo-- I got these little other duffel bags. I got like six duffel bags, nigga." MATTESON stated, "Damn." SANCHEZ continued, "Yeah, I got six, six duffel bags. More than enough. I'm just stuck n traffic, I'm on my way over there. I'll be there in like a couple hours- like two." Based upon their training, experience, and familiarity with the investigation, case agents believe that SANCHEZ told MATTESON that SANCHEZ had six duffel bags full of marijuana that needed to be packaged, and that SANCHEZ was on his way back to meet up with MATTESON. MATTESON asked, "You're not even over there yet?" SANCHEZ answered, "No, I get there at 7:00." MATTESON responded, "Yeah. Yeah, I figured." SANCHEZ stated, "It's all good. By the time I get back it'll be 10:00, 11:00." SANCHEZ commented, "I coulda called "Ocho" and been like "yeah, "Ocho," we're cool we're clear we could work here" but I wanna go home nigga. Imma keep it how it is, nigga." MATTESON stated, "Yeah." Case agents know that SANCHEZ had been in northern California for an extended period of time and that SANCHEZ talked of wanting to go back to Los Angeles, but PEREZ III (a/k/a "Ocho") wanted SANCHEZ to continue to obtain marijuana for the DTO. SANCHEZ stated, "If I tell "Ocho," that nigga's gonna drown in here later." MATTESON replied, "Yeah don't tell him." SANCHEZ stated, "I'm not gonna tell nigga shit, bro trust me." Case agents believe that SANCHEZ and MATTESON agreed not to tell PEREZ III that more marijuana

100

was currently available. SANCHEZ continued, "Like that nigga's cool. I got him all cool. So like I don't know it should be chill over there. They shouldn't be really like on the fuck shit." Case agents believe that SANCHEZ was getting frustrated with PEREZ III because PEREZ III kept SANCHEZ in northern California for so long, and it was SANCHEZ who set up PEREZ III up in the marijuana business.

192. On June 29, 2020, at 8:08 p.m., MATTESON, using (562) 536-███ sent a text message to SANCHEZ at Target Telephone 5. The text stated, "lemme come back up with you if that bitch flakes it lol I wanna invest." At 8:22 p.m., SANCHEZ replied, "Im.down lsts do it." Case agents believe this to be in reference to SANCHEZ and MATTESON partnering up in the marijuana business. At 8:23 p.m., MATTESON sent text messages to SANCHEZ that stated, "You don't gotta pay me 15$ every bag G," and "I do appreciate you doing that for me though but fr you don't gotta pay me that much." At 8:24 p.m., SANCHEZ replied, "I feel you well what do you think is fair." At 8:29 p.m., MATTESON replied, "Like 10$." Based upon their training, experience and familiarity with the investigation, case agents believe these text messages reflect that SANCHEZ pays MATTESON for assisting with the packaging of the marijuana after SANCHEZ obtains it from the growers in northern California. Case agents believe that SANCHEZ paid MATTESON $15 for each pound of marijuana that MATTESON vacuum sealed in preparation for shipment to Milwaukee, and that MATTESON told SANCHEZ that $10 per pound was a fair wage.

**Xina YANG coordinates the mailing of bulk cash and pick up of packages containing controlled substances, distributes the controlled substances, manages the manufacture of marijuana vape cartridges, and launders drug proceeds on behalf of the PEREZ III DTO.**

## Xina YANG

193.   Xina YANG (XINA) is an Asian female born on ▮▮▮▮▮ 1997.  During the course of this investigation, case agents determined that XINA has used several cellular telephones, including (626) 629-▮▮ and (213) 266-▮▮ (Target Telephone 4).  Further, XINA, more fully described below, uses Snapchat Account "ladie.▮▮ to further the activities of the DTO.  PEREZ III and XINA, PEREZ III's girlfriend, reside at ▮▮ S. 57ᵗʰ Street, West Allis, Wisconsin.  This has been confirmed by investigation, surveillance, and review of utilities records.   Throughout the investigation, data pertaining to the location of PEREZ III's Target Telephone 1 and XINA's Target Telephone 4 revealed the telephones to be in the area of ▮▮ S. 57ᵗʰ Street, West Allis, Wisconsin on a regular basis, including overnight.

194.   The investigation to date has revealed that XINA, the user of Target Telephone 4, and assists PEREZ III with the day to day operations of the DTO, including but not limited to, coordinating individuals to retrieve packages from various addresses in Milwaukee, laundering money for the DTO, as well as the counting and packaging of U.S. currency sent to SANCHEZ via the United States Postal Service.  XINA has recruited her family members to assist in a myriad of DTO activities as detailed below.

195.   As an example of XINA's activity, on May 21, 2020, case agents intercepted an outgoing call from XINA to PEREZ III, using Target Telephone 1. During the conversation XINA asked, "Babe... You know that annex out there." PEREZ III replied, "Huh?"  XINA stated, "That annex ones."  PEREZ III replied, "I'll call 'em right now..."

196.   Case agents know that PEREZ III mailed five USPS packages to SANCHEZ in California between May 19 and May 20, 2020.  Case agents believe these packages contained bulk U.S. currency that was owed to SANCHEZ for marijuana he shipped to PEREZ III.  Case agents know from shipping records that some of these packages were sent to a U.S. Postal annex in California.  Case agents believe XINA was inquiring about the address or other information regarding this location when she referred to the "annex."

197.   On March 31, 2020, at 1:31 p.m., PEREZ III, using Target Telephone 1, called XINA, using Target Telephone 4.  During this call, PEREZ III stated, "I was gonna tell you, mmm, hey my dad's is the only one left, right?" XINA replied, "Yep. And I told you Carlos has one for DHL." PEREZ III asked, "Another one?" XINA replied, "I told you late. I said, why would you grab 'em right now. They have another one coming?"  PEREZ III asked, "Are you sure?"  XINA stated, "I'm positive. I'm reading it right now. It's a partial delivery."  Based upon their training, experience, and familiarity with the investigation, case agents believe that XINA was tracking the packages and that in addition to a package arriving at PEREZ JR.'s residence, ███ E. Morgan Avenue, an additional DHL package was due to arrive at "Carlos'"

103

residence. PEREZ III replied, "It already got delivered if it says partial delivery." XINA stated, "So, that one. So that means there should be three boxes then." PEREZ III responded, "No." XINA asked, "What you mean, 'no'?" PEREZ III told her, "Look at the time. It says 10:01." XINA asked, "Yeah, is that the same one you have?" PEREZ III replied, "Yeah." Case agents believe that PEREZ III and XINA were both tracking the delivery progress of the packages using the tracking number. XINA asked, "HAUSENG got his already?" PEREZ III replied, "He's waiting." XINA asked, "It's a…you – the one that you track?" PEREZ III said, "DHL, that's the only one." XINA asked, "Yeah, that you got, right?" PEREZ III confirmed, "Yeah." Case agents believe that HAUSENG, XINA's brother, was picking up a package at a residence for PEREZ III and XINA, and further that PEREZ III was tracking the package so it could be retrieved as soon as it was delivered.

198. On May 7, 2020, at 6:58 p.m., PEREZ III, using Target Telephone 1, called XINA, using Target Telephone 4. During this call, PEREZ III and PEREZ JR. were together, and PEREZ JR. was heard in the background stating, "Then we could use the bleach." PEREZ III stated, "Hey, my pops. They don't carry chlorine here, but you can just clean out the inside of the tub with bleach." XINA replied, "I did already." PEREZ III stated, "And just put water. Oh, that should be good. It'll be good then, like that. It don't need water." PEREZ III continued, "The water, we're just gonna throw water in there." XINA said, "But I need um, a net to clean, to get out the um, 'cause the top, it had like the flowers and the trees." PEREZ III stated, "Alright." XINA continued, "I need a net to catch it." Based upon their training,

104

Case 2:20-cr-00185-JPS    Filed 09/22/20    Page 105 of 237    Document 3

experience, and familiarity with the investigation, case agents believe that XINA told PEREZ III that XINA needed to clean out the remaining residue from the tub where the DTO washed the packaging material used to hold the marijuana shipped to the DTO. XINA explained that she needed a net to capture all of the marijuana residue and small stems that were left from washing out the packaging bags. Further, case agents believe that XINA referred to marijuana residue as "flowers" and to the small stems as "trees," and needed the net to stop the residue from going down the tub drain.

199. On May 12, 2020, at 3:18 p.m., PEREZ III, using Target Telephone 1, received a call from XINA, using Target Telephone 4. During the conversation XINA stated that she was at Home Depot and asked, "So they declined me and they said they didn't know why. So what should we do?" PEREZ III replied, "Well just come home then. Hey, go pay the loft." Case agents believed XINA attempted to obtain a line of credit from Home Depot because PEREZ III and XINA are completing home improvement and landscaping projects at their residence, ███ S. 57th Street. Case agents believe XINA's application was denied and PEREZ III directed her to go pay the rent at ███ W. Pierce Street, ███ ("go pay the lofts"), the stash apartment. PEREZ III, using Target Telephone 1, then made an outgoing phone call to XINA at Target Telephone 4. PEREZ III asked, "Why don't you see if my mom can apply?" XINA replied, "She said your credit should be good." PEREZ III stated, "She should still try though I think" and "you gotta put that you're making a lot like 80,000 or something like that a year." XINA answered, "I put that I was making six grand a

month." PEREZ III replied, "Yeah, tell my mom to put like she make a hundred then." XINA asked, "Put a hundred?" PEREZ III confirmed, "Yeah. A year." Case agents believe XINA was denied a line of credit at Home Depot. Case agents believe XINA misrepresented the amount of money she was making. ("I put that I was making six grand a month."). PEREZ III then directed XINA to have his mother, Violeta GONZALEZ, apply for a line of credit and report she made $100,000 per year. ("Yeah, tell my mom to put like she make a hundred then."). To date, case agents have yet to locate any legitimate income for PEREZ III or XINA in the amounts PEREZ III and XINA represented on their credit application for Home Depot.

200. On June 10, 2020, at 3:31 p.m., XINA, using Target Telephone 4, called PEREZ III, using Target Telephone 1. During this call, XINA told PEREZ III, "Well, I was gonna say, um…she said she looked for 'em and that, she only found ninety-nine (99) of 'em. And that they emptied out all of 'em, all the boxes…" Based upon their training, experience, and familiarity with the investigation, case agents believe that XINA referred to MARY, her sister, when XINA stated "she" and that MARY was looking for a particular THC product but only found "99." PEREZ III asked, "[U/I] the sticker?" XINA replied, "No…" PEREZ III asked, "The barcode?..." XINA replied, "The bar…yeah. There's only ninety-nine (99) sheets that have twelve (12) ounces, there's only one thousand eight-hundred and eighty-eight (1,888)." PEREZ III stated, "Okay, that's…yeah just do that, and I will do the [U/I] tomorrow. And I'll just tell him." XINA asked, "So, at least put the thing in the ja…in the-in the tubes, then? And close them?" PEREZ III responded, "Yeah, yeah, yeah. Put 'em all-all the

carts in the tubes, and then put 'em in the boxes." XINA replied, "Alright." Case agents believe XINA further indicated that MARY had located 1,888 marijuana vape cartridges. ("There's only one thousand eight-hundred and eighty-eight."). Case agents believe PEREZ III directed XINA to package, or oversee the packaging, of 1,888 marijuana vape cartridges. ("Put 'em all-all the carts in the tubes and then put 'em in the boxes.").

> **Louis PEREZ JR. assisted the DTO with accepting and storing packages that contain controlled substances at his residence, and transporting those packages to other locations used by the DTO.**

### Louis Rey PEREZ JR.

201. Louis Rey PEREZ JR., (a/k/a "Pops"), is an Hispanic male born ▇▇▇▇ 1974, who is currently in the custody of the Federal Bureau of Prisons. PEREZ JR. reported to prison on or about June 23, 2020, after receiving a 60-month sentence in the District of Utah related to the September 2018, traffic stop where eight kilograms of cocaine were discovered in the truck driven by PEREZ JR. Prior to his incarceration, the investigation revealed that PEREZ JR. assisted the PEREZ III DTO by accepting packages at his prior residence, ▇▇ E. Morgan Avenue, as well as storing packages that contained controlled substances at his residence and transporting those packages to other DTO locations. Intercepted communications demonstrate that PEREZ JR. was aware of the drug trafficking activities of members of the PEREZ III DTO and allowed DTO members access to PEREZ JR.'s residence to promote activities of the DTO. Between March 20, 2020, and June 8, 2020, after his conviction in the District of Utah, approximately 138 intercepted calls and/or text

107

messages between PEREZ JR. and PEREZ III and/or XINA were deemed criminal and pertinent in nature.

202.    For example, on March 24, 2020, at 11:28 a.m., PEREZ III, using Target Telephone 1, called PEREZ JR. at (414) 208-███ During the conversation, PEREZ III told PEREZ JR., "Hey, I'm on my way man. I gotta go pick that up man. I already talk..." PEREZ JR. stated, "Alright, then." Case agents observed PEREZ III in the immediate vicinity of ███ S. 17th Street at approximately 11:37 a.m. and then he left the area. At 5:56 p.m., PEREZ III retrieved a package from ███ S. 17th Street and was surveilled to the area of ███ E. Morgan Avenue. At approximately 6:04 p.m., case agents observed, through remote surveillance, PEREZ III arrive at ███ E. Morgan Avenue and exit a white Acura sedan. Estaban REYES, a DTO member, was observed carrying the package that PEREZ III had been observed carrying out of ███ S. 17th Street into the residence of ███ E. Morgan Avenue, the residence of PEREZ JR.

203.    On March 31, 2020, at 6:23 p.m., PEREZ III, using Target Telephone 1, called XINA, at Target Telephone 4. During this call, XINA stated, "I was trynna call you 'cause your Dad's and what his name, and what his name got delivered." PEREZ III asked, "My dad's?" XINA replied, "Yeah." PEREZ III stated, "I've been right here all this time, at my dad's." XINA stated, "Its deliver. It said it deliver." Case agents believe that XINA was tracking the packages containing suspected controlled substances that were being delivered to various addresses in Milwaukee. PEREZ III stated, "What the fuck?" XINA asked, "You got it?" PEREZ III answered, "No." XINA

stated, "Huh." PEREZ III asked, "At my dad's? No." XINA stated, "No, Carlos' and your dad, I mean Carlos' and HAUSENG's, the ones that delivers?" PEREZ III asked, "HAUSENG's and my dad's?" XINA stated, "Carlos and HAUSENG's." PEREZ III asked, "Oh, not my dad's?" XINA replied, "No your dad did for the DHL ones." Case agents believe that multiple packages being delivered to different addresses that day. XINA and PEREZ III discussed which packages were sent to which address. Further, that PEREZ JR. was supposed to receive the DHL packages at his residence. XINA stated, "He sent out another one. I was just, I don't know if you wanna wait." PEREZ III replied, "He [U/I] grab it." Case agents believe that SANCHEZ sent additional packages to PEREZ III that would be arriving later that day.

204. On April 7, 2020, at 4:19 p.m., PEREZ III, using Target Telephone 1, received an incoming text message from PEREZ JR., using (414) 208-███ which stated, "I went to the bank son." At 4:22 p.m., PEREZ III, using Target Telephone 1, responded, "Ok." Based upon their training, experience, and familiarity with this investigation, case agents believe that PEREZ JR. informed PEREZ III that PEREZ JR. had drug proceeds in his possession for PEREZ III. ("I went to the bank son."). A previous call between PEREZ JR., using Target Telephone 1, and PEREZ JR., using (414) 208-███ revealed that PEREZ JR. stored at least some of the DTO drug proceeds at his residence located at 420 E. Morgan Avenue. Specifically, on March 30, 2020, at 10:46 p.m., PEREZ III called PEREZ JR. and asked PEREZ JR. to go into the bedroom and open a box, and further stated, "I had my money in that red box." PEREZ JR. responded, "The Nike one?" PEREZ III responded, "Yeah." During this

call, PEREZ III expressed concern that the money was missing and told PEREZ JR. that PEREZ III would come to PEREZ JR.'s residence to check on the money because PEREZ III had "left some money there pops."

205. On April 11, 2020, at 3:53 p.m., PEREZ JR., using (414) 208-███ called XINA, using Target Telephone 4. During the conversation, PEREZ JR. told XINA, "Nano got pulled over last night."[13] As the conversation continued, XINA believed PEREZ JR. was at PEREZ III's residence, and PEREZ JR. corrected XINA and said, "Umm no, we're at the building…" Case agents believe the "building" to be ███ W. Pierce Street, ███ XINA replied "Oh the…just be careful pa, don't touch everything." PEREZ JR. replied, "Oh no, no, no, there's nobody here." XINA asked, "Nobody's there?" PEREZ JR. replied, "Nobody's here. We just come here to make sure…I mean there's hardly any garbage of some sort." PEREZ JR. continued, "When you guys get down you got to wash your hands you know? You got to wash your hands really good you know?"

206. Case agents believe this indicates (and surveillance would later confirm) that PEREZ JR. was at ███ W. Pierce Street, Apartment ███ PEREZ JR. was at the stash location to ensure that the contents of the apartment were safe after "Nano's" traffic stop, and also to discard any garbage created by the processing of controlled substances at that location. PEREZ JR. expressed concern about the processing of the controlled substances and stressed to XINA that after processing, that they needed to "wash your hands really good."

---

[13] Case agents know that "Nano" is Geronimo RODRIGUEZ, Antonio RODRIGUEZ's brother, and also a known Mexican Posse gang member.

110

207. On April 28, 2020, at 8:48 p.m., PEREZ III, using Target Telephone 1, called PEREZ JR. at (414) 208-███ During this call, PEREZ III stated, "Hey I was gonna tell you um... hey I was gonna tell you too Pops, that tomorrow I got those tattoo guns coming." Based upon their training, experience, and familiarity with the investigation, case agents believe this to mean that PEREZ III informed PEREZ JR. that a package containing controlled substances was going to be delivered to PEREZ JR.'s residence. PEREZ JR. stated, "Okay that's fine." PEREZ III stated, "If you can keep an eye out for me." PEREZ JR. reiterated, "That's fine." PEREZ III replied, "Alright Pops thank you." Based upon their training, experience, and familiarity with the investigation, case agents believe that PEREZ III asked PEREZ JR. to watch out for the package and retrieve it upon arrival.

208. On May 5, 2020, at 9:33 a.m., PEREZ III, using Target Telephone 1, placed on outgoing call to PEREZ JR. at telephone number (414) 208-███ The call went to voicemail but prior to hanging up, PEREZ III was overheard stating, "Babe, they just got delivered (U/I) will grab them, right?" Case agents believe that PEREZ III was tracking a package containing controlled substances and observed that the package had been delivered to PEREZ JR.'s residence at ███ E. Morgan Avenue. At 10:07 a.m., PEREZ III received an incoming text message from PEREZ JR., which read: "Call me." Shortly thereafter, PEREZ III received an incoming phone call on Target Telephone 1 from PEREZ JR. During the conversation PEREZ III stated, "Ey, never mind Pops. I picked it up, man." Case agents reviewed video from the covert video recorder at ███ E. Morgan Avenue. At approximately 9:28 a.m., a FedEx

111

delivery truck was observed in front of ██ E. Morgan Avenue, and a delivery driver placed a package on the front porch of ██ E. Morgan Avenue. At approximately 9:55 a.m., PEREZ III was observed parking in front of ██ E. Morgan Avenue and was observed via the remote surveillance camera retrieving the package from the porch of ██ E. Morgan Avenue.

209. On June 12, 2020, at 8:39 p.m., JASMINE, PEREZ III's sister and PEREZ JR.'s daughter, using (414) 731-██ called PEREZ III, using Target Telephone 1. JASMINE gave the phone to Louis PEREZ JR., and PEREZ III stated, "Hey Pops, I was gonna see, hey can you-- um, can you help me out with the 1,000 of those puzzle pieces?" PEREZ JR. stated, "That's fine, I will go count them right now." PEREZ III replied, "Alright, I'll be on my way. Just whatever you could and then..." PEREZ JR. reiterated, "That's fine." Case agents believe that during this call PEREZ III asked PEREZ JR. to count out 1,000 vape cartridges for PEREZ III to pick up for distribution.

210. On June 24, 2020, case agents reviewed footage from the covert camera at ██ E. Morgan Avenue. At 3:21 p.m., case agents observed MARY, (XINA's sister), arrive at ██ E. Morgan Avenue driving MARY's Ford F-150. MARY backed up to the front door of the residence. At 3:23 p.m., PEREZ III, Manuel SOTO, and Luis GOMEZ JR., began loading the back of the pickup truck with boxes that were removed from inside the residence. Case agents counted at least 19 boxes that were loaded into the F-150. After the boxes were loaded, MARY departed the residence, and PEREZ III, SOTO, and GOMEZ JR., and other DTO members remained outside

112

on the porch. At 5:59 p.m., case agents observed GOMEZ JR., remove a handgun from the small of his back and place the handgun in the front of his pants. GOMEZ JR. attempted to conceal the handgun beneath his shirt and pants. GOMEZ JR. seemingly used HAUSENG, (XINA's brother), who was also present on the porch, to conceal the handgun movement from either the neighbors or passing cars. Once the handgun was secured, GOMEZ JR. shook hands with HAUSENG.

### *PEREZ III and XINA Arrange and Coordinate the Reception of Packages Containing Controlled Substances to Various DTO members*

### Mercedes HERBERT GONZALEZ

211. Mercedes HERBERT GONZALEZ is an Hispanic female born on ████ ████ 1991. HERBERT GONZALEZ resides at ████ S. 30th Street, Milwaukee, Wisconsin. This has been confirmed though investigation and surveillance. The investigation to date has revealed HERBERT GONZALEZ accepts packages containing controlled substances at her residence on behalf of the DTO. Between March 24, 2020, and July 23, 2020, approximately 40 intercepted calls and/or text messages between HERBERT GONZALEZ and PEREZ III and/or XINA were deemed criminal and pertinent in nature.

212. Case agents have examined shipping records from FedEx and DHL. Case agents' analysis of these records revealed that between March 2019, and August 2020, approximately 18 packages have been delivered to ████ S. 30th Street, Milwaukee, Wisconsin. Beginning on or around March 24, 2020, and continuing through late August of 2020, case agents have conducted physical surveillance and

113

observed at least 20 packages being delivered by FedEx, UPS, and/or DHL to ██ S. 30th Street.

213. As an example of this activity, on April 13, 2020, at 9:53 a.m., case agents intercepted an incoming call from HERBERT GONZALEZ, using (414) 651-██ to PEREZ III, using Target Telephone 1. HERBERT GONZALEZ stated, "Hey, a big ass heavy ass package is here." PEREZ III laughed and replied, "I'll come for it in a little bit." HERBERT GONZALEZ stated, "Alright, just wanted to let you know it was here." Case agents believe that HERBERT GONZALEZ called PEREZ III to inform PEREZ III that a heavy package had arrived at her residence for PEREZ III. PEREZ III laughed and told HERBERT GONZALEZ that PEREZ III would pick up the package. HERBERT GONZALEZ wanted to make sure that PEREZ III knew that the package had arrived.

214. On May 20, 2020, case agents were contacted by U.S. Customs and Border Protection (USCBP) regarding one DHL package addressed to Melanie Ramirez at ██ S. 30th St., the residence of HERBERT GONZALEZ. The package was shipped from Hong Kong. USCBP opened the package to inspect the contents because it was an international shipment, and the package contained empty vaping cartridges. USCBP informed case agents that the package was set to be delivered on in the afternoon of May 20, 2020.

215. On May 20, 2020, at 5:26 p.m., PEREZ III, using Target Telephone 1, called HERBERT GONZALEZ, using (414) 651-██ PEREZ III stated, "Yeah, hey Mercedes, it's gonna be there for sure today." Case agents believe that PEREZ III

114

referred to the DHL package noted above. HERBERT GONZALEZ replied, "Okay." PEREZ III stated, "One hundred percent. It's gonna be a DHL company." Case agents believe that PEREZ III informed HERBERT GONZALEZ the package's arrival was confirmed for May 20, 2020, and delivered by DHL.

216. At 7:07 p.m. that day, HEREBERT GONZALEZ, using (414) 651-███ called PEREZ III, using Target Telephone 1. HERBERT GONZALEZ stated, "Hey cous your package just came." Case agents believe that HERBERT GONZALEZ informed PEREZ III that the package had arrived. PEREZ III stated, "I told you." HERBERT GONZALEZ replied, "Alright, can you come grab it though?" Case agents believe that HERBERT GONZALEZ wanted PEREZ III to come pick up the package right away. PEREZ III answered, "Yeah, I'm at birthday party once I get done, I'll call you." Case agents know that PEREZ III was located at PEREZ JR.'s residence during this time.

217. On May 29, 2020, at 3:22 p.m., HERBERT GONZALEZ, using (414) 651-███ called PEREZ III on Target Telephone 1. During the conversation, HERBERT GONZALEZ stated, "Hey your package is here." PEREZ III responded, "Okay. I'll be right in a bit." Case agents believe that HERBERT GONZALEZ had obtained a package containing controlled substances and wanted to inform PEREZ III that the package had arrived. HERBERT GONZALEZ asked, "Oh, so you then on your way here then or are you go gonna go home before here? Just so I know." PEREZ III stated, "Uh, I be there in like about an hour." Case agents believe that HERBERT GONZALEZ inquired when PEREZ III was going to pick up the package. PEREZ III

115

told HERBERT GONZALEZ that he would pick up the package in "about an hour."

218.    According to GPS data on an Impala, which is commonly operated by PEREZ III, the Impala was in the area of HERBERT GONZALEZ's residence at approximately 3:38 p.m. that day.  Case agents believe that PEREZ III was operating the Impala at that time and retrieved the package.  Earlier, case agents conducted surveillance in the area and observed a FedEx truck arrive and deliver a package to ███ S. 30th Street, the address of HERBERT GONZALEZ, at approximately 3:08 p.m.  Case agents observed HERBERT GONZALEZ retrieve the package from the porch.  Agents further observed a Nissan Maxima, believed to be operated by DTO member Antonio RODRIGUEZ, circling the block in the area of HERBERT GONZALEZ's residence, when FedEx delivered the package. Case agents believe that RODRIGUEZ was in the area to conduct surveillance to ensure the package's safe delivery.

219.    On June 5, 2020, at 3:42 p.m., HERBERT GONZALEZ, using (414) 651-███ called PEREZ III on Target Telephone 1. PEREZ III stated, "I'm like five minutes away."  HERBERT GONZALEZ asked, "Do you want me to bring it out to you or you gon' come grab it?"   PEREZ III stated, "No, no. I come and grab it."  HERBERT GONZALEZ replied, "Alright, good 'cause my back hurts." Case agents believe that HERBERT GONZALEZ obtained a package containing controlled substances and wanted to know when PEREZ III was coming to retrieve it and whether or not PEREZ III wanted her to bring the package outside.

116

220.    At 4:03 p.m., HERBERT GONZALEZ, using (414) 651- ███ called PEREZ III on Target Telephone 1.   HERBERT GONZALEZ asked, "Hey, where you at cous--." PEREZ III stated, "Jesus Christ Mercedes! Imma…right here on National, on 34th and National."   HERBERT GONZALEZ replied, "Oh you barely taking National at your grandma's house." PEREZ III replied, "Yeah I'm coming to you right now." Case agents believe HERBERT GONZALEZ contacted PEREZ III because he hadn't retrieved his package containing controlled substances that PEREZ III had delivered to her residence.  Case agents believe HERBERT GONZALEZ was aware of the contents of the package and wanted it removed from her residence as quickly as possible.

221.    At 5:01 p.m., PEREZ III using Target Telephone 1, called HERBERT GONZALEZ at (414) 651- ███   PEREZ III asked, "Hey Mercedes can you bring it out?"   HERBERT GONZALEZ replied, "Huh, yeah.  Are you here?"   PEREZ III answered, Yeah I'm here."   HERBERT GONZALEZ stated, "Alright. Yeah I'll bring it out." PEREZ III stated, "Yeah, just to like the bottom of the stairs." Case agents believe PEREZ III retrieved the package of controlled substances from HERBERT GONZALEZ at this time.

222.    On September 10, 2020, case agents conducted surveillance and observed HERBERT GONZALEZ at ███ S. 30th Street.    Throughout this investigation, HERBERT GONZALEZ has been observed at this residence on a consistent basis.

**Michele HART**

223.    Michele HART is a white female born on ███████████ 1965.  HART previously resided at ████ S. 17th Street, Milwaukee, Wisconsin.  This had been confirmed though investigation and surveillance.  It is currently unknown where HART resides as her prior residence at ████ S. 17th Street was vacated and in late July 2020, appeared to be in the process of renovations.  The investigation to date has revealed HART assisted the DTO with the receipt of packages containing controlled substances at her residence.  Between March 23, 2020, and April 29, 2020, approximately 10 intercepted calls and/or text messages between HART and PEREZ III were deemed criminal and pertinent in nature.  Case agents know that the last call with HART on April 28, 2020, coincided with the law enforcement seizure of packages containing marijuana.

224.    On Monday March 23, 2020, at 10:29 a.m., PEREZ III, using Target Telephone 1, made an outgoing call to HART, using (414) 552 ████ Toward the end of the conversation, PEREZ III said, "Hey, Michele. I was going to tell you too, mmm, my mom some of her mail [U/I] today just giving you a heads up for FedEx." HART replied, "Okay, I'm waiting for my fucking jeans from [U/I] and I'm waiting for a computer and iron and shit I ordered. Our luggage." PEREZ III replied, "Oh shit. Alright, sound good Michele. I'll stop by shortly, okay?" HART replied, "Alright, I'm watching for the package. I got the door open. You know what? I'm calling about my jeans if somebody fucking took them from the porch."  Case agents believe that during this call PEREZ III informed HART that a FedEx package for PEREZ III was to be

118

delivered to HART's address, and PEREZ III asked HART to watch for of its arrival.

225. On March 24, 2020, at 5:44 p.m., PEREZ III, using Target Telephone 1, sent a text message to Michelle HART, using (414) 552-███ which stated, "Hey Michell my cousin is coming over for me." Later that night at 9:33 p.m., HART responded, "??" No further text exchange occurred between Target Telephone 1 and HART that day. Based on surveillance activities conducted that day, as well as case agents' training, experience, and familiarity with this investigation, case agents believe that in this text message, PEREZ III told HART that PEREZ III's "cousin" was going to pick up the package that had been sent to HART'S residence at ███ S. 17th Street, Milwaukee, Wisconsin. Based upon surveillance, case agents know that PEREZ III was with DTO member Esteban REYES earlier that day, and DTO member Manuel SOTO attempted to retrieve the package that afternoon from ███ S. 17th Street while PEREZ III watched from approximately a block away. PEREZ III waited for over an hour before retrieving the package from HART. PEREZ eventually retrieved the package and drove the package to PEREZ JR.'s residence at ███ E. Morgan Avenue. Case agents observed REYES unloading the package from PEREZ III's vehicle and taking it into the residence. Intercepted calls over Target Telephone 1 between PEREZ III and FedEx demonstrated that PEREZ III was nervous because the package had not arrived on time.

226. On March 27, 2020, at 11:13 a.m., PEREZ III, using Target Telephone 1, sent a text message to HART, using (414) 552-███ The text message stated, "Hey Michell it's Louis can u keep an eye out for my moms mail thanks." Case agents

119

believe that in this text message, PEREZ III told HART to watch out for a package containing suspected controlled substances that was due to be mailed to HART'S residence at ▮▮▮ S. 17th Street. Further, case agents believe that PEREZ III referred to the package as his "mom's mail" in an attempt to conceal its actual contents and to avoid any discussion involving controlled substances over the telephone. Case agents know that a package was delivered to HART's residence later that day.

227. On April 9, 2020, at 11:16 a.m., PEREZ III, using Target Telephone 1, called REYES, using (414) 998-▮▮▮ During this call, REYES stated, "I thought you had it all figured out?" PEREZ III replied, "Yeah I did man but fucking [U/I] ain't answering the phone." REYES laughed and PEREZ III stated, "Hey, I need a favor from you – so, when you guys get done, can you have my pops just drop you off over here, you know, remember by a hospital, by my old crib, by 17th…." REYES responded, "Okay, what is it though? What's the… ." PEREZ III then interrupted, stating, "I'll tell you when you get here…" REYES asked, "What street?" PEREZ III said, "17th and Holt." Case agents conducting physical surveillance observed PEREZ III park in the area of ▮▮▮ S. 17th Street, Milwaukee, Wisconsin ("by 17th"), which is on the same block as S. 17th Street and W. Holt Avenue, where PEREZ III directed REYES to meet PEREZ III. Case agents believe that during this call, PEREZ asked REYES to come to HART's residence on 17th Street to assist in retrieving a package because PEREZ III couldn't reach whomever was supposed to assist PEREZ III with the package retrieval. ("Yeah I did man but fucking [U/I] ain't answering the phone.").

Further, when REYES attempted to find out more information, PEREZ III cut REYES off and told REYES they would talk in person ("I'll tell you when you get here."). Case agents know that a package was delivered to HART's residence located at ▓▓▓ S. 17th Street in Milwaukee at approximately 12:10 p.m., and PEREZ III was observed through case agents' physical surveillance retrieving the package from ▓▓▓ S. 17th Street.

228.    On April 9, 2020, at 11:31 a.m., PEREZ JR., using (414) 208-▓▓▓ called PEREZ III, using Target Telephone 1.  During this call, PEREZ III asked, "I was gonna tell you mmm, if you could pick me up when you get done?"  PEREZ JR. asked, "Okay, pick you up?" PEREZ III replied, "Yeah, I'm on 17th, I told, I told, I told uncle (referring to Esteban REYES) where I was."  PEREZ JR. stated, "Yeah, okay, I'll head over now." PEREZ III continued, "No, wait for Esteban to get done though. You could, you can drop him off over here."  Case agents believe that during this call, PEREZ III told PEREZ JR. to drop off REYES in the area of ▓▓▓ S. 17th Street to wait for a package to arrive, and that PEREZ III already told REYES where PEREZ III was located ("I'm on 17th, I told, I told, I told uncle where I was."). As stated above, PEREZ III was observed waiting outside of HART's 17th Street residence for a package to arrive on this day.

### Ma YANG and Michael BUB

229.    Ma YANG (MA), XINA's sister, and Michael BUB (a/k/a Buddy), her boyfriend, reside at ▓▓▓ E. Morgan Avenue, Milwaukee, Wisconsin.  MA is an Asian female born on ▓▓▓▓▓ 1988, and BUB is a white male born on ▓▓▓▓ 1987.

121

Previously, they resided at ███ W. Burnham Street, Milwaukee, Wisconsin, where numerous packages for the DTO were sent. This has been confirmed through the investigation, surveillance, and a review of utilities records. The investigation to date has revealed that MA assists PEREZ III and XINA by receiving packages containing controlled substances at MA's prior residence, ███ W. Burnham Street, Milwaukee, Wisconsin, as well as MA's current residence of ███ E. Morgan Avenue. Further, MA assists XINA with counting and packaging U.S. currency for shipment to SANCHEZ via the United States Postal Service, as well as assembling marijuana vape cartridges on behalf of the DTO. Michael BUB assists the DTO with the manufacture of marijuana vape cartridges as well as assisting the DTO with receiving and transporting packages between different DTO residences. Between April 10, 2020, and July 23, 2020, approximately 105 intercepted calls and/or text messages between MA and XINA and/or PEREZ III were deemed criminal and pertinent in nature. Between April 16, 2020, and July 2, 2020, approximately 8 intercepted calls and/or text messages between BUB and XINA and/or PEREZ III were deemed criminal and pertinent in nature.

230. For example, on April 10, 2020, at 10:44 a.m., case agents intercepted an outgoing call from PEREZ III, using Target Telephone 1, to MA, using (414) 315-███ PEREZ III told MA "Hey, mmm, XINA's mail got there already." MA asked, "It's here?" and PEREZ III replied "Uh-huh." MA responded, "I'll go check and "I'll go look right now." Case agents believe that PEREZ III informed MA that packages

122

containing controlled substances had arrived at MA's residence for PEREZ III, and MA told PEREZ III that MA would retrieve the packages.

231. On April 13, 2020, at 6:30 p.m., XINA, using Target Telephone 4, called MA, using (414) 315-███ XINA asked, "You want to come over at 8:00?" MA replied, "I was going to come right now." Case agents believe that XINA asked MA to help prepare and package money into boxes. XINA asked MA to come over at 8:00 pm that evening, but MA wanted to come over right away. XINA replied, "I just got home and nothing is count or nothing." MA stated, "How about we do it tomorrow?" XINA replied, "No 'cause tomorrow, we need – it gotta go out tomorrow." Case agents believe that XINA informed MA that none of the money had been counted yet and that the money needed to be shipped out "tomorrow." XINA stated, "You don't want to, it's okay. I can do it myself, but I just figured that you need some money." MA replied, "No, I want to but I just told Pam I was gonna go to Pam's." Case agents believe that XINA pays MA to assist XINA with counting and packaging the currency shipped to SANCHEZ. Later in the conversation, XINA stated, "Hmmm, well let me know if you change your mind 'cause if not I might have to do it… I really don't want to…but…I mean. I have to do it if it comes down to it." MA asked, "How many you got to do?" XINA replied, "I don't know yet, that's why I'm telling you to come at 8 o'clock because we are still dividing up the money." MA replied, "Ahh…" XINA stated, "Let me know if anything changes." MA replied, "I'll do it because I need the money." Case agents believe that MA asked XINA how many boxes needed to be prepared for shipment, and XINA did not know because the money had not yet been

123

counted. MA told XINA that MA would help package the money for shipment because MA needed the additional money.

232. Based upon U.S. Postal records, case agents know that PEREZ III mailed three USPS packages to SANCHEZ on April 14 and two USPS packages on April 15, 2020. A lawful search of the two packages sent on April 15, 2020, revealed that each package contained $20,000.00 U.S. currency. The U.S. currency was concealed within the pages of magazines, meticulously taped and sealed within bags. Based upon the April 13, 2020, telephone conversation described above, case agents believe that MA assists with preparing and packaging the U.S. currency that is mailed to SANCHEZ, and that XINA and/or PEREZ III pay MA to package the money for shipment to SANCHEZ.

233. On April 15, 2020, at 9:29 a.m., PEREZ III, using Target Telephone 1, received an incoming text from MA, using (414) 315-███ The text stated, "Buddy got it 2 boxes." Case agents conducting physical surveillance at MA's prior residence located at ███ W. Burnham Street, Milwaukee, Wisconsin, observed that at 9:25 a.m., FedEx delivered two boxes at that address. Case agents believe that MA sent this text message to confirm with PEREZ III that two FedEx packages were received at her residence that morning, and that BUB had retrieved the packages for PEREZ III. Furthermore, around this time, JASMINE's vehicle was parked close to this residence; however, case agents were unable to identify the driver because of the vehicle's tinted windows. However, positional data for PEREZ III's Target Telephone 1 reflected that it was in the area of ███ W. Burnham Street at that time.

124

234. On April 21, 2020, at 6:22 p.m., XINA, using Target Telephone 4, placed an outgoing call to MA, using (414) 315-███ During this call, XINA told MA that she needed to "get rid of stuff." XINA clarified and said, "I'm gonna come and um, drop off the blender and give you the "nyiaj/nia" (the Hmong word translated by DEA linguists to mean money)." MA agreed, and XINA told MA she would call her later. Case agents believe that XINA told MA that XINA was going to drop off money to MA as payment for assisting the DTO with package retrieval and/or the packaging of U.S. currency to be mailed to SANCHEZ.

235. On April 27, 2020, at 10:47 p.m., XINA, using Target Telephone 4, called MA, using (414) 315-███ During the conversation, XINA asked MA if MA could assist XINA package money. MA asked, "How much we gotta do?" XINA replied, "All you gotta do is, everything is all ready, all you gotta do is put it and tape it for me." Case agents believe that XINA asked MA to assist with packaging U.S. currency for shipment to SANCHEZ, and MA asked how much money needed to be packaged. Further, case agents believe that XINA had already counted the money and all MA needed to do was place the money into the magazines and tape the pages as previously described for shipment to SANCHEZ.

236. On May 16, 2020, at 6:38 p.m., XINA, using Target Telephone 4, called MA, using (414) 315-███. During the conversation XINA asked, "What is it, 02..58..." MA replied, "What? Oh. Let me ask Buddy. They're downstairs." Case agents believe "Buddy" to be BUB, MA's live in boyfriend. MA can be heard in the background of the call asking, "Buddy, what's the password?" Case agents overheard

125

a male voice in the background (believed to be BUB) asking, "On what?' MA replied, "For the safe." Case agents believe that MA asked BUB for the combination to the safe ("Buddy, what's the password?"). XINA stated, "I was gonna say, you are talking too loud. I don't want all of them to know." A male, believed to be BUB, then spoke with XINA using MA's phone and stated, "It's um, 05..258." Case agents believe that BUB gave XINA the combination to the safe at MA's residence. ("It's um, 05..258."). Case agents further believe that some of the proceeds from PEREZ III's drug trafficking activities are kept in the safe at MA's residence.

237.    On June 9, 2020, at 11:39 a.m., case agents intercepted an incoming call to XINA, using Target Telephone 4, from MA, using (414) 315-        During this call, MA asked, "Are we up? Are we ready to go work?" XINA replied, "No, I'm not up. I just woke up and [U/I] no." An unknown male, believed to be BUB is heard in the background and stated, "So, another hour I'm guessing." XINA replied, "Give us like an hour." MA stated, "Yeah, 'cause everybody's up and ready to work." XINA replied, "[U/I] yeah he got the flavors too so give us like thirty (30) min to an hour. We're gonna shower and [U/I] come over." Case agents believe that MA called XINA to inquire about when they were going to "work" on assembling the marijuana vape cartridges. Case agents further believe the unknown male overheard in the background was BUB based upon case agents' voice recognition combined with their knowledge that BUB resides with MA.

238.    On June 26, 2020, a series of calls between XINA and MA occurred as well as between PEREZ and BUB. At 9:34 a.m., XINA, using Target Telephone 4,

called MA at (414) 315-███ XINA stated, "It's there. It just got there right now." MA replied, "Alright, Buddy's going out." Case agents believe that XINA informed MA that a package containing controlled substances had just arrived at the residence. At 9:40 a.m., XINA, using Target Telephone 4, called MA at (414) 315-███ During this call, XINA asked, "It's a Home Depot box right?" MA stated, "[Aside: It's a Home Depot box, baby?] In the background, case agents heard BUB stating, "Yeah." MA replied, "He said yeah." XINA stated, "Okay, yeah, that's it." Based upon their training, experience, and familiarity with the investigation, case agents believe that XINA called MA to confirm that MA had the correct package and verified that the package was a "Home Depot box," which MA confirmed.

239. At 5:21 p.m., BUB, using (414) 313-███ called PEREZ III on Target Telephone 1. PEREZ III asked, "What's up Buddy?" BUB inquired, "You at the house?" PEREZ III replied, "No, no, I'm taking care of something real quick." BUB stated, "Oh just call me when you're on your way and shit and I'll just start heading over there." PEREZ III replied, "We'll be there at 7:00 o'clock." BUB stated, "Oh yeah, [U/I] over at MA's, okay. Just let me know when you outside." PEREZ III replied, "Alright, bye." Case agents believe that during this call, BUB asked if PEREZ III was at BUB's residence retrieving the previously delivered package, but PEREZ III told BUB that PEREZ III would be over around 7:00 p.m. BUB told PEREZ III to let BUB know when PEREZ III was outside.

240. On June 26, 2020, case agents had established surveillance at ███W. Burnham Street. At 9:33 a.m., case agents observed FedEx deliver one "Home Depot"

box with tape that read "fragile." The package was delivered to the side door of the residence out of the view of case agents. As a result, case agents were unable to observe who brought the package inside of the residence.

### Jose A. ALVARADO and Shayla KNUEPPEL

241. Jose ALVARADO (a/k/a Jokes), an Hispanic male born on ███████ 1996, and Shayla KNUEPPEL, a white female born on November 1, 1996, used to reside at ██ W. Crawford Avenue, Milwaukee, Wisconsin. Based upon current information, ALVARADO and KNUEPPEL broke up in late August of 2020. On August 20, 2020, at 9:11 a.m., ALVARADO, using the Snapchat account "jokes-███ sent a snap message to PEREZ III, using Target Account 1 that stated, "Yo don't send none to the krib for a while bro me n Shayla broke up I moved out." Case agents believe that ALVARADO no longer resides at ██ W. Crawford Avenue, but believes KNUEPPEL remained at the residence. ALVARADO is also believed to be a member of the Mexican Posse street gang.

242. The above residential information has been confirmed though investigation, surveillance, and a review of utility records. The investigation to date has revealed ALVARADO and KNUEPPEL accepted packages for the PEREZ III DTO at ██ W. Crawford Avenue, and ALVARADO also obtained distribution quantities of controlled substances from PEREZ III. Between March 24, 2020, and April 5, 2020, approximately 6 intercepted calls and/or text messages between ALVARADO and PEREZ III were deemed criminal and pertinent in nature. In addition, PEREZ III communicates with ALVARADO over the Snapchat application.

128

Between August 4, 2020, and September 2, 2020, approximately 4 intercepted Snapchat communications between PEREZ III and ALVARADO were deemed criminal and pertinent in nature. Between April 29, 2020, and July 2, 2020, approximately 4 intercepted calls and/or text messages between KNUEPPEL and PEREZ III were deemed criminal and pertinent in nature. KNUEPPEL facilitates the shipments to her residence on behalf of the DTO as evidenced below.

243. Case agents believe that ALVARADO moved to ███ W. Pierce Street, Apartment ███ On September 11, 2020, case agents conducted surveillance at ███ W. Pierce Street. Case agents observed ALVARADO exit Apartment ███ and then exit the building. ALVARADO then entered his vehicle parked on the street in front of the building. In addition, location information from ALVARADO's cellular telephone places ALVARADO at or near ███ W. Pierce Street on a consistent basis and as recently as September 11, 2020. Based upon the investigation to date, as well as surveillance, case agents believe that ALVARADO maintains control of the residence, and that the residence likely contains evidence of ALVARADO's drug trafficking activities as set forth below.

244. Case agents have examined shipping records from FedEx and DHL. An analysis of these records revealed that between March 2019, and August 2020, approximately 44 packages have been delivered to ███ W. Crawford Avenue, Milwaukee, Wisconsin.

245. On March 24, 2020, at 2:07 p.m., PEREZ III, using Target Telephone 1, called ALVARADO, using (262) 389-███ ALVARADO stated, "Cops outside right

now." PEREZ III asked, "What did they say?" ALVARADO replied, "They told – 'cause I was upstairs, they told my girl that two Mexican niggas came and took two packages and uh they wanna know who robbed the packages." Based upon the investigation, case agents know that ALVARADO resided at ██ W. Crawford Avenue during the time of this call. PEREZ III stated, "Don't fuck with me, man. There's nothing in the boxes man. It's just packaging." Case agents know the Milwaukee Police Department received a call for service at 1:40 p.m. that day regarding two Hispanic males removing a package from the porch of ██ W. Crawford Avenue. PEREZ III was later stopped by the Milwaukee Police Department while in a vehicle registered to MA, and REYES and HART were in the vehicle with PEREZ III.

246. At 2:16 p.m. that same day, PEREZ III, using Target Telephone 1, called ALVARADO again at (262) 389-██ and told ALVARADO, "Fucking cops pulled me over. But, I got you phone, nigga, just so you can let them know bro, that you send [U/I]." As the conversation continued, PEREZ III and ALVARADO discussed arranging for a female to speak with the police officer. Case agents know that the package that was delivered to ██ W. Crawford Avenue that day was addressed to "Brooke Bosshart." During the intercepted call, uniformed City of Milwaukee police officers spoke telephonically with a female who identified herself as "Brooke," and informed the officers that the package PEREZ III picked up was hers. Subsequently, several calls occurred between PEREZ III and ALVARADO's number. PEREZ III, ALVARADO, and an unknown female (UF) discussed a plan to explain to the police how and why PEREZ III obtained the package from the porch of ██ W. Crawford

Avenue. Based upon the investigation to date, including but not limited to surveillance and intercepted calls, case agents believe that the unidentified in this call was KNUEPPEL.

247. On April 5, 2020, at 1:40 p.m., ALVARADO, using (262) 389-████ called PEREZ III, using Target Telephone 1. During the call, ALVARADO stated, "Hey dude, I got the packs/package on me dawg, uh, its 'cause my brother-in-law already, he on some bullshit and wants to know what the fuck is in [U/I]. I just wanna drop it off to you, to your uh, dad's place, is that okay bro?" PEREZ III hung up the phone. Based upon their training, experience, and familiarity with the investigation, case agents believe that ALVARADO possessed a package that contained controlled substances and wanted to get rid of it because ALVARADO was being questioned by a family member about its contents. Case agents further believe that ALVARADO wanted to drop off the package at PEREZ JR.'s residence. Further, case agents believe that PEREZ III did not want to discuss the package on the telephone because the package contained controlled substances, and therefore hung up the phone immediately.

248. On April 29, 2020, at 3:53 p.m., PEREZ III, using Target Telephone 1, called SANCHEZ, using Target Telephone 5. During this call, PEREZ III stated, "Hey, send me that info ASAP. For the one for Brooke. The UPS one, dawg. Send it to me, like right here on Wick." SANCHEZ asked, "The UPS one? Why? What happened?" PEREZ III answered, "Nah, 'cause they said delivered the wrong house, bro. That's what I told you bro I don't fuck with UPS, dawg. They be stealing bro.

131

They do that shit on purpose dawg, you know what I mean? Hey send ..." SANCHEZ stated, "Yeah, Imma bout to sent it right now." PEREZ III reiterated, "ASAP like right now, right now." SANCHEZ replied, "I am." PEREZ III stated, "Alright."

249. This call occurred against the backdrop of UPS seizing the package containing THC oil that was addressed to "Brooke Bosshart" at ███ W. Crawford Ave., Milwaukee, Wisconsin. Case agents believe that during this call, PEREZ III asked SANCHEZ to send PEREZ III information about the package that SANCHEZ sent to PEREZ III at ███ W. Crawford Avenue via UPS. Further, PEREZ III asked SANCHEZ to send it via the Wickr phone application. ("Hey, send me that info ASAP. For the one for Brooke. The UPS one, dawg. Send it to me, like right here on Wick."). SANCHEZ asked for clarification as to which package, and wanted to know happened. ("The UPS one? Why what happened?"). PEREZ III told SANCHEZ that PEREZ III believed someone at UPS stole the package; UPS records indicated the package had been delivered to the wrong house. ("Nah, 'cause they said delivered the wrong house, bro. That's what I told you bro I don't fuck with UPS, dawg. They be stealing bro. They do that shit on purpose dawg, you know what I mean?"). SANCHEZ told PEREZ III that SANCHEZ would send the information to PEREZ III right away. ("Yeah, Imma bout to sent it right now."). PEREZ III told SANCHEZ to send it right away so that PEREZ III could attempt to locate the package ("ASAP like right now, right now.").

250. On April 29, at 5:19 p.m., KNUEPPEL, using (414) 335-███ called XINA, using Target Telephone 4. XINA asked, "Yeah, he didn't say nothin'?"

132

KNUEPPEL asked, "Uh, who?" XINA replied, "The driver." KNUEPPEL stated, "I don't know yet. He's talking to Eight Ball [AUDIO BREAKS] now. I don't know what he said. He went on truck." Case agents know that "Eight Ball" is also PEREZ III's nickname. XINA exclaimed, "Oh my God." KNUEPPEL asked, "Why? What did they tell you?" XINA replied, "Nothing. It just said delivered and sometimes the truckers just take it." Case agents believe that XINA and KNUEPPEL talked about the missing UPS package that had not been delivered that day. KNUEPPEL stated, "That's some bullshit." A male voice can be heard in the background, and based upon voice interception familiarity, case agents believe this voice to be ALVARADO. ALVARADO stated in the background, "Morgan. [U/I] came from Morgan. Hold on, believe me, it is a white guy." KNUEPPEL stated, "A white guy was driving and and acts like the fuck's going on, where is it?" XINA replied, "Oh." KNUEPPEL stated, "He didn't have a package for over here, so. Yeah, to let you know." Case agents believe based upon this investigation that ALVARADO confronted the UPS driver and inquired about the missing UPS package that was supposed to be delivered to his residence. XINA stated, "Okay. No, Eight Ball had told me call you guys at first but if he's on the phone, then that's cool." Case agents believe that ALVARADO and PEREZ III, a/k/a "Eight Ball" were talking via a third-party telephone application during the time of this call.

251. Furthermore, throughout the day on April 29, 2020, PEREZ III, using Target Account 1, sent or received seven Snapchat snaps and/or chats with Snapchat account "Jokkes-█████ registered to the email address of

"jo█████████@gmail.com," and used by Jose ALVARADO. Therefore, case agents believe PEREZ III used Target Account 1 to communicate with ALVARADO on April 29, 2020, regarding the missing package.

252.    On May 29, 2020, at 10:53 a.m., XINA, using Target Telephone 4, called Brooke SCHICK-BOSSHART, user of (414) 216-███ XINA asked, "Brooke?" SCHICK-BOSSHART stated, "Mm-hmm." XINA stated, "Hey um, um, they sent-- I, I don't know if you're at home, can you grab it?" Case agents believe this to be in reference to a package that was sent to ███ W. Crawford Avenue, the residence of SCHICK-BOSSHART, ALVARADO, and KNUEPPEL. SCHICK-BOSSHART replied, "Yeah, I'm at home. I'll grab it." XINA replied, "Okay, and let um, I mean Alex, um, Jokes, know." SCHICK-BOSSHART responded, "Yeah, I'll let him know." Case agents believe that "Jokes" is ALVARADO, who also resides at that address. XINA stated, "Okay, thank you so much. I just, it just got there, so I just got it. It's just been sitting outside." Case agents believe that XINA and/or PEREZ III were actively tracking the package, and were able to determine when it was delivered. ("It just got there, so I just got it. It's just been sitting outside."). SCHICK-BOSSHART stated, "Yeah, I got you." XINA replied, "Okay, thank you." At 1:25 p.m., that day, case agents observed DTO member Kevin TAYLOR and another unknown Hispanic male retrieve a large cardboard box from ███ W. Crawford Avenue, and place the box into TAYLOR's Mazda. The Mazda, driven by TAYLOR, drove directly to ███ S. 15th Street, where it parked in the alley behind the residence. Case agents were unable to determine if the package was unloaded from the Mazda because of the Mazda's

134

location.

253. On June 29, 2020, at 9:36 a.m., KNUEPPEL, using (414) 335-███ called XINA, using Target Telephone 4. XINA answered and KNUEPPEL asked, "Hey, who's this?" XINA replied, "Is this Shayla?" KNUEPPEL stated, "Yeah." XINA stated, "Hey, it's "Ocho's" girl. I was calling 'cause um, did you guys grab those two things that got there?" KNUEPPEL replied, "Um, Jose---I'll call Jose, I'm at work." XINA stated, "Okay, yeah, 'cause I can't get hold of nobody." KNUEPPEL asked, "Oh really? Okay, yeah, I'll call him". At 9:38 a.m., KNUEPPEL called XINA back and stated, "He got em." XINA replied, "Okay, sounds good. Thank you so much." Case agents believe that during these two calls, XINA was actively tracking the packages containing controlled substances and observed that two packages had arrived at 170 W. Crawford Avenue. KNUEPPEL was working and told XINA that she would call "Jose," whom case agents believe to be ALVARADO. Further, case agents believe that KNUEPPEL called XINA back advising XINA that ALVARADO had retrieved the packages.

254. On July 2, 2020, at 12:26 p.m., XINA, using Target Telephone 4, called KNUEPPEL, using (414) 335-███ XINA asked, "Shayla?" KNUEPPEL replied, "Yeah?" XINA stated, "Hey something was there at—since 8 o'clock this morning I don't know if somebody grabbed it." KNUEPPEL stated, "Yeah, it's in my house. I'll have Jose call Eight." XINA responded, "Okay." Case agents believe that XINA was tracking the packages and observed that the package had been delivered at 8:00 a.m., and was ensuring that the package arrived safely. Further, case agents believe that

135

KNUEPPEL informed ALVARADO to get ahold of PEREZ III ("Eight") to inform PEREZ III that the package had arrived safely.

### *Alvarado uses Snapchat to Distribute Controlled Substances*

255. Case agents examined the Snapchat account "████14," which case agents know is used by ALVARADO. On April 21, 2020, at 4:29 p.m., ALVARADO sent a Snapchat message to PEREZ III, using Target Account 1. The message consisted of a screen shot of a conversation with "████ A█." A████ stated, "Lyk when I know." ALVARADO responded "Bet," "What's ur name my guy said," and "On Snap." A████ responded, "B████0." Case agents believe that during this conversation, ALVARADO attempted to purchase controlled substances from A████ ("lyk when I know"). Further, ALVARADO was arranging a transaction between PEREZ III and A████ through Snapchat. ("What's ur name my guy said" and "On Snap").

256. On April 21, 2020, at 4:16 p.m., A████ sent a Snapchat message to PEREZ III, using Target Account 1, that stated, "What you got on deck? I need a couple packs," followed by "Jose sent me your snap." Initially PEREZ III did not respond. Case agents believe that A████ had sent this message to PEREZ III, and wanted pound quantities of marijuana ("I need a couple packs"), but PEREZ III did not respond because ALVARADO had not yet informed PEREZ III that A████ would be reaching out to purchase marijuana from PEREZ III. On April 24, 2020, at 9:14 a.m., PEREZ III responded to A████ asking, "What's his Snap?" Case agents believe that PEREZ III sought to "verify" A████ knew ALVARADO.

136

257. On June 7, 2020, at 9:22 a.m., SOTO, using Snapchat account "m██████6" sent a message to ALVARADO, using Snapchat account "███████14." The message stated "650." Based upon their training, experience, and familiarity with the investigation, case agents believe that ALVARADO owed SOTO $650 for previously supplied controlled substances.

258. On June 22, 2020, at 3:01 p.m., ALVARADO, using Snapchat account "████14,"sent a Snapchat message to HAUSENG, using Snapchat account "h██3." The message consisted of a screen shot that stated, "Mobile all day too gas and carts Not cheap. Hit me if you tryna smoke good." Along with the screen shot ALVARADO sent, "Yoo call my bro Flaco." Case agents believe that ALVARADO was out of marijuana and was referred ALVARADO's customer, "Flaco," to HAUSENG to complete the transaction.

259. On July 28, 2020, at 4:34 p.m., HAUSENG, using Snapchat account "h████3," sent a Snapchat video to ALVARADO, using Snapchat account "████14." The video depicted a marijuana "bud" with the words "stupid hogs breath OG." Case agents believe that HAUSENG advised ALVARADO that HAUSENG possessed the above marijuana which was available for sale.

**PEREZ III uses couriers to obtain the packages from the addresses and transport the packages to other locations used by the DTO where the packages containing controlled substances are stored until distribution.**

### Esteban REYES

260. Esteban REYES is an Hispanic male born on ██████ 1974. REYES currently resides at ███ S. 57th Street, West Allis, Wisconsin. REYES is also

137

believed to be a member of the Mexican Posse street gang. REYES' residence has been confirmed though investigation and surveillance. The investigation to date has revealed REYES assists the DTO with the retrieval and transport of packages containing controlled substances, as well as the distribution of controlled substances for PEREZ III. REYES has also been present with PEREZ III during suspected drug transactions. Between April 9, 2020, and July 23, 2020, approximately 13 intercepted calls and/or text messages between REYES and PEREZ III were deemed criminal and pertinent in nature.

261. For example, on May 14, 2020, at 4:05 p.m., REYES, using (414) 998- ███ called PEREZ III, using Target Telephone 1. PEREZ III asked, "Hey, I was gonna tell you, you are at the house right?" REYES responded, "Yeah." PEREZ III asked, "Can you stay in the spot bro 'cause I got—I got a package coming." REYES replied, "Alright." At 5:07 p.m., REYES called PEREZ III. REYES stated, "The boxes came." PEREZ III replied, "Okay, yeah, just put them in the crib." REYES responded, "Alright." Case agents reviewed the remote camera positioned to view the outside activities at ███ E. Morgan Avenue and observed two packages being delivered. The camera picture then seized, and when it began working approximately one minute later, the boxes that were on the porch were now gone. Case agents believe that during this minute, REYES retrieved the packages from the porch and placed them inside of the residence.

262. Case agents know that REYES was residing at ███ E. Morgan Avenue throughout March and April of 2020. REYES then began staying at an unknown

location after the police visited ██ E. Morgan Avenue to arrest REYES on an outstanding arrest warrant in April of 2020. On May 22, 2020, REYES was arrested for an outstanding Violation of Probation warrant and was in custody from approximately May 22, 2020, until approximately July 3, 2020.

263. On September 9, 2020, case agents conducted surveillance and observed REYES at ██ S. 57th Street. In addition, location data pertaining to REYES' cellular telephone places REYES in the area of ██ S. 57th Street on a consistent basis throughout late August through Mid-September of 2020.

**Manuel SOTO**

264. Manuel SOTO (a/k/a Roach and Grillo), is an Hispanic male born on ████, 1992. SOTO is also believed to be a member of the Mexican Posse street gang. SOTO is currently in custody, but prior to SOTO's arrest he had been residing at ██ W. Pierce Street, ██, Milwaukee, Wisconsin. As mentioned above, this address had been identified as a PEREZ III DTO stash location. This has been confirmed by investigation, surveillance, and review of remote camera installed near apartment ██ Prior to SOTO's August 19, 2020, arrest, SOTO had been observed coming and going from the apartment using keys on a regular basis. As stated above, based upon a review of rental records case agents know that this apartment is leased in the nominee name of Jasmine PEREZ, PEREZ III's sister.

265. Further, SOTO has been observed at PEREZ III's and PEREZ JR.'s residences, as well as other DTO addresses. Investigation to date has revealed that SOTO was a primary distributor for the PEREZ III DTO, and he assisted the PEREZ

139

III DTO with retrieving and transporting packages that are believed to contain controlled substances to other DTO locations. Between March 24, 2020, and July 23, 2020, approximately 99 intercepted calls and/or text messages between SOTO and PEREZ III were deemed criminal and pertinent in nature.

266. SOTO maintained control of ██ W. Pierce Street, ██ prior to his August 19, 2020, arrest. As set forth below, SOTO's belongings were removed from the apartment by REYES and GOMEZ JR. during the early morning hours of August 20, 2020.

267. On March 29, 2020, at 2:08 a.m., PEREZ III, using Target Account 1, sent SOTO, using Snapchat account "m██████6," a chat text message, which stated, "Tomorrow pri need ur help in am."

268. At 7:03 a.m. on March 30, 2020, PEREZ III, using Target Account 1, sent SOTO, using Snapchat account "m██████6," two chat text messages, stating, "17th" and "Old ladies house." Case agents believe PEREZ III asked SOTO to pick up a suspected controlled substance package from ██ S. 17th Street, Milwaukee, Wisconsin, the residence of Michelle HART during this time.[14] Case agents conducted surveillance of ██ S. 17th Street, and at 11:26 a.m., agents observed SOTO arrive at ██ S. 17th Street. SOTO removed a large box from the porch of the residence and placed it in his vehicle. Case agents also reviewed video from the remote surveillance video camera at PEREZ JR.'s residence during this time, ██ E. Morgan Avenue, and observed SOTO arrive at that location a short time later. Case

---

[14] PEREZ III often referred to HART's residence as "17th" during intercepted calls.

140

agents believe that PEREZ III used Snapchat to instruct SOTO to assist in DTO-related activity.

269. On March 31, 2020, at 10:35 a.m., 10:53 a.m., and 11:41 a.m., PEREZ III, using Target Telephone 1, called SOTO, using telephone number ███████-3537. During these calls, PEREZ III and SOTO discussed packages that were scheduled to arrive. PEREZ III asked SOTO to go to "pops" house and put the packages inside. PEREZ III told SOTO that PEREZ III had "just checked" and the packages were delivered "20 minutes" ago. PEREZ III directed SOTO to "meet on 18th." PEREZ III and SOTO discussed the arrival of UPS packages and SOTO asked PEREZ III, "You see UPS thing?" PEREZ III replied, "They gonna drop one off to you. And then they gonna drop them off to me. Then we go drop these off. And then we'll come back." Case agents believe that believe that during these calls, PEREZ III and SOTO were waiting for packages containing suspected controlled substances to arrive. PEREZ III directed SOTO to ██ E. Morgan Avenue, the residence of PEREZ JR. ("Pops"). PEREZ III informed SOTO that the packages were delivered 20 minutes ago, based upon the tracking information. Case agents believe that SOTO was also tracking the arrival of UPS package(s). ("You see UPS thing?"). PEREZ III stated that a package was being delivered to SOTO, packages were being delivered to him, and then PEREZ III and SOTO would take the packages to an unidentified location. ("They gonna drop one off to you. And then they gonna drop them off to me. Then we go drop these off.").

270. On April 2, 2020, at 3:23 p.m., PEREZ III, using Target Telephone 1, called SOTO, using ███████-3537. PEREZ III stated, "Hey cousin." SOTO replied,

"What's happening G?" PEREZ III stated, "It's there already, cous." SOTO asked, "It's there?" PEREZ III stated, "Yeah, dude." SOTO replied, "Alright. But I'll be there. Right now nigga I'm right here on 16th and, uh, Mitchell." PEREZ III confirmed, "Alright. Just try to get there as fast as you could, cous." SOTO replied, "Alright, right away." Case agents believe PEREZ III advised SOTO that a package has been delivered and PEREZ III wanted SOTO to retrieve it.

271. On April 9, 2020, at 4:30 a.m., PEREZ III, using Target Account 1, sent SOTO, using Snapchat account "m██████6," several photographs depicting cannabis infused edible products, which photographs contained the following captions: "Dank gummies," "Nerd ropes," and "Dank Bars" (cannabis infused chocolate) of different "fruit" flavor. PEREZ III also sent SOTO ten photographs depicting marijuana "buds." Each photograph contained a caption describing the strain of marijuana and the quantity available of that specific strain. The captions read as follows: "Domino OG 14ps left;" "White tahoe cookie 4 ps left;" "Ghost OG 7 ps left;" "Blue Majic 3ps left;" "Berry Whites 7 ps left;" "Donkey Butters 3 ps left;" "Purple Punch 2 ps left;" "Animal Cookies 2 ps left;" "Gas_Lato OG 1 p left;" and, "Super Skywalker Og 7 ps left." Based upon their training, experience, and familiarity with the investigation, case agents believe that PEREZ III told SOTO how many pounds ("ps") of various strains of marijuana the DTO had left for sale.

272. At 4:52 a.m., SOTO replied, "Paro (stop) lol." At 6:30 a.m., PEREZ III wrote, "PRICING ON PACKS TO EVERYBODY" and followed up that message with "Ghost OGs 2150" (case agents believe this to be $2,150 per pound of Ghost OG brand

142

marijuana); "Donkey Butter Og 2k" (case agents believe this to be $2,000 per pound of Donkey Butter Og brand marijuana); "Purples 21" (case agents believe this to be $2,100 per pound of Purples brand marijuana); "Skywalker Ogs 25" (case agents believe this to be $2,500 per pound of Skywalker Og brand marijuana); and "Everything else 2k" (case agents believe this to be $2,000 per pound of the remaining brands of marijuana currently in PEREZ III's inventory).

273. On May 4, 2020, at 7:24 p.m., PEREZ III, using Target Telephone 1, called SOTO, using (323) 449-███. PEREZ III asked, "Hey cousin you at the crib?" SOTO replied, "Yeah." Case agents believe that PEREZ III asked SOTO if he was at the stash apartment at ████ W. Pierce Street, and SOTO confirmed. PEREZ III stated, "I'm swing through dawg. Hey I gave you—Imma swing through dawg." SOTO replied, "Alright." PEREZ III stated, "All set dude." Based upon their training, experience, and familiarity with the investigation, case agents believe that PEREZ III told SOTO that he left controlled substances for SOTO to distribute, and that PEREZ III wanted talk to SOTO in person.

274. On May 5, 2020, at 5:02 p.m., PEREZ III, using Target Account 1, sent SOTO, using Snapchat account "m██████6," four chat text messages, one immediately after the other, which stated: "OGs 25 w bags primo" (case agents believe this to be $2,500 per pound of OG brand marijuana in a Midwest Connected bag); "Purples 28 w bags" (case agents believe this to be $2,800 per pound of Purple brand marijuana in a Midwest Connected bag); "We gona sell the gas packs for 27/28" (case agents believe this to be $2,700 to $2,800 per pound of gas packs brand marijuana);

and "N exotic 32" (case agents believe this to be $3,200 per pound of exotic brand marijuana). Case agents believe that PEREZ III instructed SOTO what to charge for various strains of marijuana.

### *SOTO arrested at ███ W. Pierce Street on August 19, 2020*

275.    On August 19, 2020, at approximately 1:50 p.m., SOTO was arrested on an outstanding felony Violation of Parole warrant while exiting ███ W. Pierce Street after it was learned that SOTO was a suspect in a shooting investigation conducted by the Milwaukee Police Department. SOTO attempted to flee in a vehicle when SOTO observed law enforcement approaching. SOTO's vehicle was prevented from fleeing, and SOTO exited the vehicle and attempted to flee on foot. SOTO was taken into custody in the parking lot of ███ W. Pierce Street. A search of SOTO's vehicle revealed a blue colored bag, which agents had observed SOTO carrying on a routine basis throughout July and August of 2020. Contained within the bag was a loaded 9mm Glock pistol with a 30 round extended magazine that was reported stolen out of Detroit, Michigan, as well as approximately 650 grams of marijuana and approximately 12 marijuana vape cartridges.

276.    Later in the afternoon of August 19, 2020, case agents observed PEREZ III, Antonio RODRIGUEZ, Esteban REYES, and Hector ARENAS at ARENAS's residence, ███ S. 6th Street, Milwaukee, Wisconsin. Based upon surveillance, it appeared that PEREZ III, RODRIGUEZ, REYES, and ARENAS were moving numerous bags believed to contain controlled substance out of the stash house, and into various vehicles used by the DTO. At the same time, these three also appeared

144

to be conducting numerous drug transactions. Based upon their training, experience, and familiarity with the investigation, case agents believe this was an effort by the DTO to sell as much contraband as possible in case law enforcement arrested other members of the DTO. Case agents further believe that the arrest of SOTO created anxiety among other DTO members who feared that law enforcement may now be investigating the PEREZ III DTO activities and its members.

277. Case agents reviewed the covert camera at ███ W. Pierce Street, ████, and observed that at approximately 12:26 a.m. on August 20, 2020, REYES and Luis GOMEZ JR. used a pry bar to gain access to apartment ███. REYES and GOMEZ JR. exited at 12:46 a.m. REYES was observed exiting ███ with two black duffel bags and GOMEZ JR. was observed exiting pulling a red suitcase and carrying long objects covered possibly with a sheet or blanket. Based upon the shape of the objects, case agents believe these items to be some type of long guns.

278. At 12:50 a.m., GOMEZ JR. returned to ███ empty handed and entered the apartment. GOMEZ JR. exited the apartment approximately one minute later carrying a garbage bag. Based upon their training, experience, and familiarity with the investigation, case agents believe that, fearing a law enforcement search of the apartment after SOTO's arrest, REYES and GOMEZ JR. cleaned out evidence of criminal activity from the stash apartment, including but not limited to additional firearms, controlled substances, and U.S. currency prior to any law enforcement action. At the time of his arrest, SOTO possessed two cellular telephones, identified as (414) 308-███ and ████-4103.

279.   On August 21, 2020 at 8:16 p.m., SOTO called (414) 801-█████ a telephone number linked in databases to Juanita PEREZ, who is believed to be PEREZ III's grandmother.  During this call PEREZ III got on the telephone, and SOTO referred to PEREZ III as "LuLu," which case agents know is a nickname used for PEREZ III by members of the DTO.  PEREZ III told SOTO that PEREZ III already spoke with an attorney for SOTO. PEREZ III informed SOTO that "it could have been worse," which case agents believe is a reference to SOTO's arrest outside of his residence.  SOTO asked for PEREZ III's address so that SOTO could send mail to PEREZ III. PEREZ III asked, "The house?" PEREZ III then provided the address █████ S. 57th Street, West Allis, Wisconsin.

280.   PEREZ III asked if SOTO was the passenger in the vehicle when SOTO was arrested to which SOTO replied, "No, I was driving."  PEREZ III also asked SOTO "where the gun was at." SOTO replied, "It was in the car." An unknown male, believed to be GOMEZ JR., asked, "What are we going to do with all the stuff outside?" Case agents believe that GOMEZ JR.'s question referred to the vehicles that SOTO was driving, including the blue Charger used by the DTO.  SOTO asked whether PEREZ III "has the keys," which case agents believe to be the keys to ████ W. Pierce Street, █████, where SOTO was residing at the time of his arrest.  PEREZ III informed SOTO that "we cleaned out the crib." Case agents believe that PEREZ III told SOTO that the incriminating evidence had been removed from SOTO's residence.  SOTO directed PEREZ III to "give everything to my mom," which case agents know to be Minerva CRUZ, who resides at █████ S. 21st Street, Milwaukee, Wisconsin.  PEREZ

III asked about the "Charger," believed this to be the blue Dodge Charger used by the DTO. SOTO told PEREZ III to "put it at my mom's."

281. During the course of this investigation, case agents also listened to SOTO's jail calls following his arrest. On August 22, at 10:30 a.m., SOTO called Minerva CRUZ at (414) 544-███ During this call, SOTO identified the female on the line as his mother and talked about parking his vehicles at her residence. Case agents are aware that SOTOS's mother, Minerva CRUZ, resides at ███ S. 21st Street, Milwaukee, Wisconsin.

282. On August 23, 2020, at 3:08 p.m., SOTO called (414) 801-███ a telephone number for Juanita PEREZ, believed to be PEREZ III's grandmother. PEREZ III took the call, and SOTO talked about his vehicles going to his mother's house and how "his guys" were going to take over the apartment lease because SOTO had the apartment for a year. As noted later in this affidavit, GOMEZ JR. moved into this apartment on or around August 28, 2020, which continues to be leased by JASMINE.

283. On August 23, 2020, at 8:01 p.m., SOTO called PEREZ III at Target Telephone 1. During this call, PEREZ III told SOTO that PEREZ III "got the crib situated" and that when SOTO is released from jail, that PEREZ III would get "a new crib set up" for SOTO. Case agents believe this to mean that PEREZ III removed any incriminating evidence from SOTO's apartment at ███ W. Pierce Street, ███.

284.   Case agents examined the historical records for FedEx Express for the address of ███ S. 21st Street, Milwaukee, Wisconsin.  Based upon the investigation to date, at least eight packages were sent by FedEx Express to that address.

### *Search of SOTO's Phones*

285.   On August 20, 2020, case agents executed a search warrant on two cellular telephones seized from SOTO after his arrest on August 19, 2020.  An examination of cellular telephone (414) 308-███ revealed the following information pertaining to ███ S. 21st Street.

286.   Case agents observed a contact name of "MOMMA BEAR" listed in the contacts, with a phone number of (414) 544-███ associated with the contact.  Case agents know that the subscriber of this telephone is Minerva CRUZ, with a subscriber address of ███ S. 21st Street, Milwaukee, Wisconsin.

287.   While reviewing the text messages between SOTO and CRUZ contained in the download, case agents identified text messages that were exchanged between SOTO and CRUZ in regard to packages that were sent to CRUZ's residence at ███ S. 21st Street.

288.   On July 21, 2020, SOTO sent CRUZ a message stating that a package would be delivered to the residence and SOTO requested that CRUZ "keep an eye on the box."  CRUZ agreed to watch for the box.

289.   On July 22, 2020, SOTO sent another message to CRUZ stating "tomorrow again mom ok."  CRUZ stated, "Ok mijo."  Case agents believe that SOTO

informed CRUZ that another package would be arriving at her address on July 23, 2020.

290. On July 23, 2020, at 8:28 a.m., SOTO sent a message to CRUZ that stated, "lmk when it gets there." At 11::01 a.m., SOTO sent another message to Cruz that asked if "it's there," and CRUZ stated that it had not arrived. SOTO then replied that the package was still "on the way."

291. On August 4, 2020, at 1:18 p.m., SOTO sent CRUZ a message that stated "Mom, tomorrow between 8 and 12 pm." On August 5, 2020 at 10:13 a.m., SOTO sent CRUZ a message that stated "mom is it there?" At 10:25 a.m., SOTO sent CRUZ a text that stated "Mom he got it" and "he said he left the money in the grill for u." Case agents believe that an unidentified member of the PEREZ III DTO retrieved the package of controlled substances from ███ S. 21st Street, and placed CRUZ' payment for receiving the package at her address inside of the grill.

292. On August 5, 2020, at 10:20 p.m., SOTO sent another message to CRUZ stating, "tomorrow again mamma bear." CRUZ replied, "OK." On August 6, 2020, at 9:17 a.m., SOTO sent a message that stated "Mom he said he can pik up later 4pm." A discussion about when the package would be picked up. SOTO then sent a screenshot of snapchat message stating, "yea major manana g just been a long day for me today than it's jasmines birthday." SOTO also sent a text to CRUZ stating, "That what he said mom" after sending the screenshot. SOTO sent another message directly after the last one stating, "And I guess there's three more boxes." Case agents believe that based on this text exchange, PEREZ III was going to be pick up the

packages from CRUZ at her residence, but because it was JASMINE's birthday (██████, 1992), PEREZ III couldn't retrieve the packages right away.

293. On August 13, 2020, SOTO sent a text message to CRUZ that stated "tomorrow again mom, I'll be there tomorrow for the 3 orders." CRUZ replied, "OK." On August 15, 2020, at 5:56 p.m., CRUZ sent a text message to SOTO that stated, "Hey hr just picked one box up!" SOTO responded, "We're gonna get em one by one mom not all at once." Case agents believe that three DTO packages had been delivered to CRUZ's residence; however, the unknown DTO member would only pick up one package at a time.

294. Based on the totality of the numerous jail calls, combined with the information contained in the jail calls, case agents believe that SOTO's property, which had removed from ███ W. Pierce Street, ███, was taken to CRUZ' residence.

295. On August 26, 2020, case agents observed SOTO's Cadillac parked in the driveway at ███ S. 21st Street.

296. On Wednesday, September 2, 2020, case agents conducted surveillance at ███ S. 21st Street and observed Minerva Cruz exit the side door of the residence. Cruz went to the front door and retrieved the mail and re-entered the residence.

297. On September 11, 2020, case agents conducted surveillance of Antonio RODRIGUEZ and observed RODRIGUEZ operating his Nissan Maxima. RODRIGUEZ's Maxima, according to the GPS data corresponding to his vehicle, traveled to ███ S. 21st Street and later to ███ S. 30th Street (residence of HERBERT GONZALEZ). Considering the short duration of the stops, combined with the

150

historical evidence of package deliveries at the residences, case agents believe that RODRIGUEZ picked up packages for the DTO. At the HERBERT GONZALEZ residence, ███ S. 30th Street, RODRIGUEZ remained parked near the address for over an hour. Case agents believe that RODRIGUEZ was waiting in the area for the package to arrive.

### Hauseng YANG

298. Hauseng YANG (HAUSENG) is an Asian male born on ███, 2002. HAUSENG resides at ███ W. Galena Street, Milwaukee, Wisconsin. HAUSENG, XINA's brother, often frequents other DTO addresses and previously resided at ███ W. Burnham Street with MA and BUB. This has been confirmed though investigation and surveillance. The investigation to date has revealed HAUSENG assists the DTO with the retrieval and transport of packages containing controlled substances, as well as functioning as one of the primary distributors for the PEREZ III DTO. Further, HAUSENG has also been present with PEREZ III during suspected drug transactions, as well as being observed conducting drug transactions independently of PEREZ III for the DTO. Between March 24, 2020, and July 19, 2020, approximately 110 intercepted calls and/or text messages between HAUSENG and XINA and/or PEREZ III were deemed criminal and pertinent in nature.

299. In addition, in conjunction with this investigation case agents reviewed HAUSENG's recorded jail calls from the Milwaukee County Jail after his July 31, 2020, arrest. On August 1, 2020, at approximately 4:30 p.m., HAUSENG placed a recorded jail call to (414) 460-███ used by Maihle YANG (MAIHLE), HAUSENG's

151

sister. MAIHLE asked, "I was gonna say, you want me to go get your stuff?" HAUSENG replied, "Yeah…" and stated that he did not have that much "stuff" except his clothes, shoes, and television. MAIHLE stated that she talked to "XINA." XINA told MAIHLE she could take HAUSENG's belongings to her house or "CHONGY's," which case agents know is a nickname for "CHONG." MAIHLE told HAUSENG that she would go pick up his belongings. HAUSENG indicated that "Buddy" (Michael BUB), had the key for "downstairs." Case agents are aware that prior to HAUSENG's arrest, he resided with his sister, MA, and BUB at ██ W. Burnham Street. However, MA and BUB were moving from the residence in early August of 2020. Towards the end of the conversation MAIHLE asked HAUSENG where he wanted her to "take his stuff." HAUSENG replied, "You can bring it to your house or CHONGY's house."

300. On August 1, 2020, at approximately 8:01 p.m., HAUSENG placed a recorded jail call from the Milwaukee County Jail to (414) 460-███ used by MAIHLE. During the conversation MAIHLE stated, "Call me tomorrow anyways, 'cause so I can tell you exactly what, what's there and you want me to bring to the crib and shit." Case agents believe MAIHLE was going to pick up HAUSENG's property from ███ W. Burnham St., and bring it to her house ("the crib").

301. On August 2, 2020, at approximately 8:54 a.m., HAUSENG made a recorded jail call from the Milwaukee County Jail, to (414) 460 ███ used by MAIHLE. During the conversation, HAUSENG stated, "Uh my clothes and stuff." MAIHLE replied, "Imma go and get it in a little while when Ed get up." Case agents

know that MAIHLE's live-in boyfriend is named "Eddie." The conversation continued regarding HAUSENG's property at MA's house and HAUSENG stated, "My shoe boxes too and my shoes." Later, HAUSENG stated, "But um I have some *NIA* in the shoebox." Case agents are aware from this investigation, as well as from information obtained from DEA linguists who speak Hmong, that the Hmong word "*nia*" means money. MAIHLE replied, "I got you." Based upon this call, case agents believe that MAIHLE retrieved HAUSENG's money (i.e., drug proceeds) from the residence at ████ W. Burnham Street.

302. Case agents subpoenaed telephone number (414) 406████ and the subscriber was determined to be "Peter Vue" at ████ W. Galena St. Milwaukee, Wisconsin. Case agents searched CLEAR, a law enforcement database, and determined MAIHLE is associated with ████ W. Galena Street, Milwaukee, Wisconsin.

303. On February 2, 2020, at 7:26 p.m., HAUSENG, using Snapchat account "H████3," sent PEREZ III, using Target Account 1, two chat messages, which stated: "boi.rachedup on snap wanna grab 100 carts" and "He shop before?" At 9:00 p.m., PEREZ III responded, "Yea." Case agents believe that HAUSENG conferred with PEREZ III to ensure that HAUSENG did not sell 100 marijuana vape cartridges to someone who had not been "verified" by the PEREZ III DTO.

304. On February 13, 2020, at 1:50 a.m., HAUSENG, using Snapchat account "H████3," sent PEREZ III, using Target Account 1, two chat messages, which stated: "Grabbed two p 1 blue cookies and 1 indoor skywalker" and "200 carts." Case

agents believe that HAUSENG informed PEREZ III that HAUSENG had retrieved two pounds of marijuana ("grabbed two p) and 200 marijuana vape cartridges ("200 carts") from the stash house.

305.  On April 24, 2020, at 5:47 p.m., XINA, using Target Telephone 4, called HAUSENG, using (414)722-███ XINA stated, "Okay. He's just gonna get the key from you, because if you, if you gonna be all out, then he's just gonna grab that key for the basement, 'cause you're the only one who has the key."  HAUSENG stated, "The door, the door is not even, not even locked. Tell him he can just open it." HAUSENG continued, "But he can just open it [U/I] everything that's in there." XINA replied, "Okay, well, I was gonna say, what happened to you, HAUSENG? We've been, we told you, we needed you this morning."  HAUSENG replied, "Huh?" XINA reiterated, "What happened to you this morning?"  HAUSENG stated, "I was up." XINA replied, "He said that when you hop in the shower and everything, and by the time you got out the shower, it was already there. Somebody got it." XINA later stated, "Cause he said that, you know, once, he giving y'all all those plug [PH] numbers because at the end of the day, y'all be helping out and looking out and shit." HAUSENG replied, "Yup."  XINA stated, "And he was like, damn, if you don't, you know, if you ain't gonna do that, he's just gonna charge you what he be charging Bump-Bump and he ain't trying to do that to you 'cause you guys be helping out." HAUSENG replied, "Alright."  XINA continued, "But, he was like, damn, what happened? You did that two times now. It happened twice, he said. He said the first time, that one day, and then the second time today. He said that if you don't want to

154

do nothing, just let him know now because then he could just, you know, give you a different price. He only be doing that because you be looking out and helping him do that, you know?" HAUSENG later stated, "Right, no, it's, it's not like that." XINA stated, "That's why he keep-that's why he don't charge you and Grillo (SOTO) like that, because y'all be helping out. Like, Grillo didn't wanna wake up and he still woke up. He's like, you know, if you don't want to do nothing, you don't wanna like, you know, do him some favors and stuff like that, you know, he can just give you different numbers, just because you be helping out, that's why he give you those good numbers. But, he want to go in the basement, and he just gonna fix the um, grab the key from you, but if you say that it's like that, then, then Imma just tell him that he could just go. But he say he wanna talk to you, though."

306. Based upon their training, experience, and familiarity with this investigation, case agents believe that during this call, XINA spoke with HAUSENG about PEREZ III retrieving a key to the basement at ███ W. Burnham Street where HAUSENG resided from HAUSENG. ("He's just gonna get the key from you, because if you, if you gonna be all out, then he's just gonna grab that key for the basement, 'cause you're the only one who has the key."). Case agents further believe that XINA confronted HAUSENG regarding his work ethic. Based upon intercepted communications and surveillance, case agents believe that HAUSENG retrieves packages on behalf of the DTO in addition to selling controlling substances for the DTO. To that end, HAUSENG was supposed to retrieve a package(s) for PEREZ III that morning. ("Okay, well, I was gonna say, what happened to you, HAUSENG?

155

We've been, we told you, we needed you this morning."). Yet someone else retrieved the package. ("Somebody got it."). Case agents also believe that PEREZ III provides discounted prices for controlled substances to HAUSENG in exchange for retrieving packages and other work that HAUSENG performs for the PEREZ III DTO. ("'Cause he said that, you know, once, he giving y'all all those plug numbers because at the end of the day, y'all be helping out and looking out and shit." . . . "And he was like, damn, if you don't, you know, if you ain't gonna do that, he's just gonna charge you what he be charging Bump-Bump and he ain't trying to do that to you 'cause you guys be helping out.").

307. Case agents further believe that XINA discussed with HAUSENG PEREZ III's interest in talking to HAUSENG about HAUSENG's ability – or lack thereof – to continue to assist the PEREZ III DTO. If HAUSENG continued to fall down on the job, then PEREZ III would no longer supply HAUSENG at the discounted prices. ("If you don't want to do nothing, you don't wanna like, you know, do him some favors and stuff like that, you know, he can just give you different numbers, just because you be helping out, that's why he give you those good numbers" . . . "But he say he wanna talk to you, though.").

308. On April 29, 2020, at approximately 8:40 a.m., XINA, using Target Telephone 4, called HAUSENG, using (414)722-█████, and stated, "Go to eighteenth (18th street), that one got there already. You gotta go like, now!" HAUSENG replied, "I'm, I'm already almost there." XINA replied, "Okay. Knock on the door . . . It got there thirty (30) minutes ago. Or it might just be on the porch."

309.   Yet, prior to this call, the package that PEREZ III and XINA were expecting had been seized by law enforcement. Case agents had previously asked FedEx security to mark the package as delivered in their tracking system. Based upon their training, experience, and familiarity with this investigation, case agents believe this call reflects that XINA and/or PEREZ III viewed the tracking information for the package, which indicated it had been delivered at 8:12 a.m. Case agents further believe that XINA called HAUSENG, who was supposed to retrieve the package, telling him to hurry up because the package had been delivered.

310.   Because the package had actually been seized earlier that morning, law enforcement conducted surveillance in the area of the house to which it was addressed— ████ S. 18th Street. Case agents observed HAUSENG knocking on the doors of at least five residences; however, only making contact with the occupant of the house to which the package was to be delivered. Case agents observed HAUSENG speaking with the occupant on the porch. PEREZ III also arrived to this area, although he remained in his vehicle with a view of the residence for approximately fifteen minutes.

311.   On June 5, 2020, at 2:39 p.m., HAUSENG, using (414) 722-████ called XINA, using Target Telephone 4.  XINA stated, "He's on his way, he'll meet you at Booty Mama house."  HAUSENG replied, "Alright, so I don't need the truck, right?"  XINA asked, "What you say?"  HAUSENG repeated, "I don't need MA's truck?"  XINA replied, "No."  HAUSENG stated, "Alright."  XINA repeated, "Alright. Is he just gonna fill up yours and Bump's car."  HAUSENG asked, "Huh?"  XINA replied, "He's fillin'

up yours and Bump's car only." Case agents believe XINA directed HAUSENG to meet PEREZ III at MARY's residence, where they would meet RODRIGUEZ ("Bump") to obtain the finished marijuana cartridges in HAUSENG's and RODRIGUEZ's vehicles and move them to another location.

312. On April 7, 2020, at 2:03 p.m., XINA, using Target Telephone 4, called PEREZ III, using Target Telephone 1. During this call, XINA asked, "Did HAUSENG call you?" PEREZ III replied, "No, why?" XINA continued, "Well, he's supposed to be doing something for you?" PEREZ III answered, "No" and "Why?" XINA stated, "His friend just called AZIA and said he's getting arrested." PEREZ III replied, "That nigg probably has some fucking bud on him." PEREZ III asked, "Why that nigga stop dog?" XINA answered, "I don't know the details." Case agents know that on April 7, 2020, HAUSENG was arrested by the Milwaukee Police Department for possession of marijuana and carrying a concealed weapon. HAUSENG was found to be in possession of a Glock 9mm handgun and approximately 16 grams of marijuana. Case agents believe that during this call, XINA checked with PEREZ III to ensure that HAUSENG had not been arrested engaged in criminal activity for PEREZ III. PEREZ III wondered why HAUSENG allowed himself to get arrested by not fleeing from the police. ("Why that nigga stop dog?").

313. Case agents are further aware that on July 30, 2020, HAUSENG was arrested by the Milwaukee County Sheriff's Department after HAUSENG was involved in a traffic collision in Milwaukee. HAUSENG attempted to flee the scene on foot. Upon HAUSENG's arrest, HAUSENG was found in possession of a backpack

that contained various amounts of marijuana, marijuana edibles, marijuana resins, marijuana vape cartridges, a digital scale, a box of sandwich baggies, 7 rounds of .38 special ammunition, 50 rounds of 9mm ammunition, 2 cellular telephones, 13 rounds of .380 caliber ammunition, and a Glock .380 caliber handgun. Case agents believe that after the traffic collision, HAUSENG attempted to clean out his car of drug trafficking evidence, placing those items into the backpack, and attempted to flee the scene before law enforcement arrived. During the booking process, HAUSENG provided the address of ████ S. 25th Street, the primary residence of Chong YANG (CHONG), his sister.

314. A search warrant was executed on HAUSENG's cellular telephones seized during his arrest. The telephone numbers of the phones were determined to be (414) 722-███ and (414) 364-███ An analysis of the information contained in the phones revealed that on June 20, 2020, at 12:44 p.m., HERBERT GONZALEZ, using (414) 651-███ sent HAUSENG a message that stated, "What flavor carts do you got have someone who might want to buy big bulk." HAUSENG replied, "Ape Tangke dream og and cookie." Case agents believe these to be flavors of marijuana vape cartridges that HAUSENG offered for sale. In addition, on June 20, 2020, Azia YANG (AZIA) sent a message to HAUSENG, which message contained two pictures and one video. Both pictures showed several boxes of marijuana vape cartridges and the video panned over several boxes of marijuana vape cartridges secured together with rubber bands.

315. Numerous incriminating photographs were contained within the download. These pictures include but are not limited to numerous photographs of large amounts of marijuana, HAUSENG holding large stacks of U.S. currency, marijuana vape cartridges, as well as several photographs of HAUSENG with guns.

316. In addition, on July 31, 2020, a search warrant was executed on HAUSENG's blue Jaguar which he was operating at the time of the traffic collision. This blue Jaguar was used by various DTO members throughout this investigation. The search revealed, among other items, seven unused United States Postal Service Priority boxes, one marijuana vape cartridge, and a rental receipt from "Jasmine Perez" payable to the Knitting Factory Lofts (which case agents know to be ███ W. Pierce Street), issued April 8, 2020, in the amount of $900.00.

317. On September 9, 2020, at 4:52 p.m., case agents observed HAUSENG exit the front door of ███ W. Galena Street. HAUSENG met with an unknown individual in a vehicle on the street in front of the residence. HAUSENG entered the vehicle and shortly thereafter exited the vehicle. HAUSENG then walked around to the rear of the residence out of the sight of surveillance agents. Based on the short term contact, case agents believe that HAUSENG conducted a drug transaction with the occupants of the vehicle.

318. At 5:27 p.m., case agents observed an Acura, registered to MARY, arrive and stop in the street in front of ███ W. Galena Street. Case agents observed HAUSENG again exit the front door of ███ W. Galena Street. HAUSENG met

briefly with the driver of the vehicle. Based on the short term contact, case agents also believe that a drug transaction occurred with the occupant of the MARY's vehicle.

319. As evidenced by other calls and Snapchat information referenced in this affidavit, case agents believe that HAUSENG is one of the main distributors for PEREZ III and is an active participant in the PEREZ III DTO.

### Antonio RODRIGUEZ

320. Antonio RODRIGUEZ (a/k/a Bump and Lil Mexico), is an Hispanic male born on ███████ 1999. RODRIGUEZ resides at ████ N. 84th Street, Milwaukee, Wisconsin. This has been confirmed though investigation and surveillance; however, the apartment number is currently unknown. RODRIGUEZ is believed to be a Mexican Posse street gang member. The investigation to date has revealed RODRIGUEZ is a primary distributor for the PEREZ III DTO, and that he also retrieves and transports DTO packages containing controlled substances. Between April 13, 2020, and April 16, 2020, approximately 3 intercepted calls and/or text messages between RODRIGUEZ and PEREZ III were deemed criminal and pertinent in nature.

321. Case agents believe that RODRIGUEZ maintains control of the residence, and that the residence likely contains evidence of RODRIGUEZ's drug trafficking and money laundering activities, and other financial documents related to the drug and money laundering conspiracy.

322. As stated above, RODRIGUEZ was arrested on a felony arrest warrant for Possession with Intent to Distribute Cocaine and Carrying a Concealed Weapon

161

on February 6, 2020 ,at his home located at ███ S. 18th Street, Milwaukee, Wisconsin. On February 11, 2020, he was charged with Possession with Intent-Cocaine, Use of a Dangerous Weapon, and three counts of Bail Jumping. He failed to show for a February 20, 2020, court appearance, forfeiting at least a $25,000 bond.

323. Case agents know that RODRIGUEZ has two open cases pending in Milwaukee County Circuit Court and felony warrants have been issued for his arrest.

324. In late March and throughout April of 2020, RODRIGUEZ appeared to be residing at ███ W. Pierce Street, ███, which at the time was the DTO's primary stash house. Case agents confirmed this information through physical and remote camera surveillance. RODRIGUEZ was wanted on a felony drug warrant during this time. In addition, case agents intercepted the following telephone calls, of which the user, based on the contents of the call and surveillance, was believed to be RODRIGUEZ. Further, case agents believe that, as a result of RODRIGUEZ's status as a fugitive, RODRIGUEZ frequently switches telephone numbers and communicates with PEREZ III and other members of the DTO either in person or through encrypted third-party telephone applications.

325. However, case agents have observed RODRIGUEZ with PEREZ III and other DTO members on numerous occasions throughout this investigation. Based upon their training, experience, and familiarity with the investigation, case agents believe that during many of these times, suspected drug transactions occurred.

326. On April 11, 2020, at approximately 1:35 p.m., the remote camera depicted Manuel SOTO entering Apartment ███. Approximately one hour later,

162

SOTO was observed in the doorway of the apartment. Then, SOTO re-entered and exited the apartment several more times over the next few minutes carrying large black garbage bags and flattened cardboard boxes. At approximately 4:00 p.m., case agents observed SOTO and RODRIGUEZ exit Apartment ███ via the remote camera.

327. On April 13, 2020, at 12:43 p.m., PEREZ III, using XINA's Target Telephone 4, called RODRIGUEZ, using (414) 676-███ During this call, RODRIGUEZ stated that he was at El Rey, and PEREZ III replied, "Alright, Imma need that key though." RODRIGUEZ stated, "I'm on my way back there now too. If you want I can meet you there, like I'm literally... I already put the thing inside. I'm hopping in the truck." PEREZ III confirmed. At 1:34 p.m., RODRIGUEZ was observed via the remote camera at the door to apartment ███. RODRIGUEZ was carrying multiple El Rey white shopping bags and was observed with a female using a key to enter the door to ███. Case agents believe that PEREZ III allowed RODRIGUEZ to stay at ███ in order to avoid law enforcement detection.

328. On April 14, 2020, at 1:58 p.m., PEREZ III, using Target Telephone 1, called RODRIGUEZ, using (414) 676-███ During this call, PEREZ III asked about RODRIGUEZ's whereabouts and RODRIGUEZ replied, "At the crib." PEREZ III informed RODRIGUEZ, "I'm on my way cous." RODRIGUEZ replied, "Okay, you got the keys or what?" PEREZ III responded, "You got the keys, nigga." Case agents believe that PEREZ III gave his set of keys to RODRIGUEZ so that RODRIGUEZ could go in and out of the apartment without PEREZ III being present.

163

329. Case agents know that communications between PEREZ III and RODRIGUEZ ceased on the (414) 676-███ telephone in April of 2020, and case agents were unable to positively identify a phone number used by RODRIGUEZ until later in the investigation.

330. Throughout this investigation, RODRIGUEZ had been observed operating at least six different vehicles associated with PEREZ III and the PEREZ III DTO. In addition, RODRIGUEZ has also been observed in numerous other vehicles registered to his mother, Maria AVINA. Case agents believe that RODRIGUEZ is frequently switching vehicles and telephones to evade law enforcement due to his outstanding felony warrants.

331. On August 12, 2020, at 6:18 a.m., PEREZ III, using Target Account 1, sent a Snapchat message to RODRIGUEZ that stated, "I don't got a key cuz I thaught u were Gina pull up" At 6:19 a.m., PEREZ III sent another message that stated "That's why u got hecs keys to his truck u should've told me I would've kept his truck key." No response was intercepted. Case agents believe that PEREZ III referred to ARENA's Ford Explorer and that RODRIGUEZ had the key. Case agents know that at the time this message was sent, ARENAS was with SANCHEZ in California. Further, case agents know that PEREZ III was driving ARENA's explorer because PEREZ III had been observed on surveillance operating it and it was also observed parked outside of PEREZ III's residence on several occasions while ARENA's was gone.

164

332. On August 12, 2020, at 7:27 p.m., PEREZ III, using Target Account 1, sent a Snapchat message to RODRIGUEZ that stated, "30 edibles of the gummys the 600 mg ones and 10 nerd ropes then qup of the skywalker og." No response was intercepted. Based upon their training, experience, and familiarity with the investigation, case agents believe that PEREZ III sent RODRIGUEZ a customer's order that consisted of 30 packages of the 600 mg edible marijuana products, 10 packages of "nerd ropes" and a quarter pound quantity of the "skywalker og" strain of marijuana.

333. In late August of 2020, a search warrant was executed on RODRIGUEZ's Snapchat account "m███████p." The warrant return revealed numerous items of incriminating evidence, including but not limited to photographs and videos of marijuana, marijuana vape cartridges, as well as at least 5 photographs depicting guns.

334. In early September of 2020, a GPS search warrant was issued for RODRIGUEZ's Nissan Maxima. Data from the GPS device showed that RODRIGUEZ has been regularly parked at or near ███ N. 84th Street on a consistent basis.

335. In addition, on September 11, 2020, case agents observed RODRIGUEZ exit the north facing door at ███ N. 84th Street and enter the Nissan Maxima. The Maxima then departed the area and surveillance was terminated.

**PEREZ III also uses other DTO members to distribute controlled substances.**

### Hector ARENAS

336.    Hector ARENAS is an Hispanic male born on ▓▓▓▓, 1993.  ARENAS currently resides at ▓▓▓▓ S. 6th Street, Milwaukee, Wisconsin.  ARENAS is believed to be a member of the Mexican Posse street gang.  The investigation to date has revealed that ARENAS maintains one of the stash houses for the PEREZ III DTO at ▓▓▓▓ S. 6th Street, Milwaukee, Wisconsin, and obtains distribution quantities of controlled substances from PEREZ III.  In addition, ARENAS has traveled to California on behalf of the PEREZ III DTO.  Between April 11, 2020 and July 23, 2020, approximately 72 intercepted calls and/or text messages between ARENAS and PEREZ III were deemed to be criminal and pertinent in nature.

337.    For example, on April 11, 2020, at 10:26 p.m., PEREZ III, using Target Telephone 3, called ARENAS, using (414) 366-▓▓▓▓  PEREZ III asked, "Yeah, what's going on with you?"  ARENAS replied, "Not much bro... chilling. Hey, shit started moving even more bro."  PEREZ III responded, "I know-- hey whatever you have left, you better chop that shit up."  Based upon their training, experience, and familiarity with the investigation, case agents believe that PEREZ III referred to adding "cut" to the cocaine to make it last longer. ("You better chop that shit up.").  ARENAS stated, "That's what I'm doing. That's exactly what I'm doing bro [LAUGHS]."  PEREZ III commented, "[U/I] want it too nigga and nobody has nothing. They'll buy that shit."  Case agents further believe that PEREZ III related to ARENAS that despite adding cut to the cocaine, customers will still buy it because of the cocaine shortage in

166

Milwaukee. ("Nobody has nothing. They'll buy that shit."). ARENAS replied, "No, yeah for sure. For sure, sure. That's why I was calling you earlier bro to see what's the word or what? What's going on or... if anything else bro, you know..." PEREZ III answered, "Should be a couple of days." Case agents believe this to mean that PEREZ III was expecting to receive a shipment of cocaine in the next couple of days. ARENAS stated, "Yeah. Um... what you call, nah bro, just wanted to uh, [U/I] keep up." PEREZ III stated, "All set dude." ARENAS stated, "I haven't heard from you for a minute but... I don't forget dude." PEREZ III replied, "Nah, it's cool bro. Yeah, yeah, Imma let you know, alright?" ARENAS confirmed, "Alright then." Based upon their training, experience, and familiarity with the investigation, case agents believe that PEREZ III would contact ARENAS when the cocaine arrived.

338. On April 14, 2020 at 2:10 p.m., ARENAS, using (414) 366-███, sent a text message to PEREZ III, using Target Telephone 3. ARENAS texted, "I got the rest of that loot for u." At 5:09 p.m., PEREZ III, using Target Telephone 3, called ARENAS, using (414) 366-███. PEREZ III asked, "Hey you said you got the money?" ARENAS replied, "Yeah bro. I probably just drop it off at the house right now. Imma head that way." PEREZ III stated, "Yeah that be cool bro." ARENAS replied, "Yeah." Case agents believe these conversations are regarding money that ARENAS owed PEREZ III for previously supplied controlled substances. Further, case agents conducted physical surveillance of PEREZ III during the evening hours of April 14, 2020 and PEREZ III was observed parked in the area of ARENAS's house

339.  On April 22, 2020, at 11:37 pm, PEREZ III, using Target Telephone 3, called ARENAS, using (414) 366-███. During the conversation, ARENAS stated, "Nothing here at the house." Case agents believe that during this call ARENAS told PEREZ III that ARENAS was out of controlled substances and needed more. PEREZ III asked, "You called me?" ARENAS replied, "Yeah I called you but um, I have money here for you bro." PEREZ III stated, "That's cool bro. I'll stop by tomorrow." ARENAS confirmed, "Alright". Case agents believe that during this call, ARENAS informed PEREZ III that ARENAS had money for PEREZ III for previously supplied controlled substances supplied to ARENAS at his residence. PEREZ III told ARENAS that PEREZ III would pick up the money the following day.

340.  On May 15, 2020, at 11:51 a.m., PEREZ III, using Target Telephone 1, called ARENAS at (414) 366-███ During this call, PEREZ III stated, "Hey dude, you at the crib?" ARENAS replied, "Yeah." PEREZ III stated, "Imma stop by. I don't got my key on me dawg." ARENAS stated, "Alright." Case agents believe that PEREZ III was calling ARENAS to make sure that ARENAS was at ARENAS's house, which case agents believe to be an additional stash house location of ███ S. 6th Street, ("Hey dude, you at the crib?"), but that PEREZ III needed access to the house because PEREZ III had forgotten his key. ("Imma stop by. I don't got my key on me dawg"). At 11:52 a.m., PEREZ III, using Target Telephone 1, sent a text message to ARENAS at (414) 366███ The text message stated, "I'm on my way." Case agents were conducting surveillance of PEREZ III during this time, and at 11:55 a.m., observed SOTO and PEREZ III leave the Pierce Street stash apartment, via the covert camera.

SOTO and PEREZ III drove to ARENAS's house at ▆▆▆ S. 6th Street and walked towards the area of the residence and out of case agents' view. At 12:17 p.m., case agents observed SOTO and PEREZ III leave ARENAS's residence and back to the Pierce Street stash apartment. At 12:26 p.m., case agents observed via the covert camera SOTO and PEREZ enter the Pierce Street stash apartment. Both SOTO and PEREZ III were carrying brown paper bags into the apartment. Based upon their training, experience, and familiarity with the investigation, case agents believe that the brown paper bags contained an unknown quantity of controlled substances.

341. On June 5, 2020, at 5:41 p.m., PEREZ III, using Target Telephone 1, sent an outgoing text message to ARENAS, using (414) 366-▆▆▆ PEREZ III sent, "Yo I'm here bro I don't have my ▆▆ key." Case agents know that ARENAS resides at ▆▆▆S. 6th Street, which PEREZ III uses as a stash house for controlled substances and guns, and that PEREZ III has a key for and has access to the residence.

342. On August 10, 2020, case agents were monitoring the court authorized location data for ARENAS's phone, (414) 366▆▆▆ Case agents observed that the phone began registering in the San Francisco, California, area around 7:00 p.m. Location data for SANCHEZ's Target Telephone 5 placed SANCHEZ's phone and ARENAS's phone in the same general area at the same general time, and both phones appeared to travel north to the area of Novato, California, together.

343. On August 11, 2020, both phones traveled together and at approximately 10:00 p.m., both phones began registering in Costa Mesa, California, near SANCHEZ's primary residence and continued to register overnight in Costa

169

Mesa the nights of August 11 and 12, 2020. ARENAS's registered in the area of Los Angeles International Airport around 11 a.m. on August 13, 2020, and at O'Hare International Airport on August 13, 2020 at 7:14 p.m. Further, a review of the pen registers installed on SANCHEZ's phone by case agents revealed at least 21 calls and texts with ARENAS's phone beginning on August 10, 2020, and continuing through August 13, 2020. During this same time frame, ARENAS's phone was in contact with both PEREZ III's Target Telephone 1 and XINA's Target Telephone 4.

344. Based upon their training, experience, and familiarity with the investigation, case agents believe that ARENAS traveled to California to meet with SANCHEZ on behalf of the PEREZ III DTO. Case agents believe that because the three postal packages containing a total of approximately $60,000 in U.S. currency went missing in early July, the PEREZ III DTO had shifted their methods of operation away from sending currency through the U.S. Postal service. To this end, PEREZ III only sent three packages to SANCHEZ on July 28, 2020, and case agents were unable to locate any additional packages sent since that date. Case agents believe that ARENAS brought the drug proceeds with him to personally deliver to SANCHEZ, and that PEREZ III is now sending money couriers, including but not limited to ARENAS, to California to deliver the proceeds to SANCHEZ.

345. Case agents have conducted regular surveillance of this address throughout the investigation. During surveillance, case agents have regularly observed ARENAS at this address, as well as his vehicle parked at this address on a consistent basis. In addition, location data, as well as GPS data affixed to ARENAS

170

vehicle, place ARENAS at or near this residence on a consistent basis as recently as September 7, 2020.

## Luis F. GOMEZ JR.

346.   Luis GOMEZ JR. (a/k/a "Scarecrow"), is an Hispanic male born on ███████, 2001.   According to electronic and physical surveillance, GOMEZ JR. resides at ██████ S. 10th Street, Milwaukee, Wisconsin.   This has been confirmed though the investigation and confirmed with surveillance.   On or around September 10, 2020, GOMEZ JR. moved into this residence with his mother. GOMEZ JR. is also believed to be a member of the Mexican Posse street gang.   The investigation to date has revealed GOMEZ JR. assists PEREZ III with deliveries of quantities of controlled substances from PEREZ III.   The investigation has also revealed that GOMEZ JR. routinely  carries  a  firearm.    Between  August  8,  2020,  and  August  23,  2020, approximately 3 intercepted Snapchat communications between PEREZ III and GOMEZ were deemed criminal and pertinent in nature.

347.   Throughout this investigation, case agents have monitored the remote surveillance camera activity at █████ W. Pierce Street, ██████ for evidence of criminal activity and to identify the various individuals entering and exiting the stash apartment.  One of those individuals has been identified as GOMEZ JR., and toward the end of July of 2020, GOMEZ JR. was observed coming and going from the apartment using keys to access the door.

348.   Further,  throughout  June  and  July  2020,  GOMEZ JR. case  agents observed GOMEZ JR. on the remote camera entering and exiting apartment █████ on

a regular basis. On several of these occasions, GOMEZ JR. was observed coming out of or going into ███ brandishing firearms, including but not limited to a handgun with a laser sight, a handgun with an extended magazine, and on at least two occasions, GOMEZ JR. was observed openly carrying an assault style rifle. Throughout much of August of 2020, GOMEZ JR. did not frequent apartment███. During this time, GOMEZ JR. was observed at ██ E. Morgan Avenue, as well as ███ S. 6th Street.

349.    Throughout this investigation, case agents have conducted surveillance on one of PEREZ III's vehicles, a white Buick, which was routinely used to distribute controlled substances for the DTO. This vehicle was used by numerous members of the PEREZ III DTO, including but not limited to SOTO, PEREZ III, GOMEZ JR., and HAUSENG. Specifically, on May 12, 2020, case agents conducted surveillance on the white Buick, which was parked at ███ W. Pierce Street,███. Case agents observed an unknown Hispanic male enter the driver's seat of the Buick and GOMEZ JR. entered the passenger seat. Throughout the next hour, case agents observed the occupants of the Buick conducting numerous drug transactions at various locations throughout Milwaukee. The Buick would return to ███ W. Pierce Street, and then leave again. Case agents then observed that GOMEZ JR. was operating the Buick with the unknown Hispanic male, believed to be GALAN, now the passenger.

350.    Subsequently, a Milwaukee Police Department squad car attempted to conduct a stop of the vehicle for a traffic violation. When the squad car attempted to stop the Buick, the Buick immediately fled from the squad at a high rate of speed.

172

The squad immediately terminated the pursuit once the Buick fled. Case agents continued to monitor the GPS unit affixed to the Buick and observed the Buick return to ███ W. Pierce Street. A short time after arriving at ███ W. Pierce Street, case agents positively identified GOMEZ JR. and GALAN entering apartment ███ via the remote camera.

351. Further, GOMEZ JR. has been observed on physical, as well as remote camera, surveillance at ███ E. Morgan Avenue on several occasions throughout the investigation. On several of these occasions, GOMEZ was observed with several other individuals removing numerous boxes from the residence and loading the boxes into various vehicles, which were then transported to other DTO locations.

352. Case agents executed a search warrant on Esteban REYES cellular telephone number (414) 998-███ on May 30, 2020 after REYES was arrested for a violation of probation. An examination of the phone revealed a contact for "Roach" with cellular telephone number (323) 449-███, which case agents know to be Manuel SOTO. Contained in the messages was a message from REYES to SOTO dated "May 8 at 5:38 pm" that stated, "Going back to lulu to unload the materials lulu said to bring scarecrow to help unload." Case agents know that PEREZ III is commonly referred to as "Lulu" by other members of the DTO. Case agents believe that REYES instructed SOTO to meet with REYES and PEREZ III to help unload boxes containing controlled substances, and PEREZ III told SOTO to bring "Scarecrow" (GOMEZ JR.).

353. Throughout this investigation, case agents have not intercepted GOMEZ JR. over the target telephones with the exception of one telephone call. On

173

July 23, 2020, PEREZ III, using Target Telephone 1, called GOMEZ JR., using (414) 346-███ a telephone subscribed to by GOMEZ JR. PEREZ III answered the phone and stated, "Yo yo." GOMEZ JR. asked, "You said you on 18th, uh, 19th?" PEREZ III asked, "And Becher?" GOMEZ JR. stated, "Rogers." PEREZ III confirmed, "Rogers, alright, I'm on 22nd and Rogers. GOMEZ JR. stated, "Alright, set." PEREZ III continued, "Alright, I'm right here pulling up." Based upon their training, experience, and familiarity with the investigation, case agents believe that during this phone call, GOMEZ JR. was distributing controlled substances for PEREZ III, and PEREZ III wanted to meet with GOMEZ JR. to talk in person instead of over the telephone.

354.    Throughout this investigation, GOMEZ JR. has routinely been observed on surveillance conducting numerous suspected drug transactions with numerous different individuals. Many of these transactions were conducted using vehicles used by other DTO members, including but not limited to the white Buick, the blue Dodge Charger and the blue Jaguar.

355.    Case agents believe that GOMEZ has additional unknown telephone numbers and/or communicates with PEREZ III through third-party phone applications. The investigation has revealed that GOMEZ is a close member of the DTO and it is case agents' belief that the DTO needs to communicate the activities of the DTO to PEREZ III, as well as other members.

356.    As an example, on August 16, 2020, at 5:37 p.m. case agents intercepted an outgoing "snap" message from Target Account 1, used by PEREZ III, to a Snapchat account, "████████ow13," used by Luis GOMEZ JR (a/k/a "Scarecrow"). The snap

174

message contained a video that depicted PEREZ III wearing a blue bandana over his face, operating what appeared to be PEREZ III's "Slingshot," which is a three wheeled open air vehicle with no roof. PEREZ III appeared to be driving, and holding two pistols in his left hand. Based upon case agents' training and experience, case agents identified the pistols as semi-automatic firearms. One pistol was a tan color, and the other, black with an extended magazine. PEREZ III pointed the firearms at the camera. Because the vehicle PEREZ III was operating was without a roof, any member of the public would have been able to observe PEREZ III openly displaying firearms while driving down the street.

### *GOMEZ JR. now Resides at ██ S. 10th Street, Milwaukee, Wisconsin*

357. On April 11, 2020, GOMEZ JR., using his Snapchat account, "████ow13," sent a Snapchat message to PEREZ III, using Target Account 1. The message stated, "██ S. 10th St." On May 14, 2020, GOMEZ JR., using his Snapchat account "████ow13," sent a Snapchat message to Manuel SOTO, using Snapchat account "m████6" that stated, "4███67." Based upon their familiarity with the investigation, case agents believe that in these messages GOMEZ JR. provided PEREZ III with his address ("██ S. 10th St"), and SOTO with his telephone number ("4███67").

358. As mentioned above, after SOTO was arrested on August 19, 2020, and jailed case agents obtained SOTO's recorded calls from the Milwaukee County Jail. Shortly after SOTO's arrest, GOMEZ JR. had moved into the stash apartment, ████ W. Pierce Street, Apartment ██, Milwaukee, Wisconsin. Beginning on September

175

3, 2020, a series of calls occurred between SOTO and PEREZ III. During these calls, the two discussed "Scarecrow's" (GOMEZ JR.'s) debt to PEREZ III for the rent owed to him at ███ W. Pierce Street; that "Scarecrow" had not paid the rent to PEREZ III. PEREZ III mentioned to SOTO that PEREZ III was going to move his sister into SOTO's apartment (███) and "kick out Scarecrow."

359.    Previously, case agents obtained a search warrant for the location data associated with GOMEZ JR.'s cellular telephone, (414) 346-███. Beginning around September 4, 2020, case agents began receiving location data from GOMEZ JR.'s cellular telephone, (414) 346-███ Case agents' review of the location data placed GOMEZ JR.'s cellular telephone in or around the area of ███ W. Pierce Street on a regular basis, including overnight. Beginning in the evening hours of September 10, 2020, GOMEZ JR.'s cellular telephone began registering in the area of ███ S. 10th Street, Milwaukee, including during the overnight hours. Based upon this location information, combined with the jail calls, case agents believe that GOMEZ JR. moved from ███ W. Pierce Street to his mother's residence at ███ S. 10th Street. A check with WE Energies revealed that since April 2018 an open account exists at ███. S. 15th Street, Milwaukee, Wisconsin, in the name of Martha Gonzalez. In addition, WE Energies lists "███ as the upper front unit.

360.    Case agents searched public databases as well as Wisconsin Department of Transportation records, and discovered that GOMEZ JR. regularly lists ███ S. 10th Street as his address, without specifying "█," which case agents know corresponds to the upper unit.

176

361.    During the evening of September 14, 2020, City of Milwaukee police officers made contact with Martha Gonzalez at ▮▮▮ S. 10th Street, Milwaukee, Wisconsin. Ms. Gonzalez stated that she owns ▮▮▮ S. 10th Street and resides in the upper unit. Later in the evening, officers returned to ▮▮▮ S. 10th Street, Milwaukee, and observed GOMEZ JR. standing on the landing of the staircase leading to the upper unit, addressed as "▮▮▮" S. 10th Street. Officers spoke briefly with GOMEZ JR., who stated his "mom" told GOMEZ JR. that the officers had visited the residence earlier in the evening. Although the officers were familiar with GOMEZ JR.'s appearance from a photograph provided by case agents, and knew his identity, when officers asked GOMEZ JR. to identify himself he refused, and walked away.

362.    During the early morning hours of September 15, 2020, the West Allis Police Department was involved in a high speed pursuit of a stolen Nissan Altima, bearing Dealer registration plates MV4950. Previously on September 8, 2020, case agents observed DTO member Ivan GALAN operating this vehicle. The vehicle was disabled during the pursuit, and the driver was identified as GOMEZ JR., the rear passenger identified as HAUSENG, and the front passenger identified as Ana RODRIGUEZ, the sister of Antonio RODRIGUEZ. Both GOMEZ JR. and HAUSENG were wearing masks and latex gloves. HAUSENG attempted to flee on foot after the vehicle was disabled, but was apprehended by officers. Inside of a backpack worn by HAUSENG, officers recovered numerous marijuana vape cartridges as well as quantities of marijuana. In addition, officers located a 9mm Springfield handgun with a 50 round drum magazine. After arrest and during the booking process,

177

GOMEZ JR. provided the address of "███ S. 10th Street, Milwaukee, Wisconsin," and HAUSENG provided an address of ███ S. 25th Street, Milwaukee, Wisconsin. Based upon their training, experience, and familiarity with the investigation, case agents believe that HAUSENG provided this specific address in order to conceal his actual residence.

363.  Throughout this investigation, case agents have observed GOMEZ JR. operating numerous DTO vehicles while conducting suspected drug transactions. In addition, as noted herein GOMEZ JR. has been observed in the possession of firearms. GOMEZ JR. is a convicted felon, convicted in Milwaukee County Case Number 2019CF000306. Based upon their training, experience, and familiarity with the investigation, case agents therefore believe that evidence of the aforementioned crimes will be found at █████ S. 10th Street, Milwaukee, Wisconsin.

### Ivan GALAN

364.  Ivan GALAN (a/k/a Porky), is an Hispanic male born on ███████ 1993. GALAN is believed to reside at ███ N. 24th Street, Milwaukee, Wisconsin. At various times throughout the investigation, GALAN has been observed coming and going from the residence. GALAN has been identified as a Mexican Posse gang member.

365.  During the course of the investigation, GALAN has been regularly observed at DTO stash houses, ███ W. Pierce Street, ████, and ███ S 6th Street. Investigation to date has revealed that GALAN is another primary controlled substances distributor for the PEREZ III DTO. Between May 13, 2020, and July 23,

178

2020, approximately 77 intercepted calls and/or text messages between GALAN and PEREZ III were deemed criminal and pertinent in nature.

366.    For example, on May 14, 2020, at 4:43 p.m., GALAN, using (414) 982- ███ sent a text message to PEREZ III, using Target Telephone 1.  GALAN sent "Sup," and PEREZ III replied, "Come on through pri."  Case agents believe this exchange to mean that that PEREZ III wanted to meet GALAN.  During the time of this text, case agents were conducting physical surveillance and observed PEREZ III was traveling back and forth from ████ S. 6th Street and appeared to conduct several drug transactions in the area while driving the Impala.  At 4:54 p.m., case agents observed the white Buick pull into the parking area at ████ S. 6th Street, and two males exited the Buick.  Due to the location, agents were unable to identify the individuals before they entered ████ S. 6th Street.  At 5:33 p.m., case agents identified Manuel SOTO and GALAN exit ████ S. 6th Street and walk to the Buick. GALAN was carrying a large bag which appeared to be weighted with contents based on the way GALAN was carrying it.  SOTO was carrying a smaller object, which SOTO placed into the trunk of the Buick.  The Buick departed ████ S. 6th Street and case agents followed it to ██ W. Maple Street.  Case agents observed GALAN exit the Buick and GALAN was carrying two plastic shopping bags.  GALAN then entered the front door at ██ Maple Street.  Case agents believe that GALAN and SOTO were assisting PEREZ III at the stash house at ████ S. 6th Street, and further, that SOTO drove GALAN back to ███ W. Maple Street, GALAN's previous

residence, where GALAN took an undetermined amount of controlled substances with GALAN into the residence inside of the plastic bags.

367.    On May 28, 2020, at 12:58 p.m., GALAN, using (414) 982-███ called PEREZ III, using Target Telephone 1.  PEREZ III stated, "Yeah, no I was just gonna see what's going on and shit."  GALAN replied, "Shit everything good partner. I think I got almost everything together for right now, I gotta uh. I'm gonna try and have my little brother go collect this shit real quick dawg and I'll see what I can get together for you and imam tell him—I'll make sure he sprays out the money too [U/I] with fucking Lysol and all that shit."  PEREZ III replied, "Oh yeah, yeah, yeah, for sure."  GALAN stated, "I gotchu cous, later I'm gonna go and make sure [U/I] put it in a bag or something."  Based upon their training, experience, and familiarity with the investigation, case agents believe GALAN advised PEREZ III that GALAN was collecting drug proceeds for controlled substances that PEREZ III had provided to him.  GALAN informed PEREZ III that GALAN will have the money for PEREZ III later.  PEREZ III replied, "Alright, that's cool."

368.    GALAN continued, "Alright cous. Alright… Like are there any coming through soon or no?"  Case agents further believe that GALAN asked PEREZ III if he will have more controlled substances available to sell.  PEREZ III replied, "Yup, yup. Um, I'll be ready when you ready."  Case agents believe PEREZ III had controlled substances available for GALAN and will provide them to GALAN when GALAN pays PEREZ III the money PEREZ III was owed for previous controlled substances GALAN obtained from PEREZ III.

369.     On May 31, 2020, beginning at 4:35 p.m., case agents intercepted a series of text messages between PEREZ III, using Target Telephone 1, and GALAN, using (414) 982-██████ PEREZ III sent an outgoing text message to GALAN and asked, "What's the word." GALAN replied, "Call me form the other one rq." Case agents know that "rq" is an abbreviation for "real quick." PEREZ III replied, "K." Case agents know that PEREZ III, GALAN and other members of the PEREZ III DTO often use third-party telephone applications to communicate with each other when they discuss matters related to controlled substances. Case agents believe that GALAN directed PEREZ III to contact him on the one of the third party applications "real quick" when GALAN stated, "Call me from the other one rq."

370.     On June 7, 2020, at 9:51 p.m., PEREZ III, using Target Telephone 1, called GALAN, using (414) 982-███ PEREZ III asked, "What's the word man?" GALAN replied, "Shit, right here dawg still laying low dawg. I still don't know what happen." PEREZ III replied, "Yeah, yeah I feel you. I was gonna tell you. Hey dude so, straight up, when you gonna have a payment bro 'cause it's been a minute dawg." GALAN stated, "I know man [U/I] I got you. Imma make something happen for you, alright?" PEREZ III continued, "Cause it already been like a month dawg. You haven't given me nothing like, nothing, nothing bro. Nothing, nothing dude." Case agents believe PEREZ III contacted GALAN to collect the money GALAN owed PEREZ III for the controlled substances PEREZ III previously provided to GALAN. GALAN replied, "I know bro, I been fucking just running back and forth with this foo too." PEREZ III replied, "Yeah, that's the case bro. You know I just take back, I'll

181

take it back dawg 'cause..." Case agents believe PEREZ III requested the return of the controlled substances back PEREZ III provided to GALAN on consignment if he could not provide payment for them. ("You know I just take back."). GALAN stated, "No, I got you." PEREZ III continued, "You know what I mean? 'Cause we still, hey we on the same shit over here too dude but everything still [U/I] bro know what I mean?" Case agents believe GALAN was having trouble selling the controlled substances he obtained from PEREZ III. GALAN replied, "I know, I know. It just made it hard for me 'cause I ain't have a place to stay so I'm all over the place, you know? But I got you right now cousin, for sure I got you." PEREZ III asked, "Yeah... more or less when you thinking for a payment or something?" GALAN replied, "Yeah Imma hit you up right now, uh..." PEREZ III asked, "Tonight, tomorrow or?" GALAN replied, "Give me... yeah, I'll try to hit you tomorrow cousin for sure, alright?" Case agents believe GALAN agreed to call PEREZ III the following day to arrange a payment for the controlled substances.

371. On July 6, 2020, at 4:20 p.m., GALAN, using (414) 982-███ called PEREZ III, using Target Telephone 1. PEREZ III asked, "What's going on, man?" GALAN stated, "Shit, I was trying to see what's up with you? You were trying to meet up today, man." PEREZ III stated, "Yeah, I'm at work right now, though. I'll hit you up when I'm free." GALAN replied, "Alright." Case agents believe that PEREZ III was going to meet with GALAN to supply GALAN with controlled substances after PEREZ III finished with work.

372. On July 23, 2020, at 12:43 p.m., GALAN, using (414) 982-███ sent a text message to PEREZ III, using Target Telephone 1. The text stated in Spanish "Quiero chambiar cuz," which was translated by DEA linguists to be "I want to work cuz." Based upon their training, experience, and familiarity with the investigation, case agents believe that GALAN wanted to distribute controlled substances for PEREZ III; however, he was currently out of controlled substances and needed PEREZ III to resupply him.

### Kevin TAYLOR

373. Kevin TAYLOR (a/k/a "Eskimo"), is an Hispanic male born on ███████, ███, 1992. Based on the investigation to date and surveillance, TAYLOR resides at ███ S. 15th Street, Milwaukee, Wisconsin. This has been confirmed though investigation and surveillance. TAYLOR is also identified as a Mexican Posse gang member. The investigation to date has revealed TAYLOR assists the DTO with the transport of packages containing controlled substances between the delivery locations and other residences used by the DTO and has been observed at the stash house locations of ███ W. Pierce Street, ███ and ███ S. 6th Street. Between April 30, 2020, and May 31, 2020, approximately 16 intercepted calls and/or text messages between TAYLOR and PEREZ III were deemed criminal and pertinent in nature.

374. For example, on April 29, 2020, PEREZ III, using Target Telephone 1, called Manuel SOTO, using (323) 449-███ During this call, PEREZ III told SOTO that "Eskimo" wanted to "stop through" and was going to be at "pops crib," which case agents know to be ███ E. Morgan Avenue. PEREZ III stated, "He wanna chop it up

183

and shit. 'Cause I know you wanna meet him too." Case agents conducted remote and physical surveillance at █ E. Morgan Avenue and observed a white 2007 Mazda registered to Martha Pacheco, TAYLOR's mother, arrive at the residence. A short time after the Mazda arrived, PEREZ III arrived. Case agents observed TAYLOR enter the passenger seat of PEREZ III Impala, which then circled the block, and eventually parked in the alley to the east of █ E. Morgan Avenue. While parked, PEREZ III, using Target Telephone 1, called PEREZ JR., using (414) 208-█ PEREZ III asked PEREZ JR., "Can you tell Grillo (SOTO) to come outside?" Case agents observed a person exit the residence and walk to the Impala, which remained parked in the alley. Due to darkness and the glow from the headlights, case agents were unable to identify this person; however, based upon the intercepted call this person was likely SOTO. The three individuals remained in the Impala for approximately 50 minutes. Case agents believe that PEREZ III, TAYLOR, and SOTO discussed criminal activity, which they wanted to discuss in person instead of over the telephone. On May 1, 2020, case agents observed the Mazda that TAYLOR was driving parked behind █ S. 15th Street, Milwaukee, Wisconsin.

375. On April 30, 2020, PEREZ III, using Target Telephone 1, called TAYLOR, using (920) 264-█ PEREZ III asked, "What's happening Eskimo?" TAYLOR replied, "Shit, here, just got back from work. What's up?" PEREZ III asked, "Hey Macerino [PH] picked up a pump?" TAYLOR replied, "Yes dude. I was gonna tell you, I forget dawg, in the morning. I called work, they went to pick up (Mossberg) pump, but I don't know where at." PEREZ III asked, "Oh, that's who picked up the

(Mossberg) pump?" TAYLOR stated, "Yep." Based upon their training, experience, and familiarity with the investigation, case agents believe that an unknown associate of PEREZ III's named "Macerino" obtained a pump action Mossberg brand shotgun. PEREZ III commented, "We should take it away." TAYLOR replied, "That's why I'm telling you bro, I don't know if it's for that guy or is it for him? But point is, Imma have that motherfucker bring it with him and we can wrap it up." Case agents believe that PEREZ III and TAYLOR wanted to purchase the shotgun from the individual. TAYLOR asked, "Oh hey foo-- hey did you give Manny my number?" PEREZ III replied, "I think he wrote it down but Imma text to him again just in case he forgot." TAYLOR stated, "No, no he called me. That's why I'm asking." PEREZ III stated, "He got your shit from you dude." TAYLOR replied, "Okay, all set. I was making sure because nobody has this number except you guys." Case agents believe that TAYLOR asked PEREZ III if PEREZ III gave SOTO (Manny) TAYLOR's telephone number because SOTO had called TAYLOR already, and few people had the number. ("Nobody has this number except you guys.").

376. On May 14, 2020, at 11:48 a.m., PEREZ III, using Target Telephone 1, called TAYLOR, using (920) 264█████ During this call, PEREZ III asked, "What up Eskimo?" TAYLOR replied, "Shit. Chillin' here. Everything good?" PEREZ III asked, "What's the word?" TAYLOR stated, "Shit, I mean shit it's busy, bro. We just trynna [U/I] later but you know I was calling to know what's up with that? You know how you gonna be able to help me out?" PEREZ III stated, "Oh yeah, the brisky. Yeah, I got you today dawg." TAYLOR asked, "Yeah?" PEREZ III confirmed, "Yep. No, for

185

sure I got you today. For sure, for sure, dawg. I'll meet with you like around like 6:00, 7:00?" TAYLOR replied "Yes, alright, dude." PEREZ III stated, "Yeah, I got you bro. I got you. Based upon their training, experience, and familiarity with the investigation, case agents believe that TAYLOR was looking for a kilogram quantity of an unknown controlled substance, and PEREZ III used the code word "brisky" to refer to a "brick," which is a common street term for a kilogram quantity of a controlled substance. PEREZ III agreed to provide the substance to TAYLOR later that evening, around 6 or 7 o'clock p.m.

377.    On May 15, 2020, at 10:16 p.m., PEREZ III, using Target Telephone 1, called TAYLOR, using (920) 264███ PEREZ III stated, "We're right here at Primo's crib." Based upon the investigation, case agents believe this to be ██ W. Pierce Street, ██, the residence of SOTO, who is frequently referred to as "Primo" by PEREZ III. TAYLOR asked, "Oh at the loft?" PEREZ III confirmed PEREZ III was at "the loft." Based upon this investigation, case agents know that PEREZ III and other members of the DTO often refer to the Knitting Factory Lofts at ██ W. Pierce Street as "the loft." Further, case agents know that the term "the loft" refers to Apartment██ where SOTO resided and was one of the stash houses used by the DTO. PEREZ III stated, "Yeah come through right here. We're here kickin' it, dawg."

378.    On July 9, 2020, case agents conducted surveillance at ██ S. 15th Street. Case agents observed TAYLOR's black and white Mazda parked behind the residence. At 1:13 p.m., TAYLOR exited the residence, entered the Mazda, and left

186

the area. At 2:55 p.m., TAYLOR returned to the residence and was observed entering the door at ████ S. 15th Street.

379. Case agents have conducted regular surveillance of this address throughout the investigation. During surveillance, case agents have regularly observed TAYLOR at this address, as well as his vehicle parked at this address on a regular basis as recently as September 10, 2020.

### XINA's family members manufacture marijuana vape cartridges at MARY's residence, ████ N. 49th Street, for the PEREZ III DTO.

### Mary YANG

380. Mary YANG (MARY), XINA's sister, is an Asian female born on ██████████ 1991. MARY resides at ████ N. 49th Street, Milwaukee, Wisconsin. This has been confirmed though investigation, surveillance, and a review of utility records. The investigation to date has revealed MARY, assists the DTO with transportation of the packages containing controlled substances and the manufacture of the marijuana vape cartridges at her residence. Between April 13, 2020, and July 22, 2020, approximately 68 intercepted calls and/or text messages between MARY and XINA and/or PEREZ III were deemed criminal and pertinent in nature.[15]

---

[15] On August 28, 2019, at approximately 4:24 p.m., MARY was driving a van through Wyoming when she was stopped by a highway patrol trooper for speeding. After a narcotics detection canine indicated on the passenger side of the van, the van was searched, which search revealed two partially burned marijuana cigarettes in the center console, marijuana "shake" on the front passenger seat, $4,000 in a fanny pack, and nine bundles of suspected bulk currency, totaling $99,970, in the driver's side stow-n-go compartment under a dog kennel with three dogs inside. The bundles were tightly wrapped in black electrical tape. MARY denied any knowledge of the nine bundles of currency, claimed ownership of the currency in the fanny pack, and stated that she was driving from Milwaukee to Fresno, California, to visit her mother for two days. MARY was arrested for possession of marijuana.

187

381. For example, on March 30, 2020, at 6:58 p.m., PEREZ III, using Target Telephone 1, received an incoming call from XINA, using Target Telephone 4. During the conversation, PEREZ III asked XINA, "Hey, um, where do I get off on for your sister's?" XINA eventually replied, "57th and Hampton." PEREZ III stated, "Okay, I know how to get there." XINA later stated, "No, no, no, 40—it's right there by the McDonalds." Case agents believe that PEREZ III was driving to XINA's sister MARY's residence, who resides at ██ N. 49th Street, which is close to the McDonald's near N. 49th Street and W. Hampton Avenue. Later in the conversation, PEREZ III stated, "Can you let your sister know though?" XINA replied, "She just called me, she said she's gonna call you. Call her." PEREZ III stated, "Just let her know I'm already on my way." Case agents believe that PEREZ III was on his way to pick up/drop off controlled substances for use in the manufacture of marijuana vape cartridges which based on the investigation to date, are manufactured at MARY's residence. Further, case agents conducting remote surveillance at ██ E. Morgan Avenue observed PEREZ JR.'s pickup truck backed up to the front porch of the residence at approximately 6:47 p.m. Case agents observed PEREZ JR., Manuel SOTO, and Esteban REYES removing approximately 29 packages from the residence and loading them into the back of the pickup truck. At 7:07 p.m., PEREZ III and Antonio RODRIGUEZ arrived at the residence and PEREZ III entered the driver's seat of the pickup and drove off. Intercepted communications between PEREZ III and XINA later that night revealed that PEREZ III, REYES, SOTO, and PEREZ JR. drove the packages to MARY at ██ N. 49th Street.

382.    On April 7, 2020, case agents intercepted a series of calls between XINA and PEREZ III regarding PEREZ III bringing boxes to MARY's residence. Case agents conducting surveillance observed via the remote camera at ██ E. Morgan Avenue, that at approximately 9:25 p.m., PEREZ III backed PEREZ JR.'s red Silverado pickup to the front door. PEREZ III, PEREZ JR., and another Hispanic male loaded up several boxes into the back of the pickup truck until the bed of the pickup was full of boxes. At 9:51 p.m., case agents conducting physical surveillance observed PEREZ III and PEREZ JR. unloading the boxes at ██ N. 49th Street. At 10:22 p.m., XINA, using Target Telephone 4, called PEREZ III, using Target Telephone 1. During this call, XINA inquired about PEREZ III's activities and PEREZ III stated, "Nothing, just here with my pops. Just got done." XINA asked, "You drove with your dad?" PEREZ III replied, "Yep, yep. One truck." Based upon their training, experience, and familiarity with the investigation, case agents believe that the numerous boxes contained controlled substances, as well as equipment used to manufacture the marijuana vape cartridges.

383.    On April 14, 2020, throughout the day, case agents intercepted numerous telephone calls between MARY, PEREZ III and XINA over Target Telephones 1 and 4. In these conversations, the three discussed MARY picking up packages that day and what time that would occur. At approximately 9:55 p.m., case agents observed MARY in the area of ██ S. 6th Street. Case agents also sighted PEREZ III in that area. At 10:11 p.m., case agents observed MARY exiting the alley at ██ S. 6th Street driving a Ford F-150 registered to her. Case agents followed

189

MARY to her residence at ███ N 49th Street, where four large cardboard boxes were removed from the truck. Due to the darkness, case agents were unable to positively identify who was unloading the truck. The boxes were brought along the side of the residence, and out of view of case agents. Based upon their training, experience, and familiarity with the investigation, case agents believe that on this occasion MARY obtained numerous boxes of controlled substances and equipment for the assembling of the marijuana vape cartridges from the stash house at ███ S. 6th Street and brought them to her residence.

384. On April 16, 2020, at 5:32 p.m., XINA, using Target Telephone 4, received an incoming call from MARY, using (414) 399-███ MARY stated, "Girl, there's nothing in my garage. The only thing in my garage is [U/I] parts and stuff." XINA replied, "No, he has stickers….what he say." MARY stated, "Yeah, I called him, he said oh, maybe they're in the boxes in your garage, and I'm like, I thought y'all picked them up, and I opened it, the only thing that's in here is the sticky parts and the…and the…" XINA interrupted, "He didn't give…oh my fucking god." The conversation continued about the parts and XINA stated, "No, it's over there. No it's over there. It's either on MA's (XINA and MARY's sister) house there is plenty of boxes, it's at MA's." MARY stated, "I know, I asked HAUSENG (their brother). HAUSENG said that y'all picked everything up at MA's house. It's not at MA's house." The conversation continued about the parts and their location and MARY later stated, "I need the stickers, so I can start putting them into like groups." XINA stated, "He says he's going to call me once he gets off the jail call so umm, I'm just

waiting." Interceptions of Target Telephone 1 confirm that PEREZ III was speaking to an incarcerated individual at the time of this call.

385.    Case agents believe that during this call, MARY called XINA to inquire about assembling the "vape cartridges" containing THC oil. ("Girl, there's nothing in my garage. The only thing in my garage is [U/I] parts and stuff."). XINA told MARY that PEREZ III had the stickers for the vape cartridges. ("No, he has stickers….what he say?"). XINA thought that the parts should be at MARY's house and if they weren't there then they were likely at MA's residence. ("No, it's over there, no it's over there. It's either on MA's house there is plenty of boxes. It's at MA's."). MARY informed XINA that MARY needed the stickers to start grouping the vape cartridges by brand. ("I need the stickers, so I can start putting them into like groups."). XINA told MARY that XINA needed to talk to PEREZ III. ("He says he's going to call me once he gets off the jail call so umm, I'm just waiting.").

386.    On April 17, 2020, at 12:06 p.m., XINA, using Target Telephone 4, received an incoming call from MARY, using (414) 226- XINA asked MARY if MARY checked her garage and MARY replied, "Yup, I checked my garage." XINA said, "No, no, no, when you checked your garage did you see the little tube things? You remember those little tube things for the dab?" MARY replied, "I gave you all those. It was only one box. I picked it up, I got those at MA's house 'cause that's the one thing he wanted out of there the first time." Later in the conversation MARY stated, "And so I'm just waiting. All I have is the VVS and runtz, because you guys have two things on the runtz left. But you guys only have the cart, the outer box for

191

a runtz. You don't even have the inserts for the carts for the runtz display that you guys do have." MARY continued, "You guys do have some but, they're mixed up and I didn't want to mix them up because HAUSENG told me yesterday that he sold some but they gave it back to him because they weren't the right ones."

387.  Case agents believe that XINA and MARY discussed (1) the assembly of "vape cartridges" and suspected marijuana candies ("runtz"); (2) whether MARY had certain DTO-related parts needed for the assembly in her garage, ("No, no, no, when you checked your garage did you see the little tube things, you remember those little tube things for the dab?"); and, (3) picking up suspected controlled substances or controlled substance related parcels from MA's residence ("It was only one box. I picked it up. I got those at MA's house."). Further, MARY told XINA that the vape cartridges weren't assembled correctly, and that HAUSENG had sold some defective vape cartridges that were returned by customers. ("You guys do have some but, they're mixed up and I didn't want to mix them up because HAUSENG told me yesterday that he sold some but they gave it back to him because they weren't the right ones.").

388.  On May 27, 2020, XINA, using Target Telephone 4, called PEREZ III, using Target Telephone 1.  XINA stated, "Mary said what's the plan, 'cause it's already 3 o'clock."  PEREZ III replied, "Yeah, let's go. You should see if you can go pick up the truck real quick."  XINA stated, "She said that Brandon won't let nobody drive it; that she's gonna be the one driving."  Case agents know that MARY's live-in boyfriend is named "Brandon."  Case agents believe that PEREZ III wanted to use

192

MARY's F-150 to move the packages containing controlled substances. PEREZ III and XINA continued to discuss the packages' destination, and PEREZ III stated, "MA's house is cool, just, MA's house, [U/I] pops." Based upon their training, experience, and familiarity with the investigation, case agents believe that PEREZ III referenced MA's residence at ███ W. Burnham Street and PEREZ JR.'s residence at ███ E. Morgan Avenue, as destinations for the packages containing controlled substances.

389.    At 3:23 p.m., XINA, using Target Telephone 4, called MARY, using (414) 399-███ During this call, XINA asked, "Are you guys on your way to Auntie MA's house?" MARY asked, "Ya'll ready?" XINA stated, "Yeah, he said to come here first and then go to pops house after that." MARY stated, I'm on my way." At 4:13 p.m., case agents conducting surveillance observed MARY arrive at ███ W. Burnham Street in an F-150 pickup truck. Surveillance units then observed an unknown Hispanic male placing several packages suspected to contain controlled substances into the back of the pickup truck. At around the same time, surveillance observed Ger YANG (GER), a brother, arrive at the address driving a silver Toyota Camry. Case agents observed GER load a box containing suspected controlled substances into the trunk of the Camry. BUB, MA's live-in boyfriend, arrived driving a blue Infinity and entered the residence. At 5:06 p.m., surveillance units observed MARY, operating the F-150 with HAUSENG as a passenger, leave the garage area of ███ W. Burnham Street. The Camry, driven by GER, followed the F-150. Both the F-150

and the Camry drove to ▄▄ E. Morgan Avenue. BUB, driving the Infiniti, also arrived a short time later.

390. Upon arrival at �as E. Morgan Avenue, physical as well as remote surveillance observed several individuals at the residence. MARY remained in the driver's seat of the F-150. Several individuals, including but not limited to HAUSENG, GER, Luis GOMEZ JR., PEREZ III, Michael BUB, Manuel SOTO, and PEREZ JR. began removing boxes from within the residence, and the individuals listed above loaded at least 18 boxes containing suspected controlled substances into the back of the F-150. After loading the F-150, HAUSENG entered the passenger side of the F-150 and the F-150 drove away from the residence, followed by GER in the Camry. At 5:55 p.m., surveillance agents observed the F-150 arrive at MARY's residence, ▄▄ N. 49th Street, and back into the driveway. GER, driving the Camry, parked on the street across from MARY's residence and walked across the street to MARY's residence. Due to the way the F-150 was parked, case agents were unable to fully observe the activities in the driveway; however, case agents were able to observe that the tailgate of the F-150 was down and the side door to the residence propped open. Based upon their training, experience, and familiarity with the investigation, case agents believe that packages were being taken into the residence. A short time later, HAUSENG and GER exited the residence, entered the Camry, and left the area.

391. On June 10, 2020, at 11:52 a.m., XINA, using Target Telephone 4, called MARY, using (414) 399-▄▄ XINA asked, "Why MA just called me two times and

she was like, 'Don't go to MARY's house yet, I have to take dad to get his phone then come to MARY's house so give me an hour or so.' Why—she making it seem like--." MARY stated, "Cause she doesn't want us to start without her. Yesterday, she, yesterday, they stayed and we finished it all. But I only took some because MA did fifteen-hundred (1,500)." XINA replied, "And then I said, and I—this is what I text her, I said, "We here already. GER was supposed to tell you. We start at eight-thirty (8:30) this morning." She put 'WHAT' all capital letters." Case agents believe XINA and MARY discussed how many marijuana vape cartridges that MA completed the previous day at MARY's house, and further discussed what time everyone was supposed to start manufacturing marijuana vape cartridges for the PEREZ III DTO. Case agents believe MARY's garage is used to manufacture all the marijuana vape cartridges for the PEREZ III DTO. Case agents believe many of the YANG family members and associates, including but not limited to MARY, MA, BUB, Chong YANG (CHONG), HAUSENG, GER, Azia YANG (AZIA), and Carina RODRIGUEZ (Carina), work out of ███ N. 49th Street manufacturing the marijuana vape cartridges. The two continued to discuss MA's behavior and attitude regarding the work. MARY stated, "But Tou Ger got his stuff and he didn't – he didn't finish filling them yesterday, so he – that's why he got – that's why MA was like, 'Okay, cool.' 'Cause MA and them filled fifteen-hundred (1,500) yesterday, girl. And Damn, I feel like damn, and if I didn't take my one thousand (1,000), then she would've filled it 'cause AZIA was like, "I'ma go home. I'm not gonna finish my thousand (1,000). Imma leave three-hundred (300) for me to do." And MA was like, 'Well if you leave, then Imma

do it.'" XINA asked, "You did say that you're taking it?" MARY stated, "No, I took mines already, but AZIA kept hers too. And AZIA was like, 'Well, I'm finna go home. I'm tired and stuff.' And she had three-hundred left and MA was like, 'If you don't do it, Imma do it.' So, AZIA end up staying finishing them all." XINA replied, "Damn, MA is all fuckin'…" MARY replied, "That's why I was just like, girl, I don't know what to say, it's not for me to say. So I don't know. I'm just like, "Okay, I just gotta, 'cause I guess I gotta just keep cuffing mine." So that's bo—I feel like it's bogus as a bitch. Like we were able to do like eight-hundred a day, like, "why ya'll doubled it." I understand that they did come to work but, damn." XINA stated, "Well, I was gonna say Imma show you how the boxes need to be MARY, and then you can just start it. And then if everybody starts coming, you can just show them how the boxes need to be." MARY replied, "Well, I'm trynna figure out where the label's at, 'cause I grabbed my boxes already, so I don't see no labels. Are they in the box?" Case agents believe that during this call, XINA and MARY discussed how MA tried to make more money than other family members by filling more of the vape cartridges than the other family members. Case agents further believe that this call reflects how each member is responsible for manufacturing 800 to 1,000 marijuana vape cartridges each time they work at MARY's. Case agents believe XINA instructs the workers how to package the marijuana vape pens for distribution by the DTO, and that XINA supervises the process.

392. On July 22, 2020, at 7:05 p.m., MARY, using (414) 607-███ called XINA, using Target Telephone 4. MARY asked, "Just him going to the house? You

not going to the house?" XINA replied, "No, I'm not with him, so, um, yeah, just him." Case agents believe that MARY asked if PEREZ III was going to her residence without XINA, and XINA confirmed. MARY stated, "Oh. He's with his cousin?" XINA replied, "Um, Grumpy (Antonio RODRIGUEZ), but I don't think, I told her that he don't-- just gonna go and grab—he's just gonna go and grab a hundred (100) things, but he's gonna grab more than a hundred because there's no point of him just going grab a little bit." Based upon their training, experience, and familiarity with the investigation, case agents believe that PEREZ III and RODRIGUEZ, a/k/a "Grumpy," were picking up at least 100 marijuana vape cartridges from MARY's. MARY continued, "I mean, he could pull in the driveway. Back into it." XINA replied, "No, I told him not. I told him not, [U/I] go in the driveway." MARY stated, "Yeah, yeah, back into and then grab, yeah. Um, there's some finished one in that back room where [U/I] at, if y'all want to grab those, and then the ones in the basement," and "ones that I did." XINA stated, "Alright. Sounds good." Case agents believe that MARY told XINA that it was fine for PEREZ III to back into the driveway while at the residence, and enter the house to obtain the marijuana vape cartridges. On numerous occasions throughout this investigation, case agents have observed PEREZ III and other members of the DTO back into MARY's residence.

393.    Case agents have conducted regular surveillance at this address throughout the investigation. During surveillance, case agents have regularly observed MARY and her vehicles at this address, as recently as September 11, 2020.

**Chong YANG**

394.    Chong YANG (CHONG) is an Asian female born on ▮▮▮▮▮▮ 1992. CHONG is a sister to XINA.  CHONG resides at ▮▮▮▮ S. 25th Street, Milwaukee, Wisconsin.  This has been confirmed though investigation and surveillance.  The investigation to date has revealed CHONG assists the DTO with the manufacture of marijuana vape cartridges for the DTO.  In addition, case agents believe that CHONG served as a courier for the DTO by traveling to California to meet with SANCHEZ in March of 2020, and late July of 2020.  Between May 3, 2020, and July 23, 2020, approximately 14 intercepted calls and/or text messages between CHONG and XINA were deemed criminal and pertinent in nature.

395.    On June 2, 2020, at 4:02 p.m., XINA, using Target Telephone 4, called CHONG, using (414) 639-▮▮▮.  XINA asked, "You're heading to MARY's house?" CHONG replied, "I just left MA's house."  XINA stated, "Okay, okay, okay, okay. Alright, bye." CHONG stated, "I just left. I just left MA's house, so, I'm already headed over to MARY's house."  Based upon their training, experience, and familiarity with the investigation, case agents believe that XINA asked CHONG if CHONG would be going to MARY's house to manufacture vape cartridges. CHONG stated that she was "headed over to MARY's house."

396.    On June 2, 2020, as the result of a search warrant for XINA's snapchat account, case agents received Snapchat data.  The warrant covered the time period from January 1, 2019, until the date the warrant was signed, May 12, 2020.

397. For XINA's account "████macc," case agents observed several photographs of marijuana and marijuana related products, price lists of various strains of marijuana, screenshots of addresses where packages were sent including but not limited to ██ E. Morgan Avenue, ██ S. 17th Street, February 25, 2020, address of "████ E. Valley View Avenue, West Covina, CA 91792" and the name "Julian Sanchez." In addition, case agents observed photographs of PEREZ III and XINA, photographs of a calculator with various amounts displayed on the screen, the address of "███ W. Grevillea Street, Ontario, CA 91762," a picture of a Mylar bag with the "Midwest Connected" logo, photographs of XINA with large amounts of cash, and videos of large amounts of cash.

398. Further, case agents observed messages sent from XINA on March 21, 2020, to an account "████y24," believed to be used by CHONG. The messages stated, "██ paramount blvd Lakewood ca," "7████1," "Terps" and "Call him when you get there." Case agents are aware that "Terps" is a nickname for SANCHEZ.

399. Case agents examined the pen register data for SANCHEZ's Target Telephone 5, and observed that on March 21, 2020, CHONG placed two calls to SANCHEZ between 9:24 p.m. and 9:35 p.m. Prior to March 21, 2020, case agents had observed no communication between CHONG and SANCHEZ on any of their known telephone numbers.

400. Based upon their familiarity with the investigation, case agents believe that CHONG traveled to California on behalf of the PEREZ III DTO to obtain a

199

quantity of controlled substances other than marijuana. Case agents believe that CHONG was sent to acquire a controlled substance other than marijuana because as at the time XINA sent CHONG the chat containing SANCHEZ's telephone number and address, the PEREZ III DTO was already receiving marijuana shipments through the mail. In addition, on March 20, 2020, law enforcement surveillance observed CHONG and her boyfriend, Jonathan VANG, at PEREZ III and XINA's residence at ███ S. 57th Street, Milwaukee, Wisconsin. During this surveillance, case agents observed CHONG and VANG take two suitcases into the residence. A short time later, CHONG, VANG, and XINA exited the residence with four suitcases, which were all placed into the Nissan Pathfinder driven by CHONG and VANG to the residence. CHONG, VANG, and XINA all entered the Nissan Pathfinder and left the area. The next day, surveillance observed PEREZ III driving the Nissan Pathfinder. Case agents believe that the additional two suitcases contained U.S. currency that CHONG and/or VANG brought to California for SANCHEZ as payment for the controlled substances.

401. On July 4, 2020, at 10:19 a.m., XINA, using Target Telephone 4, called CHONG, using (414) 639-███. XINA stated "CHONGY." CHONG asked, "What?" XINA stated, "The um uh, the ones ones that you needed extra um, the extra um wrap for, are they done already?" CHONG asked, "Mine?" XINA replied, "Yeah, remember you took a box." CHONG stated, "Mines just majority done." The call then disconnected. Case agents believe that XINA asked CHONG about the marijuana

vape cartridge wrappings and whether CHONG had completed wrapping them for DTO distribution. CHONG confirmed a "majority done" before the call disconnected.

402. On July 20, 2020, at 1:14 p.m., CHONG, using (414) 639-█, called XINA, using Target Telephone 4. CHONG stated, "I just sent it." XINA replied, "Okay." Later in the conversation CHONG stated, "Well, tell AZIA I sent her enough. You can transfer the money right away instead of wait." XINA replied, "Okay, as long as it's sent and everything's good and they be able to get home with those luggages." Case agents know that AZIA and Carina RODRIGUEZ (CARINA) returned home from California later that evening. Case agents further believe that CHONG wired money to AZIA for expenses related to the trip back to Milwaukee. XINA wanted to make sure that AZIA and CARINA arrived home with the luggage that case agents believe contained hidden compartments to conceal money and controlled substances. CHONG replied, "Yeah." XINA stated, "He asked me" and the phone disconnected.

403. At 1:16 p.m., XINA called CHONG back after the call disconnected. XINA stated, "He was asking why I took out his money. I told him because I need to pay...[LAUGHS] I need to pay, um, our things in California." Portions of this statement were in Hmong and translated by trained DEA linguists. CHONG laughed and XINA stated, "Om my god, dawg. And I haven't paid it yet." Based upon their training, experience, and familiarity with the investigation, case agents believe that XINA used some of PEREZ III's money to pay for California related expenses on behalf of the PEREZ III DTO. XINA continued, "But Imma wake him up anyways

201

because we gotta go to MARY's house." CHONG replied, "Yup." Case agents believe that XINA was going to awaken PEREZ III because other members of the DTO were going to MARY's to assemble the marijuana vape cartridges.

404. On July 21, 2020, at 12:02 p.m., CHONG, using (414) 639-███, called XINA, using Target Telephone 4. CHONG asked, "For your things?" This phrase was in Hmong and translated by trained DEA linguists. XINA asked, "Huh?" CHONG asked, "Do you still need me to put um, the money to my account for your things?" XINA laughed and stated, "Yes [LAUGHS] for that." XINA continued, "And then can you call it and pay it? And then I'll give you the money." CHONG stated, "Yeah." Later in the conversation, CHONG stated, "Okay. Imma go to the bank now. I'll come to your house after." Based upon their training, experience, and familiarity with the investigation, case agents believe that CHONG pays for unknown items for XINA, and that XINA was going to repay CHONG in cash. Case agents know that throughout this investigation, XINA asked CHONG and MA to pay for various items. In turn, XINA reimbursed them in cash for the items. Case agents believe that XINA wanted to conceal her purchase and payment of these items.

405. On July 23, 2020, at 5:47 p.m., CHONG, using (414) 639-███, called XINA, using Target Telephone 4. CHONG asked, "Well, are they almost done?" XINA replied, "Yeah, I think they're only doing like one (1) or two (2) boxes." CHONG responded, "Um, okay." Case agents believe that CHONG asked XINA if the marijuana vape cartridges were almost all assembled by their family members. XINA

202

informed CHONG that "they" still had "one or two boxes," which case agents believe to be a 100 or 200 quantity amount.

406.   Case agent examined the pen register data for SANCHEZ's Target Telephone 8, and observed that on July 30, 2020, at approximately 3:38 p.m., there were three incoming or outgoing telephone calls between CHONG and SANCHEZ. Previously, case agents observed that CHONG and SANCHEZ had never communicated either before or after the March 21, 2020, trip to California – a trip believed to be in furtherance of the DTO.  Case agents therefore believe that CHONG had again traveled to California on or around July 30, 2020, on behalf of the DTO; that is, traveling out with money and returning with controlled substances.

407.   Case agents have conducted regular surveillance at this address throughout the investigation.   During surveillance case agents have regularly observed CHONG and her vehicles at this address, as recently as September 10, 2020.

### Ger YANG

408.   Ger YANG (GER) is an Asian male born on ███ 2000.  GER resides at ███ W. Florist Avenue, Milwaukee, Wisconsin.  This has been confirmed though investigation and surveillance.  The investigation to date has revealed GER assists the DTO with the transportation of packages containing controlled substances and the manufacture of marijuana vape cartridges for the DTO.  Between May 3, 2020, and July 22, 2020, approximately 16 intercepted calls and/or text messages between GER and PEREZ III were deemed criminal and pertinent in nature.

409.   On May 25, 2020, at 12:29 p.m., XINA, using Target Telephone 4, called

GER, using (414) 416-■■■■ XINA asked, "Where you at? Home?" GER stated, "Yeah." XINA asked, "Where's [U/I] address? I need to -- I need to get um ... that thing in the garage." Case agents believe that XINA needed to obtain controlled substances from GER's garage at GER's residence. GER stated, "Uh, it's uh, [LOST AUDIO] fifty six (56th) and Florist." Case agents believe that GER misspoke, and meant to say "65th and Florist" XINA asked, "You're gonna be there right?" GER replied, "Well, actually, I'm actually gonna head out right now, but why?" XINA asked, "Is the garage open?" GER stated, "How long is it gonna be? No it's not open ---- Why would it be open?" Case agents believe GER had the garage locked and that XINA needed to access the garage to obtain controlled substances. XINA responded, "Exactly -- That's why I need you to be there." At the end of the conversation, XINA stated, "Send me the address." At 12:34 p.m., XINA, using Target Telephone 4, received an incoming text from GER, using (414) 416-■■■■. Case agents did not intercept this text because the court order did not authorize text messaging during the time this text message was sent.

410. On May 25, 2020, at 2:07 p.m., XINA, using Target Telephone 4, called PEREZ III, using Target Telephone 1. PEREZ III stated, "I'm right here pullin' up dude, I'm coming from the north side. What the fuck!" XINA stated, "She said it's fine, she's just gonna leave." Later in the conversation, PEREZ III stated, "I know, I'm coming all the way from Florist." XINA replied, "I know that. That's what I was tellin' her. She said that she's just gonna go, she's just gonna pick the bike and drive it back to the [U/I]" Case agents believe that an unknown female was watching PEREZ III's

and XINA's child, and PEREZ III told XINA that he was "coming from the north side," from "Florist." Case agents believe, based on the call with XINA at 12:29 p.m. referenced above, that PEREZ III was returning home from GER's residence after obtaining controlled substances from GER's garage. Location data from PEREZ III's Target Telephone 1 placed PEREZ III near the area of N. 76th Street and W. Hampton Avenue at 1:52 p.m.

411. On June 2, 2020, at 5:07 p.m., XINA, using Target Telephone 4, called GER, using (414) 416-███. During this call, XINA inquired about GER's location. GER stated he was "at the mall." XINA asked, "Oh. You not workin'?" GER replied, "Shit, no. I mean, if anything, I can, I can head there in a bit. I just have to come-" XINA told GER that they needed "a pot" from XINA's mother's house. GER replied, "Oh my god, lord. I can go do that too before I come there then." XINA stated, "We need it right now. We trying to ha--eat before we all [AUDIO BREAKS] fucking work." Based upon the positional data for Target Telephone 4, case agents know that XINA was located in the area of MARY'S residence at ███ N. 49th Street. Further, that XINA told GER that everyone was going to eat before they began manufacturing the marijuana vape cartridges.

412. On June 7, 2020, at 9:44 p.m., XINA called GER, using (414) 416 ███. XINA asked, "Where you at?" GER replied, "I'm on my way there. I'm basically getting off of Howell right now. I couldn't answer because the fucking police was kinda driving right by me, and you guys kept callin'." XINA laughed and stated, "My bad. Alright, bye." Case agents believe that during this call, GER was transporting

controlled substances for the DTO, and was nervous because the police were in the vicinity.

413.    On June 29, 2020, at 12:01 p.m., XINA, using Target Telephone 4, called GER, using (414) 416-███. XINA stated, "I'm calling because MARY still has at least two (2) of your boxes to do or one and a half (1.5). And you know, it's best for you to come over here, and help him out you know, that --and help her out and do it." Based upon their training, experience and familiarity with the investigation, case agents believe that XINA referred to PEREZ III when she informed GER that it was "best for him (GER)," to "help him out."  GER asked, "Wait, what?"   XINA repeated, "I'm calling because MARY has a box left to do and she would like for you to help her because it's your stuff."  GER stated, "Oh my. Alright."  XINA told GER to "hurry up and come over here."  Case agents believe that XINA was upset because GER had not assembled the number of marijuana vape cartridges for which GER was responsible (i.e., there was at least "a box left" to complete).  Based upon their training, experience, and familiarity with the investigation, case agents believe that the term "box" refers to a 100 count quantity.

414.    On July 20, 2020, at 8:52 p.m., XINA, using Target Telephone 4, called GER, using (414) 416-████.  Portions of this call were in Hmong and translated by trained DEA linguists. GER asked, "Hello. Yeah, I was gonna say, where do I come and pick up my money?"  XINA stated, "Uh..."  GER continued, "I did, I did six (6) of 'em today."  XINA replied, "Alright, um...well, I'm at home but let me call Louis 'cause I don't know where he put the money at."  GER responded, "Okay. Alright, then."

206

Case agents believe that during this call, GER informed XINA that GER had completed the assembly of 600 marijuana vape cartridges ("6 of em") and GER wanted his payment. Before paying GER, XINA needed to call PEREZ III ("Louis") to find where PEREZ III had put the money before XINA could pay GER.

415.    At 9:58 p.m., GER, using (414) 416-███, called XINA, using Target Telephone 4. XINA stated, "He supposed to be on his way home. He said just wait." GER replied, "Alright." XINA continued, "You gotta go up there to MARY's house anyway, so yeah, we'll just give it to you tomorrow." GER replied, "Alright." Case agents believe that during this call, XINA told GER that PEREZ III would pay him tomorrow because GER had to return to MARY's the following day to continue to manufacture marijuana vape cartridges.

416.    On July 22, 2020, at 6:07 p.m., GER, using (414) 416-███, called XINA, using Target Telephone 4. XINA asked, "You here?" GER replied, "Yeah." XINA stated, "Alright, what I was gonna say, what did you do? How many you do? Twelve hundred (1,200) only?" GER answered, "Yeah. I only did twelve hundred (1200)." XINA asked, "Did you package or anything?" GER replied, "No, I didn't." XINA stated, "Alright. Bye." Case agents believe that during this call, XINA confirmed with GER that GER had only completed 1,200 marijuana vape cartridges that day and did not package them up for retail sale.

417.    Case agents examined the pen register data for SANCHEZ's Target Telephone 5, and observed that between August 7 and August 11, 2020, there were 12 calls and/or text messages between SANCHEZ and GER. Case agents had not

207

previously observed GER and SANCHEZ communicate on any of the known telephone numbers used by either of them. On August 4, 2020, case agents had observed XINA operating a red Chevrolet Tahoe. On August 15, 2020, case agents in California observed this same Chevrolet Tahoe parked at SANCHEZ's primary address in Costa Mesa, California. Case agents believe that GER drove the Tahoe to California for SANCHEZ. Further, GER likely brought proceeds from the DTO to personally deliver to SANCHEZ as payment for controlled substances. At this point in time, case agents are aware that the DTO appears to have shifted away from using the USPS to send DTO proceeds because of the missing $60,000 in U.S. currency described above.

418. Throughout late August and through September 2020, case agents have conducted regular surveillance at this address. On August 31, 2020, case agents observed GER at this address sitting on the porch. During surveillance, case agents have regularly observed GER and his vehicle at this address, as recently as September 11, 2020.

## Azia YANG and CARINA RODRIGUEZ

419. Azia YANG (AZIA) is an Asian female born on ████ 2002, and Carina RODRIGUEZ (CARINA) is an Hispanic female born on ████ 2000. Both reside at ██ E. Morgan Avenue, Milwaukee, Wisconsin. This has been confirmed though investigation and surveillance. Case agents believe that AZIA is the daughter of MA and the niece of XINA. CARINA is the girlfriend of AZIA. The investigation to date has revealed AZIA and CARINA assist the DTO with the manufacture of marijuana

vape cartridges. In addition, AZIA and CARINA have traveled to California on behalf of the PEREZ III DTO. Between April 13, 2020, and July 23, 2020, approximately 20 intercepted calls and/or text messages between AZIA and XINA were deemed criminal and pertinent in nature. Between April 27, 2020, and July 18, 2020, approximately 3 intercepted calls and/or text messages between CARINA and XINA and/or PEREZ III were deemed criminal and pertinent in nature.

420. On June 7, 2020, at 11:20 a.m., AZIA, using (414) 236-███, called XINA, using Target Telephone 4. AZIA asked, "What time are we working today?" XINA replied, "I'm just now getting up. Imma about to wake em' up in like twenty (20) minutes to [U/I] we got something to do at two so we'll come and do it." Case agents believe that AZIA asked XINA what time they were going to start "working," (i.e., manufacturing the marijuana vape cartridges).

421. On June 9, 2020, at 4:29 p.m., XINA, using Target Telephone 4, called AZIA, using (414) 236-███. During this call, AZIA discussed relationship difficulties she was experiencing with CARINA. At one point AZIA stated, "And so, all of a sudden, we went to Cali, XINA..." Case agents believe that AZIA and CARINA had previously traveled to California on behalf of the DTO. Later in the call, as an aside AZIA stated, "She's downstairs making the [U/I] right now. Right now, we're just packaging the stuff." Based upon their familiarity with the investigation, case agents believe that AZIA and CARINA were at MARY's residence, and CARINA was "downstairs" manufacturing the marijuana vape cartridges while AZIA was talking to XINA in another location within the residence.

422. Case agents examined flight records for American Airlines and observed that on July 18, 2020, at 2:10 p.m. AZIA and CARINA flew from O'Hare International Airport to San Francisco, California. AZIA and CARINA returned to O'Hare International Airport on July 20, 2020, at 7:36 p.m. Case agents observed that AZIA and CARINA's flights were each priced at $596.20 each, and paid for in cash. Based upon the below intercepted telephone calls and pen register analysis, as well as the investigation to date, case agents believe that AZIA and CARINA traveled to California for the PEREZ III DTO, and met with SANCHEZ. Further, case agents believe that AZIA and CARINA brought U.S. currency with them for SANCHEZ on behalf of PEREZ III.

423. An analysis of intercepted telephone calls revealed that on July 18, 2020, at 9:22 a.m., XINA, using Target Telephone 4, attempted to call AZIA, using (414) 236-███, but the call went to voicemail. At 9:23 a.m., CARINA, using (414) 676-███, attempted to contact PEREZ III, using Target Telephone 1, but no audio was recorded. At 9:28 a.m., PEREZ III, using Target Telephone 1, called CARINA, using (414) 236-███. CARINA asked if PEREZ III was home, but then told PEREZ III to disregard, and the call terminated.

424. On July 18, 2020, at 12:41 p.m., XINA, using Target Telephone 4, called AZIA, using (414) 236-███. XINA instructed, "Y'all gotta go through TSA soon 'cause it's already 12:41." Case agents heard a female voice, believed to be CARINA, in the background. Case agents further believe that AZIA and CARINA were at the airport and XINA wanted them to clear TSA in time to board the plane.

210

425.    On July 18, 2020, at 6:33 p.m., PEREZ III, using Target Telephone 1, called CARINA, using (414) 676-███. PEREZ III asked, "What airline? What's the company airline you guys going to be at so I can tell them to pick you guys up." CARINA replied, "Oh, we taking American Airlines." PEREZ III responded, "Alright sounds good. Alright, bye." Case agents believe that PEREZ III asked CARINA what airline AZIA and CARINA were flying so that PEREZ III could notify SANCHEZ where to pick them up. Case agents examined the pen register data for SANCHEZ's Target Telephone 8, and observed that CARINA called SANCHEZ at 6:40 p.m. and 6:41 p.m., and SANCHEZ sent a text message to CARINA at 8:00 p.m.

426.    On July 18, 2020, at 8:01 p.m., XINA, using Target Telephone 4, called AZIA, using (414) 236-███. XINA asked, "Y'all got picked up already?" AZIA replied, "Yeah." XINA responded, "Alright. Y'all grab the luggage and everything, right?" AZIA stated, "Yup. They emptied it out already." XINA asked, "Who emptied it out?" AZIA replied, "Me and um….CARINA." XINA stated, "Alright. Did he get y'all a room?" AZIA answered, "Yeah. He got a room, too. Right next to ours." Based upon this call and the investigation, case agents believe that AZIA and CARINA traveled to California for the PEREZ III DTO and met up with SANCHEZ. Further, case agents believe that AZIA and CARINA brought U.S. currency with them for SANCHEZ on behalf of PEREZ III DTO. ("Y'all grab the luggage and everything, right?" and "They emptied it out already.").

427.    An analysis of the location data on SANCHEZ's Target Telephone 5 for July 18 through July 20, 2020, revealed that on July 18, 2020, Target Telephone 5

traveled from the Novato, California, area at approximately 5:45 p.m., and Target Telephone 5 registered near San Francisco International Airport at 6:49 p.m. At approximately 7:50 p.m., Target Telephone 5 again registered near Novato, California. Case agents believe, based on the location data, that SANCHEZ picked up AZIA and CARINA from the San Francisco International Airport and all three then returned to the Novato, California, area.

428. On July 19, 2020, at 4:12 a.m., PEREZ III called CARINA, but the monitoring station was closed so the call was not intercepted. CARINA attempted to call PEREZ III at 9:54 a.m., but no connection occurred. On July 20, 2020, case agents observed from pen register data that SANCHEZ, using Target Telephone 8, attempted to call CARINA at 12:42 p.m., and again at 12:43 p.m. CARINA called SANCHEZ back at 12:46 p.m.

429. On July 20, 2020, at 11:00 p.m., CARINA, using (414) 676-■, called PEREZ III, using Target Telephone 1. CARINA asked PEREZ III if PEREZ III was at home. PEREZ III replied that XINA was home, but her phone was dead. PEREZ III told CARINA that he "would be home in 10 minutes," and the call ended. At 11:42 p.m., PEREZ III, using Target Telephone 1, called CARINA and stated, "XINA said come back." CARINA stated, "Alright, we coming back," and the call terminated. Case agents believe that AZIA and CARINA had returned to Milwaukee and wanted to meet with PEREZ III and XINA to discuss in person the details of the meeting with SANCHEZ in California.

430.    On July 23, 2020, at 5:47 p.m., CHONG, using ████████5740, called XINA, using Target Telephone 4.  During this call CHONG stated, "Cause I just dropped off um, some money to MA."  CHONG asked, "Well, are they almost done?"  Case agents know from this call that AZIA and CARINA were manufacturing marijuana vape cartridges and XINA was waiting for them to finish to take XINA home.  XINA replied, "Yeah, I think they're only doing like one or two boxes."  As stated above, case agents believe that the term "box" refers to a 100 count quantity.

431.    On July 23, 2020, at 5:52 p.m., XINA, using Target Telephone 4, called AZIA, using (414) 236-████.  During this call, XINA asked a female (identified on the phone as "Fantazia") "Are they almost ready" and are "AZIA and CARINA, to go." Fantazia stated, "They don't wanna leave until like 8 or 9."  XINA replied, "They just said 6."  Fantazia responded, "AZIA just said 8 or 9. That's why she's over here asking HAUSENG to drop you off. CARINA wants to get these carts done."  Case agents believe that during this call, AZIA and CARINA were at MARY's residence, ████ N. 49th Street, manufacturing the marijuana vape cartridges.  CARINA, in particular, wanted to stay until 8 or 9 p.m. to finish assembling the cartridges.  Regardless of when they finished, XINA stated "I'll pay y'all on Sunday" and "So y'all don't gotta rush."  AZIA then took the phone and spoke with XINA.  AZIA stated, "But I still wanna work [U/I] and Louis."  XINA replied, "I know. But y'all don't have to rush and do it because y'all trying to rush and do it so y'all can get it over with so y'all can get paid. "I'll pay y'all once y'all get done."  Case agents believe that XINA thought AZIA and CARINA were rushing to finish assembling the required number of marijuana

213

vape cartridges so that XINA would pay them sooner. However, XINA stated that she was going to pay AZIA and CARINA on Sunday whether or not they finished that day or at a later time. ("I'll pay y'all on Sunday" and "So y'all don't gotta rush.").

**JASMINE assists PEREZ III with obtaining storage sheds, stash houses, and laundering money for the DTO.**

### Jasmine L. PEREZ

432.    Jasmine L. PEREZ (JASMINE) is an Hispanic female born on ██████ 1992. JASMINE resides at ███ S. 57th Street, West Allis, Wisconsin. This has been confirmed though investigation, surveillance, and a review of utility records. The investigation to date has revealed JASMINE is PEREZ III's sister and assists the DTO with drug and money laundering activities, as well as renting the stash house located at ███ W. Pierce Street, Apartment ███ Between March 21, 2020, and July 23, 2020, approximately 107 intercepted calls and/or text messages between JASMINE and XINA and/or PEREZ III were deemed criminal and pertinent in nature.

433.    As an example, on March 31, 2020, at 6:39 p.m., PEREZ III, using Target Telephone 1, made an outgoing call to JASMINE at (414) 731-███. PEREZ III stated, "Hey Jas." JASMINE replied, "Sup?" PEREZ III asked, "Hey, for the mortgage, um, you gonna make the payment?" JASMINE replied, "I already did. Oh yea, I got to make those other ones." PEREZ III asked, "Yeah can you make it tomorrow? Send it out." Based upon their training, experience and familiarity with the investigation, case agents believe that the payments referred to during this call relate to PEREZ III and XINA's residence at ███ S. 57th Street, West Allis,

214

Wisconsin, and also for the apartment that PEREZ III uses at ███ W. Pierce Street, ███, Milwaukee, Wisconsin, which is leased in JASMINE's name. As mentioned above, case agents believe, based upon intercepted communications and physical and remote camera surveillance, that the PEREZ III DTO used ███ W. Pierce Street, ███, as a stash location for the PEREZ III DTO.

434. On April 25, 2020, at 1:51 p.m., XINA, using Target Telephone 4, placed an outgoing call to JASMINE, using (414) 731-███. XINA asked, "Jas, how much is umm rent?" JASMINE answered, "Umm, I think is fourteen fifty-three (1,453), but let me double check upstairs right now." JASMINE continued, "I'll, yeah, I'll just text it, I got it written down in my agenda." At 1:52 p.m., XINA received an incoming text message on Target Telephone 4 from JASMINE that read, "1435$." Case agents believe that this is in reference to the monthly rent at ███ W. Pierce Street, ███, where JASMINE is listed as the tenant for the apartment.

435. On May 15, 2020, at 11:41 a.m., JASMINE, using (414) 731-███, sent a text message to PEREZ III, using Target Telephone 1, which stated, "He taxing me 25 each 1 . . . and said no more exotic pack either, its jaz btw..." Case agents believe that this text referred to a marijuana vape pen costing $25. ("He taxing me 25 each 1"). At 11:42 a.m., PEREZ III asked, "Who?" JASMINE immediately responded, "Roach (SOTO) if not he said 13 for 250 which is 19 a piece." In this text, JASMINE told her brother that SOTO charged $19 for each marijuana vape pen if JASMINE bought 13 of them. ("13 for 250 which is 19 a piece.").

436.    At 11:44 a.m., PEREZ III replied, "How many do u need? I can see if bump can look out?" Case agents believe that PEREZ III asked how many marijuana vape cartridges JASMINE needed, and that PEREZ III could ask Antonio RODRIGUEZ (a/k/a "Bump") if RODRIGUEZ had any vape cartridges. ("How many do u need? I can see if bump can look out?"). At 11:51 a.m., JASMINE replied, "10" and "Lmk." At 11:52 a.m., PEREZ III responded, "Let me ask I'll just try an give u his number for u guys can talk." Case agents believe that PEREZ III was going to contact RODRIGUEZ and ask if JASMINE could contact RODRIGUEZ directly to negotiate a cheaper price.

437.    At 11:53 a.m., in a text message JASMINE replied, "Um ok thanks but kinda doubt it tho bc I kno how grump was b4 when them carts around." Case agents believe that JASMINE told PEREZ III that JASMINE did not think RODRIGUEZ a/k/a "Grumpy" and "Bump" would negotiate the prices. ("Kinda doubt it tho bc I kno how grump was b4 when them carts around."). At 11:54 a.m., JASMINE sent an additional text, "He wasn't budging for under 18 a piece...lil irritating but all good i get my spot." Case agents believe that JASMINE contacted RODRIGUEZ for a cheaper price, but RODRIGUEZ wouldn't go any lower than $18 for each marijuana vape cartridge. ("He wasn't budging for under 18 a piece.").

438.    On May 15, 2020, at 12:12 p.m., PEREZ III, using Target Telephone 1, called JASMINE, using (414) 731-███. PEREZ III stated, "Hey, I found something that might interest you." JASMINE asked, "What?" PEREZ III answered, "So, found some, uh, some unpackaged -- some carts that don't got no packages in it. They're

216

dabwoods but they be six (6) dollars a [U/I]." Based upon their training, experience, and familiarity with the investigation, case agents believe that PEREZ III told JASMINE that PEREZ III had marijuana vape cartridges for $6 each, but they didn't come with any packaging. ("So, found some, uh, some unpackaged -- some carts that don't got no packages in it. They're dabwoods but they be six (6) dollars.") JASMINE asked, "How much?" PEREZ III replied, "Fucking five (5) dollars a [U/I]." JASMINE stated, "Hmm, I can try asking 'cause -- HAUSENG is the one that's asking. HAUSENG is the one that's asking." Case agents believe that HAUSENG was the one asking for the marijuana vape cartridges to sell and that JASMINE had to check with HAUSENG to see if HAUSENG wanted the ones without packaging. ("HAUSENG is the one that's asking."). PEREZ III stated, "Yeah, it's just -- they don't have no packages -- but I'm just waiting to see if uh -- HAUSENG will get back to me for you." JASMINE replied, "Hmmm, yeah. I'll see what he says about that 'cause I think he wants the package. I'll see what he says." PEREZ III commented, "Hey, five (5) dollars a [U/I]. He can't beat that. You tell him ten (10)." Case agents believe PEREZ III advised JASMINE that JASMINE could buy the cartridges for $5 each and sell them to HAUSENG for $10 each. This scenario would allow JASMINE to make a larger profit. ("Hey, five (5) dollars a [U/I]. He can't beat that. You tell him ten (10)").

439. On May 18, 2020, at 3:37 p.m., PEREZ III, using Target Telephone 1, received an incoming call from JASMINE, using (414) 731-███. During this call, JASMINE stated, "Hey, I wanted to ask you for, [U/I], Daisy asked for a full one,

mmm, I don't know." PEREZ III replied, "I'll talk to you when I get home." JASMINE stated, "Alright, bye." Case agents believe that "Daisy" wanted one pound of marijuana, ("Daisy asked for a full one"), but that PEREZ III didn't want to discuss this on the phone and would talk to JASMINE in person, ("I'll talk to you when I get home.").

440. On June 11, 2020, at 3:30 p.m., JASMINE, using (414) 731-███ called PEREZ III, using Target Telephone 1. During this call PEREZ III stated, "Hey, I was going to tell you, hey umm, did you renew the lease or no?" JASMINE replied, "I'm going there tomorrow for sure, for sure." PEREZ III stated, "Okay." Case agents believe that PEREZ III wanted to confirm with JASMINE that she was going to renew the lease for ███ W. Pierce Street, ███, because PEREZ III wanted to continue to use the apartment for the DTO.

### *PEREZ JR. and JASMINE lease two storage units at ███ W. Lapham Street, West Allis, Wisconsin*

441. Case agents have identified two storage units located at EZ Self Storage, ███ W. Lapham Street, West Allis, Wisconsin believed to be used by the DTO. Case agents learned that JASMINE rents storage unit ███, and PEREZ JR. is the renter of storage unit ███.

442. On June 27, at 6:23 p.m., MA, using (414) 315-███, called XINA, using Target Telephone 4. XINA stated, "I don't know what to say because he don't, he don't fucking know where the thing is at. If anything, y'all can just put it in that ███, oh, ███ (███) storage. The empty one." MA asked, "The ███, oh, ███ (███) is yours though?" XINA answered, "It was ours, but Jasmine didn't pay for it and then once

218

they open back up tomorrow, I'll just call them and tell them that we're taking it over." Case agents believe that PEREZ III and XINA assumed ownership of storage shed ███ because JASMINE never paid the outstanding bill for the storage unit. Later in the conversation, MA stated, "I mean or we could just d-- we could just drive the car back to pops' house. But Louis [U/I] to put the key, the house key on Buddy's keys and I don't see it." In the background of the conversation XINA stated to PEREZ III, "You put the house key on BUDDY's key right?" PEREZ III replied, "Yes, I did." XINA then stated to MA, "Yeah, he did, he said." In the background, XINA asked PEREZ III to identify the key. XINA stated, "It's the fuc—it's the Milwaukee Brewer one." Case agents believe that MA and Michael BUB, a/k/a Buddy, had recently moved into PEREZ JR.'s residence after PEREZ JR. reported to prison. PEREZ III had given BUB the key to the residence, which was a key bearing a Milwaukee Brewers logo. Case agents then heard BUB on the phone stating, "Oh, no, no, I never had a Milwaukee Brewer one." MA explained, "No, there's no Milwaukee Brewers on it...on these keys." The conversation continued regarding the key to the storage unit. Finally XINA stated, "I'll have the key," and agreed to meet MA and BUB at "pops house" at 420 E. Morgan. Case agents believe that XINA possessed the key to the storage unit and was going to meet BUB and MA at ███ E. Morgan Avenue to get them the key to the storage unit.

443. On July 9, 2020, at 2:29 p.m., JASMINE, using (414) 731-███, called PEREZ III, using Target Telephone 1. JASMINE asked, "What's up, bro'?" PEREZ III asked, "What's up, girl? Yeah, I was gonna tell you, um... Where is uh, hey do you

219

know dad's storage number?" JASMINE replied, "████████ (███)." PEREZ III asked, "█████████ (███), to get in?" JASMINE replied, "It's ████████████" PEREZ III repeated, "████████████████ to the gate, to get in?" PEREZ III asked, "Could you text that to me?" At 2:30 p.m., JASMINE sent a text message to PEREZ III that stated "███ Pin ████" Based upon the conversation and positional data for Target Telephone 1, case agents believe that PEREZ III was at the EZ Storage, ████ W. Lapham Street, West Allis, Wisconsin. At this time, he was searching for JASMINE's storage shed, and JASMINE provided PEREZ III with the gate access code as well as the storage shed storage shed number.

444. On July 9, 2020, at 2:53 p.m., JASMINE, using ████████7354, called PEREZ III, using Target Telephone 1. PEREZ III stated, "Uh, no, I was calling 'cause I -- what the fuck? I had to pay-- no, I had to pay the storages. What the fuck, shit bro" and "Hey, where's ██████, where's that storage at dawg?" JASMINE asked, "████?" PEREZ III replied, "Yeah, I don't see an ████." JASMINE stated, "Must be in the inside part. Try that." PEREZ III responded, "It has to be right here in front. I had to pay your storage unit." JASMINE replied, "Shit." PEREZ III commented, "It was 160.00 bucks." Case agents believe that PEREZ III was at the EZ Storage, ████ W. Lapham Street, West Allis, Wisconsin and was looking for PEREZ JR.'s storage shed, which case agents know to be unit ██████. PEREZ III also had to pay the storage fees. ("It was 160.00 bucks.").

445. On August 13, 2020, case agents served a subpoena on EZ Self Storage, ████ W. Lapham Street, West Allis, Wisconsin requesting a current customer

list. Case agents observed that JASMINE remained a current renter of storage unit ███. A review of the records by case agents further revealed that "Louis Rey Perez" is currently the renter of storage unit ███ however, the records did not specify either PEREZ JR. or PEREZ III.

### *JASMINE, PEREZ III and XINA Rent Safety Deposit Boxes*

446.   On February 2, 2019, JASMINE opened safe deposit box number ███ at Wells Fargo Bank, located at 131 West Layton Avenue in Milwaukee, Wisconsin. JASMINE is the sole lessee of the safe deposit box according to bank records obtained by case agents. Case agents obtained copies of access logs and observed that JASMINE accessed the box on the following dates: February 13, 2019, March 1, 2019, May 20, 2019, June 21, 2019, and August 29, 2019.

447.   Case agent know from bank records with Wells Fargo Bank that the safe deposit box is prepaid and rented out on an annual basis. This safe deposit box is rented by JASMINE and prepaid through February 2, 2021.

448.   On January 30, 2020, PEREZ III and XINA also opened safe deposit box number ███ at JP Morgan Chase, located at 111 East Wisconsin Avenue, Milwaukee, Wisconsin. PEREZ III and XINA are joint lessees of the safe deposit box according to bank records obtained by case agents. Case agents obtained copies of access logs and observed that PEREZ III and XINA accessed the box on January 30, 2020, and XINA accessed the box by herself on February 6, 2020.

449.    Case agent know from bank records with JP Morgan Chase that the safe deposit box is prepaid and rented out on an annual basis.  This safe deposit box is rented by PEREZ III and XINA and prepaid through January 30, 2021.

450.    On November 8, 2019, XINA opened a safe deposit box number ███ at US Bank, located at, 939 W. Historic Mitchell Street, Milwaukee, Wisconsin.  XINA is the sole lessee of the safe deposit box according to bank records obtained by case agents.  Case agents obtained copies of access logs and observed that XINA accessed the box on the following dates: November 8, 2019, November 16, 2019, November 29, 2019, December 2, 2019, December 31, 2019, January 7, 2020, January 9, 2020, and January 14, 2020. Case agent know from bank records with US Bank that the safe deposit box is prepaid and rented out on an annual basis.  This safe deposit box is rented by XINA and prepaid through November 8, 2020.

451. Based upon their training, experience, and familiarity of the investigation, case agents believe that the above-referenced safety deposit boxes and storage facilities were leased in order to conceal evidence of drug trafficking.  I further believe that these locations contain evidence of the crimes specified herein.

## V.    COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

452.    Based upon my training and experience, I know that computer hardware and software may be important to a criminal investigation in two distinct and important respects: (1) the objects themselves may be instrumentalities, fruits, or evidence of crime, and/or (2) the objects may have been used to collect and store information about crimes (in the form of electronic data).  Rule 41 of the Federal

222

Rules of Criminal Procedure permits the government to search and seize computer hardware and software which are (1) instrumentalities, fruits, or evidence of crime, or (2) storage devices for information about crime.

453.   To this end, based upon my training and experience, I know that individuals involved in drug trafficking frequently use cellular telephones to maintain contact and arrange transactions with their sources and customers of and co-conspirators in the distribution of controlled substances. I have also found it very common for crime suspects to use their cellular telephones to communicate aurally or via electronic message in "text" format with individuals whom they purchase, trade, or otherwise negotiate to obtain illegal drugs.  I also believe that it is common for crime suspects who possess illegal controlled substances and firearms to often take or cause to be taken photographs and other visual depictions of themselves, their associates, and the illegal controlled substances and firearms that they control, possess, buy, and sell.

454.   As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

223

455.   *Probable cause.* I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.      Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.      Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

456.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as

direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described

225

herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual

226

information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f. I know that when an individual uses a computer to operate a website that is used for illegal conduct, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

457. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

227

a.   The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

458.   *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

459.    Because multiple people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

460.    *Unlocking Apple brand devices:* I know based on my training and experience, as well as from information found in publicly available materials including those published by Apple, that Apple devices are used by many people in the United States, and that some models of Apple devices such as iPhones and iPads offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

   a.    If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) at the bottom center of the front of the device. In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

   b.    In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include: (1) when

229

more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time. Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; and (3) five unsuccessful attempts to unlock the device via Touch ID are made.

c.    If Touch ID enabled Apple devices are found during a search of the PREMISES, the passcode or password that would unlock such the devices are presently unknown to law enforcement. Thus, it will likely be necessary to press the finger(s) of the user(s) of any Apple device(s) found during the search of the PREMISES to the device's Touch ID sensor in an attempt to unlock the device for the purpose of executing the search authorized by this warrant. Attempting to unlock the relevant Apple device(s) via Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

d.    In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device via Touch ID, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any occupant of the premises to press their finger(s) against the Touch ID sensor of the locked Apple device(s) found during the search of the PREMISES in order to attempt to identify the device's user(s) and unlock the device(s) via Touch ID.

e.    Although I do not know which of a given user's 10 fingerprints is capable of unlocking a particular device, based on my training

230

and experience I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the Apple device(s) found in the PREMISES as described above within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

461. Due to the foregoing, I request that the Court authorize law enforcement to press the fingers (including thumbs) of individuals found at the PREMISES to the Touch ID sensor of the Apple brand device(s), such as an iPhone or iPad, found at the PREMISES for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by this warrant.

## VI. CONCLUSION

462. Based on the forgoing, I believe there is probable cause to believe that the following individuals have and are committing violations of federal law, including Title 21, United States Code, Sections 841, 843, and 846; and Title 18, United States Code, Sections 924(c), 1956(h) and 2. These individuals are: Louis R. PEREZ III, Xina YANG, Julian SANCHEZ, Miguel SARABIA, a/k/ Ali MAS, Gabriel MATTESON, Louis R. PEREZ JR., Manuel SOTO, Hauseng YANG, Antonio RODRIGUEZ, Hector ARENAS, Luis F. GOMEZ JR., Ivan GALAN, Jose A. ALVARADO, Esteban REYES, Kevin TAYLOR, Ma YANG, Mary YANG, Jasmine PEREZ, Michael BUB, Chong YANG, Michelle M. HART, Shayla KNUEPPEL, Mercedes HERBERT GONZALEZ, Ger YANG, Azia YANG, and Carina RODRIGUEZ. I further believe that there is probable to believe that located at and in the property described in Attachment A, there is evidence of drug trafficking,

231

associated firearms possession, money laundering and fruits, instrumentalities and proceeds of drug trafficking, all of which is detailed more specifically in Attachment B, Items to be Seized.

# **ATTACHMENT B**

## *Items To Be Seized*

1. Controlled substances, including but not limited to heroin, fentanyl, cocaine, or cocaine base in the form of "crack" cocaine, and marijuana, or marijuana in any form to include marijuana wax, marijuana oils, marijuana edibles, and marijuana vape cartridges;

2. Paraphernalia associated with the manufacture and distribution of controlled substances including but not limited to materials and items used for packaging, processing, diluting, weighing, and distributing controlled substances;

3. Duffel, canvas bags, suitcases, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

4. Proceeds of drug trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds from drug trafficking activities;

5. Firearms, including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, gun boxes and any and all documentation related to the purchase of such items;

6. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

7. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

8. Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, receipts, documents and other items or lists reflecting names, addresses, purchases, telephone numbers,

233

addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

9. Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

10. Cellular telephones, text messaging systems, other communication devices, and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data, as well as any records associated with such communications services used to commit drug trafficking offenses;

11. Records, items and documents reflecting travel for the purpose of participating in drug trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel;

12. Indicia of occupancy, residency or ownership of the premises, vehicles, and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys;

13. Photographs, videotapes or other depictions of assets, firearms, coconspirators, or controlled substances;

14. Computers, laptops, or other electronic storage device capable of being used to commit the violations or store any of the information described above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

234

## ATTACHMENT B

### *Items To Be Seized*

1. Paraphernalia associated with the manufacture and distribution of controlled substances including but not limited to materials and items used for packaging, processing, diluting, weighing, and distributing controlled substances;

2. Duffel, canvas bags, suitcases, safes, or other containers to hold or transport controlled substances and drug trafficking related items and proceeds;

3. Proceeds of drug trafficking activities, such as United States currency, precious metals, financial instruments, and jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds from drug trafficking activities;

4. Firearms, including pistols, handguns, shotguns, rifles, assault weapons, machine guns, magazines used to hold ammunition, silencers, components of firearms including laser sights and other components which can be used to modify firearms, ammunition and ammunition components, bulletproof vests, gun boxes and any and all documentation related to the purchase of such items;

5. Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, bank statements, safe deposit box keys and records, money containers, financial records and notes showing payment, receipt, concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances;

6. Drug or money ledgers, drug distribution or customer lists, drug supplier lists, correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed;

7. Personal telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, receipts, documents and other items or lists reflecting names, addresses, purchases, telephone numbers, addresses and communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

8. Records of off-site storage locations, including but not limited to safe deposit box keys and records, and records and receipts and rental agreements for storage facilities;

235

9. Cellular telephones, text messaging systems, other communication devices, and all electronic storage areas on the device including stored telephone numbers, recently called numbers list, text messages, digital audio and/or video recordings, pictures, settings, and any other user defined settings and/or data, as well as any records associated with such communications services used to commit drug trafficking offenses;

10. Records, items and documents reflecting travel for the purpose of participating in drug trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel;

11. Indicia of occupancy, residency or ownership of the premises, vehicles, and things described in the warrant, including utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, lease or rental agreements, addressed envelopes, escrow documents and keys;

12. Photographs, videotapes or other depictions of assets, firearms, coconspirators, or controlled substances;

13. Computers, laptops, or other electronic storage device capable of being used to commit the violations or store any of the information described above.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).